UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>  v.<br><br>DAVID SIDOO et al.,<br><br>        Defendants | No. 1:19-CR-10080-NMG |

**GAMAL ABDELAZIZ'S RESPONSE TO GOVERNMENT'S MOTION FOR HEARING REGARDING CONFLICTS OF INTEREST**

## **INTRODUCTION**

Although styled as a Motion for Hearing Regarding Conflicts of Interest ("Motion"), and represented to defendants' counsel as such during the Rule 7.1 conferral, the language of the Motion makes clear that the government is actually asking the Court to disqualify Nixon Peabody ("Nixon"), Latham & Watkins ("Latham"), and Ropes & Gray ("Ropes"). The government has simply couched the disqualification request in the language of a request for a hearing so as to make the filing appear more palatable. The Court need look no further than how the government has handled other so-called "conflicts" in this case—that is, ignoring them if a defendant pleads guilty—to realize that the government's motion here is a transparent attempt to meddle with the defendants' constitutional right to counsel of their choice.

Setting aside the purpose of the government's motion, Nixon's representation of USC in various corporate, healthcare, intellectual property, and licensing matters in California does not create a conflict of interest with the firm's representation of Mr. Abdelaziz. There is no "direct adversity" because there is no conflict between the legal rights and duties of USC and the legal rights and duties of Mr. Abdelaziz. Nor is there any material limitation on Nixon Peabody's ability to represent Mr. Abdelaziz stemming from, for instance, USC sharing confidences with Nixon about the subject matter of this case (which it has not done). To the extent there might be any conflict, it can be ameliorated by having Nevada co-counsel cross-examine any USC witnesses. Further, Mr. Abdelaziz will waive any conflict, and (to the extent it is relevant), USC has waived any conflict by executing an advance conflict waiver which it cannot now revoke.

**ARGUMENT**

I. **The Government's Suggestion of a Disqualifying Conflict of Interest is Contradicted by the Government's Treatment of at Least Five Additional Defendants**

The government's motive in seeking to disqualify Nixon, Latham, and Ropes is not to protect any potential conviction from a Sixth Amendment challenge, *see Wheat v. United States,* 486 U.S. 153 (1988), or to enforce the Rules of Professional Conduct, but rather to gain an improper litigation advantage by depriving defendants Gamal Abdelaziz, Douglas Hodge, Lori Loughlin, and Mossimo Giannulli of their constitutional right to counsel of their choice. Any argument to the contrary is undermined by the government's treatment of defendant Bruce Isackson.

Mr. Isackson is represented by the law firm of Quinn Emanuel Urqhart & Sullivan ("Quinn Emanuel"), which also currently represents the University of Southern California ("USC") in **active litigation** in the Central District of California. *See In re USC Student Health Ctr. Litig.*, No. 2:18-cv-04258 (C.D. Cal.). Defendant Isackson, like defendants Abdelaziz, Hodge, Loughlin, and Giannulli, allegedly conspired to commit mail fraud and honest services fraud for the purpose of securing his child's admission to USC. *See* Information, *United States v. Isackson,* No. 1:19-cr-10115 (D. Mass. Apr. 8, 2019), ECF 313. Therefore, under the government's theory, Quinn Emanuel is operating under the exact same supposed conflict as Nixon, Latham, and Ropes—that is, Quinn Emanuel's "simultaneous representation of U.S.C. and a defendant accused of defrauding the university poses a serious conflict." Mot. at 25.

Despite the identical "conflicts," however, the government has not moved for a hearing to inquire into Quinn Emanuel's concurrent representation of USC and Mr. Isackson. The government grudgingly acknowledges this fact in a footnote in its Motion. Mot. at 6 n.5. But if the government truly believed that concurrent representation of USC and a "USC parent" was

an actual conflict, there is no principled reason why the government would not suggest disqualifying Quinn Emanuel as it has suggested disqualifying Nixon, Ropes, and Latham. To the extent that a conflict taints a defendant's representation during trial, it also taints a defendant's plea agreement. It is black letter law that the Sixth Amendment "right to conflict-free representation extends to plea proceedings, including investigation and negotiation." *See Moore v. United States*, 950 F.2d 656, 660 (10th Cir. 1991). And defendants who plead guilty can and do challenge their convictions on the basis that the attorneys counseling them in plea negotiations were conflicted. *See, e.g.*, *United States v. Liceaga*, 45 F. Supp. 3d 133, 135 (D. Mass. 2014) (Gorton, J.) (denying post-conviction relief because defendant waived his right to conflict-free counsel both before and during the Rule 11 hearing). Indeed, a guilty plea is the ultimate example of when a defense attorney might "pull punches," convincing a client to plead guilty so as to avoid cross-examining another client.

Even more telling than the government's choice not to request a *Foster* hearing for Mr. Isackson is the government's obfuscation of when it learned of Quinn Emanuel's representation of USC. The government states only that it did not acquire such knowledge "until after Bruce Isackson executed his plea and cooperation agreements." Mot. at 6 n.5. That may be so, but Mr. Isackson's plea and cooperation agreements were signed on April 7, 2019, and the Rule 11 hearing did not take place until nearly a month later on May 1, 2019. This timeline suggests that the government was well aware of Quinn Emanuel's active representation of USC at the time Mr. Isackson's guilty plea was accepted, but did not find it necessary to inform Judge Saris of the same conflict that is supposedly disqualifying for Nixon, Latham, and Ropes.

The government's inconsistency does not end with its treatment of Mr. Isackson. If we are to indulge in both: (1) the government's dubious theory that all parents in this case were

3

involved in a **single conspiracy**; and (2) the government's repeated refrain that the universities were the victims of the conspiracy, it follows that the government should have sought disqualification of every attorney who represents both a member of the conspiracy and a "victim" of the conspiracy, regardless of which parent's child attended which university.  In its Motion, the government asserts that Nixon's, Ropes's and Latham's clients have been "specifically charged with defrauding U.S.C. by conspiring to use bribery and other forms of fraud to have their children admitted to that university as purported athletic recruits."  Mot. at 5.  But that is not true.  Instead, according to the second superseding indictment, all parents have been charged with participation in a **single conspiracy**, the goal of which was "to facilitate their children's admission to selective colleges and universities in the District of Massachusetts and elsewhere."  ECF 314 at ¶ 60.  As charged, if the universities are victims, they are victims of all of the defendants.  *See United States v. Collins*, 209 F.3d 1, 4 (1st Cir. 1999) ("In the context of a conspiracy . . . a defendant is liable in restitution to all the victims of the reasonably foreseeable acts of his co-conspirators.").

This would call into question the guilty pleas of at least four additional defendants: (1) Robert Flaxman (pled guilty to arranging for cheating on ACT exam), represented by Quinn Emanuel, which also represents USC; (2) Gordon Caplan (pled guilty to arranging for cheating on ACT exam), represented by Ropes & Gray, which also represents USC; (3) Devin Sloane (pled guilty to paying bribes for his son to be accepted to USC), represented by Morgan Lewis, which also represents Georgetown University in litigation in the District of Columbia;[1] and (4) Gregory Abbott (pled guilty to arranging for cheating on the ACT and SAT exams), represented by Mayer Brown, which also represents Georgetown University in litigation in the

---

[1]   *See Wesley v. Georgetown University*, No. 1:18-cv-02658 (D.D.C.).  The case appears to have been dismissed ten days ago.

4

District of Columbia.[2]  Of course, the government is not interested in any of these potential conflicts, because these five defendants have already pled guilty.

None of this is to suggest that attorneys for these defendants should be disqualified, or that it is even necessary for the Court to inquire into the supposed conflicts.  It is meant instead to show that Nixon, Latham, and Ropes do not have a conflict of interest, that the government's position on the matter is entirely inconsistent, that the government has only asserted conflicts when it has not been able to extract guilty pleas, and that the true purpose of the government's motion is to meddle in the non-pleading defendants' constitutional right to counsel of their choice.  *See United States v. Joyce*, 311 F. Supp. 3d 398, 403-04 (D. Mass. 2018) (Gorton, J.) ("[T]he government may not infringe upon the right to counsel of choice to gain a tactical advantage.") (citing *United States v. Diozzi*, 807 F.2d 10, 13-14 (1st Cir. 1986)).

## II. The Court's Inquiry Must Focus on Defendant's Sixth Amendment Right to Counsel

The Court's inquiry in a *Foster* hearing focuses on the defendant's Sixth Amendment right to counsel.  "[T]he trial judge must conduct some type of inquiry into the potential conflict before accepting a waiver of the defendant's right to conflict-free representation."  *See Doherty v. United States,* 948 F. Supp. 111, 116 (D. Mass. 1996).   Then, "[i]f the judge finds the defendant is making a knowing, voluntary, and intelligent waiver, the court may accept the waiver and the trial may proceed."  *Id.*  The Court is not required to accept the defendant's waiver.  However, as Judge Young has written:

> [W]here a knowing, voluntary, and intelligent waiver is made, an individual may continue to have the counsel of his choice notwithstanding the potential for a conflict of interest.  This protects the core values of the Sixth Amendment.  Any more restrictive waiver rule would infringe those values and would act as incentive

---

[2] *See Wilcox v. Georgetown University*, No. 1:18-cv-00422 (D.D.C.).

for the government to disqualify the most active and vigorous members of the defense bar . . . .

*Id.*

Disqualification is a "drastic remedy" and "should be a measure of last resort." *Joyce*, 311 F. Supp. 3d at 404 (quoting *Diozzi*, 807 F.2d at 12). Therefore, "the government bears a heavy burden of establishing that disqualification is justified." *Id.* Because the right to counsel of one's choice "reflects constitutional protection of the defendant's free choice independent of concern for the objective fairness of the proceeding," *Flanagan v. United States*, 465 U.S. 259, 268 (1984), where defense counsel is disqualified without sufficient justification, any resulting conviction will be reversed regardless of whether the defendant was otherwise prejudiced. *See Diozzi,* 807 F.2d at 16 (setting aside conviction where trial court improperly disqualified counsel of defendant's choosing); *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006) ("Where the right to be assisted by counsel of one's choice is wrongly denied, therefore, it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation.").

### III. There is No Conflict Because There is No Direct Adversity or Material Limitation

There is no direct adversity between Mr. Abdelaziz and USC, and therefore there is no conflict. As the Supreme Judicial Court has noted, "[d]irect adversity involves a conflict between the **legal rights and duties of clients**." *Bryan Corp. v. Abrano*, 474 Mass. 504, 513 (2016) (emphasis added). *See also Maling v. Finnegan, Henderson, Farabow, Garrett & Dunner, LLP*, 473 Mass. 336 (2016). Here, there is no conflict between Mr. Abdelaziz's **legal rights** and USC's **legal rights**. Although USC presumably has a general interest (shared by the public) in bringing wrongdoers to justice, Mr. Abdelaziz has only been accused—not convicted—of participation in a conspiracy in which USC was one of many alleged victims. The general interest of USC in seeing all members of the conspiracy brought to justice is not a **legal**

6

**right** or **legal interest** of USC's.  *See State v. Ehlers*, 631 N.W.2d 471, 483 (Neb. 2001) ("Although a witness may have some personal interest in the outcome of a criminal trial, he or she is not a party to the action and does not have standing to intervene as a party to the action . . . .  Instead, it is the State's interests that are directly at issue."); *United States v. Driscoll*, No. 94-10153-RCL, 1994 WL 549504, at *5 (D. Mass. Oct. 4, 1994) ("[D]iscomfort alone is insufficient to tip the scale against the presumption under the Sixth Amendment favoring the defendant's choice of counsel.").

The only **legal right** the government has suggested USC might have would be in future restitution proceedings, should any of the defendants actually be convicted.  Mot. at 22.  At this time, however, USC's entitlement to restitution from Mr. Abdelaziz is speculative.  If necessary, there is no reason that Nevada co-counsel could not adequately represent Mr. Abdelaziz in post-trial restitution proceedings as a means of ensuring that Mr. Abdelaziz is able to exercise his constitutional right to counsel of his choice during trial.  *See United States v. Moreno*, 132 F. Supp. 3d 265, 272 (D.P.R. 2015) (noting that none of government's arguments supporting disqualification "suffice to warrant the measure of last resort").

The government is correct that some courts have held that clients do not necessarily have to be parties to the same litigation for there to be direct adversity.  Although that is certainly the paradigmatic example of direct adversity, *see Bryan Corp*, 474 Mass. at 505 (referring to rule 1.7's "prohibition against the simultaneous representation of adverse **parties**") (emphasis added), in some instances courts have considered witnesses to be "directly adverse" to litigants.  The cases that the government cites for this proposition, however, are far afield from any adversity between USC and Mr. Abdelaziz.

For instance, in *United States v. Arias*, 351 F. Supp. 3d 198 (D. Mass. 2019), the court disqualified an attorney from representing a defendant accused of selling heroin when the attorney also represented, and intended to cross-examine, the primary prosecution witness—the individual who bought the heroin from the defendant. It goes without saying that the government's comparison between USC and a cooperating witness in a hand-to-hand drug case makes no sense. Here, unlike in *Arias*, USC witnesses would testify only to background matters. Because no USC employee interacted with Mr. Abdelaziz in the context of this case, no USC witness will be able to discuss the specifics of Mr. Abdelaziz's alleged participation in the charged conspiracy. *See, e.g.*, *United States v. Morrell-Corrada*, 343 F. Supp. 2d 80, 85 (D.P.R. 2004) (denying motion to disqualify and noting, "[u]nder these circumstances, where there is no showing that Mr. X can link defendant to the conspiracy alleged in the indictment, the Court cannot find that his anticipated testimony will be materially adverse.");[3] *United States v. Mazzone*, No. CR. A. 99-0363-06, 2000 WL 1790115, at *2 (E.D. Pa. Dec. 7, 2000) (denying motion to disqualify where attorney concurrently represented defendant and witness who could provide only background information and "no eyewitness testimony involving [defendant] or his codefendants on any predicate act or substantive act").

The government's second case, *In re Cendant Corp. Secs. Litig.*, 124 F. Supp. 2d 235 (D.N.J. 2000), fares no better. *In re Cendant* was a civil matter that did not implicate any constitutional interests. There, the court prevented a law firm from simultaneously representing a cross-claimant and a defense witness in the exact same litigation. The law firm had proposed that one set of its lawyers would serve as cross-claimant's counsel and another set of its lawyers

---

[3] The court explained: "The government's argument that Mr. X's testimony could corroborate the testimony of others who have direct evidence against defendant also fails to establish the direct adversity vis-à-vis defendant. At most, Mr. X's testimony could be generally adverse, and that falls far short of the direct adversity required under Model Rule 1.9." *Morrell-Corrada*, 343 F. Supp. 2d at 85 (citations omitted).

8

would serve as the witness's counsel, which would include assisting in responding to discovery requests from their colleagues who served as cross-claimant's counsel. Further, the witness at issue was a "key" witness, and had shared privileged and confidential information with the law firm regarding the subject matter of the lawsuit. Here, on the other hand, Nixon Peabody does not represent USC in this proceeding, and USC has not shared any information about this case with any Nixon Peabody attorney.[4]

Just as there is no "direct adversity," *see* Mass. Rule of Prof'l Conduct 1.7(a)(1), there is also no "significant risk that the representation of one or more clients will be materially limited by [Nixon Peabody's] responsibilities to another client," Rule 1.7(a)(2). In particular, there is no risk that Nixon Peabody's representation of Mr. Abdelaziz will be limited by the Firm's responsibility to maintain USC's client confidences. *See Commonwealth v. Cousin*, 478 Mass. 608, 620-21 (2018) ("An attorney may be materially limited by having acquired privileged information which inhibits him in his representation of the defendant."). Because the subject matter of Nixon Peabody's representation of USC has absolutely nothing to do with the firm's representation of Mr. Abdelaziz, there is no conceivable way in which Nixon Peabody would find itself in the dilemma of needing to share information with Mr. Abdelaziz, or use information to defend him, but be unable to do so pursuant to Rule 1.6 (regarding client confidences).[5] *See*

---

[4]   As a prophylactic measure, Nixon Peabody has instituted a screen between attorneys working on USC matters and attorneys working on Mr. Abdelaziz's matter. With respect to Boise Schiller, which simultaneously represents both a cooperating witness and a defendant in this matter, the government has suggested that a screen may be sufficient to resolve the conflict. *See* Mot. at 13-14. The government has made no attempt to explain why a screen might be sufficient where Boise Schiller represents both a cooperating witness and a defendant **in the same case** but not with respect to Nixon Peabody, which represents USC in matters having absolutely nothing to do with this litigation. *See State v. McKinley*, 860 N.W.2d 874, 882 (Iowa 2015) ("[C]oncurrent representation of a defendant and a witness on unrelated matters by separate attorneys from the same private law firm did not meet the material limitation standard when counsel for the defendant did not personally represent the witness, had no knowledge of the witness's confidential information, and had taken measures to screen himself from the law firm's personnel and files with such information.").

[5]   Far from being "**irrelevant**" that the matters in which Nixon, Ropes, and Latham represent USC are unrelated to this case, see Mot. at 22-23, it is **highly relevant** that the subject matters of the representations are different. The

*id*. at 622 ("[Attorney's] representation of [civil litigant] did not create an actual conflict of interest because there is no indication that [attorney] acquired confidential information from [civil litigant] that materially limited his representation of [defendant].").

Further, any suggestion that Nixon Peabody would somehow let future business generation opportunities "materially limit" its independent judgement in advising Mr. Abdelaziz is contradicted by the First Circuit's presumption that "the lawyer will subordinate his pecuniary interests and honor his primary professional responsibility to his clients in the matter at hand." *Bucuvalas v. United States*, 98 F.3d 652, 656 (1st Cir. 1996). To the extent there is any residual limitation (even just a potential limitation) on Nixon Peabody's ability to represent Mr. Abdelaziz, the limitation can be remedied by having Nevada co-counsel, unaffiliated with Nixon Peabody, cross-examine any USC witness, as explained below.

## IV. Co-Counsel's Questioning of Any USC Witness Will Resolve Any Perceived Conflict

Without citation to authority, the government claims that co-counsel's questioning of any USC witness is insufficient to resolve any perceived conflict between USC and Mr. Abdelaziz.[6] The government is incorrect. Courts regularly permit co-counsel to cross-examine current or former clients in criminal matters so as to avoid depriving defendants of their Sixth Amendment

---

four cases the government relies on for the proposition that the subject matter of the representation is irrelevant are all civil cases in which the same law firm represented (albeit not in the same litigation) both the plaintiff and the defendant, or parties that would become plaintiff and defendant. In particular, the government relies on a Nebraska Supreme Court case for this proposition. But as the Nebraska Supreme Court has stated, "because a criminal defendant has a Sixth Amendment interest in representation by the counsel of his or her choice, irrebuttable presumptions that we have applied in favor of disqualification in civil cases cannot be applied in a criminal case." *State v. Ehlers*, 631 N.W.2d 471, 476 (Neb. 2001). Here, Nixon, Ropes, and Latham are not representing "opposite sides of the v" because the case against the defendants is brought by the United States, not USC. Of course, Nixon, Ropes, and Latham do not represent the United States in any matter.

[6]   The government argues that defense counsel's proposal to "disclaim . . . critical lines of potential defense, or [to] agree to hand them off to conflict counsel without any involvement from the rest of the defense team or any plan for whether and, if so, how they fit into an overall defense strategy" is an unworkable solution. Mot. at 24. To be clear, Nixon Peabody has never offered this solution to the perceived conflict. Nixon Peabody has committed only that it will not cross-examine any USC witness at trial. No further restriction on Nixon Peabody's representation of Mr. Abdelaziz is necessary.

10

right to counsel of their choice. For instance, in a case in which the Seventh Circuit found that a convicted defendant's attorney had been erroneously disqualified because the attorney also represented a potential witness, Judge Easterbook noted that co-counsel cross-examining the witness was the preferred solution that should have been instituted by the trial court. *See Rodriguez v. Chandler*, 382 F.3d 670, 673 (7th Cir. 2004) ("Having co-counsel cross-examine [the witness] would have eliminated all risks; and this easy solution . . . makes it unreasonable for the state to have denied [Defendant] the benefit of [attorney's] services.").

Although in certain instances having co-counsel examine a client may be insufficient, here, co-counsel ameliorates the perceived conflict for the following reasons: (1) Nixon Peabody's representations of USC are completely unrelated to the subject matter of this case; (2) no Nixon Peabody attorney knows any confidential USC information about this case which he or she could convey to co-counsel; (3) the attorneys working on Mr. Abdelaziz's case have never worked for USC and do not know any privileged or confidential information about USC— whether related to this case or any other case involving USC; (4) no potential USC witness interacted with Mr. Abdelaziz in the context of this case; and (5) any USC witness would be a representative of the institutional client, not an individual who is personally represented by Nixon Peabody in any matter.

Two cases are informative. First, in *United States v. Lorenza-Cordon,* 125 F. Supp. 3d 129 (D.D.C. 2015), the court found that a lawyer need not be disqualified where co-counsel would cross-examine a witness who was the lawyer's current client. The court noted that in cases where co-counsel cross-examining the client was **not** an adequate solution, "the conflicted attorney knew the nature of the likely witness testimony because the attorney was involved in discussions regarding the transactions at issue in those particular cases. As a result, the courts in

11

those cases had to count on the conflicted attorney keeping the information he or she received from the witness separate from any information obtained from the defendant." *Id.* at 136. Unlike those cases, the lawyer in *Lorenza-Cordon,* like the Nixon Peabody attorneys here, did "not need to separate out the information he has about the witness' testimony because he does not know this information." *Id.*

Second, in *United States v. Georgievski*, No. 2:12-cr-00004-APG-GWF, 2015 WL 3378453 (D. Nev. May 22, 2015), the court found that disqualification was not warranted when the defendant's attorney's law partner represented a cooperating witness. There, the cooperating witness had no information specific to the defendant, and the defendant's attorney had no relevant information about the cooperating witness. The Court reasoned:

> [T]here is no indication that [cooperating witness] has personal knowledge of Defendant[s] alleged participation in the crimes charged in the indictment. Instead, the Government may call [cooperating witness] to testify more generally about the existence of the Carder.su organization or conspiracy, and how it functioned. Although an attorney's conflict of interest is imputed to other attorneys in the same law firm, *see* Rule 1.7 of the Nevada Rules of Professional Conduct, [defendant's attorney] has not had any direct attorney-client relationship with [cooperating witness] through which he has acquired confidential information that might be exploited if [cooperating witness] testifies at trial. The Court accepts the representations of [defendant's attorney] and [cooperating witness's attorney] that they have not shared confidences regarding their respective clients. This case does not involve the same degree of conflicted representation that exists where the attorney has actually represented the co-defendant or witness and acquired confidential information that could be used on behalf of the client he currently represents. To the extent additional protection is required, the Court can follow the suggestion in *Turner* that separate counsel be appointed to cross-examine [cooperating witness].

*Id.* at *7. Similarly, here, any USC witness would testify only on background matters. Because no USC witness interacted with Mr. Abdelaziz in the context of this case, there is no risk that a USC witness would testify about his or her personal recollection of Mr. Abdelaziz's actions.

12

Further, as noted, the Nixon Peabody attorneys who are working on Mr. Abdelaziz's case have never done any work for USC and have no confidential information about USC.

### V. To the Extent the Court Finds a Potential Conflict, Mr. Abdelaziz is Prepared to Waive the Conflict

To the extent the Court finds there is an actual or potential conflict of interest, Mr. Abdelaziz is prepared to engage in a colloquy with the Court to waive the conflict. Mr. Abdelaziz has consulted with an attorney outside of Nixon Peabody (Nevada co-counsel Don Campbell) regarding the purported conflict and has already executed a waiver that confirms his understanding of the firm's simultaneous representation of USC. Mr. Abdelaziz does not object to other Nixon Peabody attorneys' representation of USC in various unrelated matters and wishes to exercise his constitutional right to employ counsel of his choosing, the undersigned Nixon Peabody attorneys, to defend the serious charges the government has leveled against him.

Mr. Abdelaziz's knowing and voluntary waiver is adequate for the Court to find that undersigned counsel can continue to represent Mr. Abdelaziz in these proceedings. *See United States v. Perez*, 325 F.3d 115, 125 (2d Cir. 2003) ("Where the right to counsel of choice conflicts with the right to an attorney of undivided loyalty, the choice as to which right is to take precedence must generally be left to the defendant and not be dictated by the government."); *United States v. Chavushpour,* 968 F.2d 21 (10th Cir. 1992) (rejecting habeas challenge where client knowingly waived his lawyer's concurrent representation of the key government witness against him); *Silva v. United States*, 75 F. Supp. 2d 877, 881 (N.D. Ill. 1999) (same with respect to potential witness).

### VI. To the Extent it is Relevant to the Court's Inquiry, and to the Extent There is a Conflict, USC has Waived the Conflict

Although the government is insistent that Nixon, Ropes, and Latham should be disqualified because USC declined to waive any conflict, for Sixth Amendment purposes it is the

waiver of the defendant, not USC, that is determinative.  This principle was illustrated in a recent case in the Southern District of New York.  In *United States v. Zarrab*, No. 15-cr-867 (RMB), 2017 WL 946334 (S.D.N.Y. Feb. 15, 2017), the government moved to disqualify Kirkland & Ellis from representing a defendant charged with illegally channeling money to Iran through various banks, including eight banks that were Kirkland's current clients.  Bank employees were expected to testify at the defendant's trial, some of Kirkland's bank representations related to the same subject matter as the defendant's case, and the government asserted that the banks were the "victims" of the defendant's fraud.  Although seven of the banks agreed to waive any conflicts stemming from Kirkland's representation of the defendant, crucially one of the banks refused to do so.  *Id.* at *1.  Nonetheless, because the defendant "knowingly and voluntarily and rationally waived potential conflicts," the court denied the government's motion to disqualify Kirkland.[7]  *Id.* at *3.

In a similar case from the Southern District of West Virginia, the court declined to disqualify a defendant's attorney where an attorney from the same firm had previously represented the "key witness" against the defendant in a related matter.  Significantly, the "key witness" did not waive the perceived conflict, and—unlike in this case where there is no suggestion that USC violated any criminal law—the two clients were "effectively attempting to pin criminal responsibility upon each other."  *See United States v. White Buck Coal Co.*, No. 2:06-00114, 2007 WL 130322 (S.D.W.V. Jan. 16, 2007).

Mr. Abdelaziz need not rely on the *Zarrab* and *White Buck Coal* cases, however, because at least with respect to Nixon, USC **did** waive any conflict arising from Nixon's representation

---

[7] As relevant to section I, *supra*, the Southern District of New York found that "while there are several potential conflicts, there does not appear to be an actual conflict." *Zarrab*, 2017 WL 946334 at *3.

14

of Mr. Abdelaziz.[8] *See United States v. Lundstrom,* No. 4:14-cr-3136, 2015 WL 5881898 (D. Neb. Oct. 7, 2015) (declining to disqualify counsel where advance waivers existed for two former clients and the defendant waived conflicts). Specifically, on August 31, 2016, the General Counsel of USC executed an engagement letter with Nixon which stated:

> This firm is a general service law firm that you recognize has represented, now represents, and will continue to represent numerous clients (including without limitation your debtors, creditors, and direct competitors), nationally and internationally, over a wide range of industries and businesses and in a wide variety of matters. Given this, without a binding conflicts waiver, conflicts of interest might arise that could deprive you or other clients of the right to select this firm as their counsel.
>
> Thus, as an integral part of the engagement, you agree that this firm may, now or in the future, represent other entities or persons, including in litigation, adversely to you or any affiliate on matters that are not substantially related to (a) the legal services that this firm has rendered, is rendering, or in the future will render to you under the engagement and (b) other legal services that this firm has rendered, is rendering, or in the future will render to you or any affiliate (an "Allowed Adverse Representation").
>
> You also agree that you will not, for yourself or any other entity or person, assert that either (a) this firm's representation of you or any affiliate in any past, present, or future matter or (b) this firm's actual, or possible, possession of confidential information belonging to you or any affiliate is a basis to disqualify this firm from representing another entity or person in any Allowed Adverse Representation. You further agree that any Allowed Adverse Representation does not breach any duty that this firm owes to you or any affiliate.

Advance waivers of this type are regularly entered into by law firms and sophisticated clients, *see Max-Planck v. Whitehead Inst. For Biomedical Research*, 850 F. Supp. 2d 317, 324-25 (D. Mass. 2011) ("It is not uncommon for parties, especially sophisticated ones, to prospectively waive legal conflicts of interest by agreement."), and are enforced by the courts. *See, e.g.*, *Galderma Labs., L.P. v. Actavis Mid Atlantic LLC*, 927 F. Supp. 2d 390 (N.D. Tex. 2013); *Simpson Strong-Tie Co., Inc. v.*

---

[8] Any argument that the conflict is unwaivable is controverted by the government's treatment of Sidley Austin LLP, which represents defendant William McGlashan. Mr. McGlashan is alleged to have "agreed with Singer to pay an amount, ultimately totaling $250,000, to facilitate his son's admission to USC as a purported football recruit." ECF 314 at ¶ 222. Undersigned counsel understands that USC is a current client of Sidley Austin LLP but that USC has told the government that it has waived what it perceives as a conflict between McGlashan and USC. The government has apparently decided not to pursue the matter further, indicating that the government does not understand that it is the waiver of the defendant that is most crucial, not a non-party who perceives there to be a conflict.

*Oz-Post Int'l, LLC*, No. 3:18-cv-01188-WHO, 2018 WL 3956430 (N.D. Cal. Aug. 17, 2018). *See also* ABA Formal Op. 05-436. The government has offered no authority explaining why USC's waiver was invalid when entered into.

The government's only argument is that USC has "revoked" its waiver and that the supposed "revocation" precludes Nixon from representing Mr. Abdelaziz. This argument is based on a misreading of the Massachusetts Rules of Professional Conduct. Comment 21 to Rule 1.7 (which the government quotes) states that a client may, in certain circumstances, revoke consent to a conflicted representation, but the comment also makes clear that the client must terminate **its own** representation in order to do so. The comment reads:

> A client who has given consent to a conflict may revoke the consent and, like any other client, may terminate the lawyer's representation at any time. Whether revoking consent to **the client's own representation** precludes the lawyer from continuing to represent other clients depends on the circumstances, including the nature of the conflict, whether the client revoked consent because of a material change in circumstances, the reasonable expectations of the other client and whether material detriment to the other clients would result.

Rule 1.7, cmt. 21 (emphasis added). So as to avoid acknowledging the weakness of its position, the government begins quoting comment 21 to Rule 1.7 **after** the words "**the client's own representation**." *See* Mot. at 25. *See also* Restatement (Third) of the Law Governing Lawyers § 122 cmt. f. ("Revoking consent to the client's own representation, however, does not necessarily prevent the lawyer from continuing to represent other clients who had been jointly represented along with the revoking client."). The government is aware that Nixon **currently** represents both USC and Mr. Abdelaziz, which it asserts is the very conflict at issue. The invocation of "revocation," therefore, is largely beside the point.

The government's argument also ignores the fact that if clients could revoke advance waivers at any time they did not want their attorneys to undertake a particular representation, there would be

16

no utility whatsoever to the advance waivers. The "material change" referenced in the comment, for instance, could occur when consent has been granted for a particular joint representation and the joint clients' interests suddenly become directly adverse. *See* Restatement (Third) of the Law Governing Lawyers § 122 cmt. f. In the case of general advance waivers, however, it is almost impossible to speak of a "material change in circumstance," since the client has agreed to waive unknown conflicts. *Cf. id.*, illustration 7 (where Client A provides advance waiver of all conflicts in unrelated matters, and Client B later sues Client A in an unrelated matter, Client A cannot revoke its consent).

Nonetheless, Mr. Abdelaziz respectfully submits that the Court need not inquire long into the applicability of USC's advance waiver or break new ground in the law of advance waivers. The "court may rely on counsel's representations that no such conflict exists." *United States v. Santiago-Lugo*, 167 F.3d 81, 84 (1st Cir. 1999). Further, while determining the intricacies of advance waivers might be an appropriate undertaking in a civil case, in this context the Court should be satisfied that an advance waiver exists and that, more importantly, the defendant has waived any perceived conflict. *Cf. United States v. O'Malley*, 786 F.2d 786, 789 (7th Cir. 1986) ("A separate line of cases addresses a criminal defendant's right to the counsel of his choice. Unlike a civil defendant, a criminal defendant's choice of his counsel is protected by the sixth amendment . . . . Given the weight of the defendant's constitutional right to the counsel of his choice . . . we refuse to apply to a criminal case the holdings in the civil cases cited above by the government."); *United States v. Cellini*, 596 F. Supp. 2d 1194, 1197 (N.D. Ill. 2009) (denying disqualification of counsel for witnesses who did not waive conflicts and noting, "[w]hile the rules may be universal in application, they are not enforced the same way in criminal cases").

## CONCLUSION

For the foregoing reasons, Mr. Abdelaziz respectfully requests the Court permit him to continue his engagement of Nixon Peabody to defend him in these proceedings. Mr. Abdelaziz is available to appear at a hearing and make any waiver on the record that the Court deems appropriate.

Dated: June 27, 2019

Respectfully submitted,

GAMAL ABDELAZIZ

By his attorneys,

*/s/ Brian T. Kelly*
Brian T. Kelly (BBO No. 549566)
Joshua C. Sharp (BBO No. 681439)
NIXON PEABODY LLP
53 State Street
Boston, MA 02109
617-345-1000
bkelly@nixonpeabody.com
jsharp@nixonpeabody.com

Donald J. Campbell (*pro hac vice*)
CAMPBELL & WILLIAMS
700 S 7th Street
Las Vegas, NV 89101
702-382-5222
djc@cwlawlv.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the forgoing was filed electronically on June 27, 2019, and thereby delivered by electronic means to all registered participants as identified on the Notice of Electronic Filing.

*/s/ Joshua C. Sharp*
Joshua C. Sharp