UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Criminal No. 19-10080-NMG

UNITED STATES OF AMERICA

v.

GAMAL ABDELAZIZ

## ORDER RE CONFLICT OF INTEREST

KELLEY, U.S.M.J.

I.      Introduction.

The government moved for a hearing pursuant to *United States v. Foster*, 469 F.2d 1, 5 (1st Cir. 1972) and Federal Rule of Criminal Procedure 44(c), to address potential conflicts of interest with regard to the representation of Gamal Abdelaziz by the law firm of Nixon Peabody LLP ("Nixon"). (#400.) Nixon represented John Vandemoer in a related case, 19-cr-10079-RWZ, who pled guilty and has been sentenced. In addition, Nixon represents the University of Southern California ("USC"), which the government alleges to be a victim in this case, in unrelated matters.

Mr. Abdelaziz is charged with conspiracy to commit mail and wire fraud and honest services mail and wire fraud, in violation of 18 U.S.C. § 1349, conspiracy to commit federal programs bribery, in violation of 18 U.S.C. § 371, and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). (#732, fourth superseding indictment.) The government alleges that he

defrauded USC when he agreed with a college admissions consultant, Rick Singer, who is charged in a related case, 19-cr-10078-RWZ, to bribe an administrator to have his child admitted to USC.

Mr. Abdelaziz filed a response to the government's motion, the government replied, and Mr. Abdelaziz filed a sur-reply. (##444, 460, 485.) On July 23, 2019, the court held a hearing on the government's motion. (#491.) Mr. Abdelaziz then filed an ex parte and sealed response (#510-1) to the court's order (#493) that Mr. Abdelaziz file a supplemental memorandum concerning compliance with Rule 1.7 of the Massachusetts Rules of Professional Conduct. Recently, the parties submitted further briefing. (##811, 812.)

II.    The Hearing.

At the hearing on July 23, 2019, Attorney Brian Kelly argued that the conflicts of interest with Mr. Vandemoer and USC are not fatal to Nixon's representation of Mr. Abdelaziz. (#506, transcript of hearing.) He stated that USC, represented by Nixon in California on matters having nothing to do with this case,[1] has informed Nixon that it objects to Nixon's representation of Mr. Abdelaziz. *Id*. at 12–13.[2] He argued that USC had in fact consented to the representation of Mr. Abdelaziz, however, because when USC engaged Nixon to represent it in California, the general counsel for USC signed a conflict waiver on August 31, 2016, consenting to Nixon's prospective "adverse representation" of other clients under certain circumstances.[3] *Id*. at 17–18.

---

[1] Attorney Kelly described the California matters as involving "corporate healthcare, intellectual property matters, totally unrelated to this [case]." (#506 at 12–13.)

[2] Apparently, attorneys from Gibson Dunn, who have entered appearances for USC in this case, also told the government that they object to Nixon's representation of Mr. Abdelaziz. (#506 at 10.)

[3] The conflicts waiver is set out at length at #444 at 16 and is discussed in detail *infra*.

Attorney Kelly represented that the firm has instituted an ethical screen such that the two teams representing Mr. Abdelaziz and USC are unable to access each other's documents or discuss anything pertaining to the representation of the clients.[4] *Id*. at 13. Further, Mr. Abdelaziz has retained counsel not affiliated with Nixon, Attorney Donald J. Campbell of Campbell & Williams, a law firm located in Nevada, who will cross-examine any witness from USC at trial. *Id*. at 14–15.[5]

Mr. Abdelaziz was present at the hearing and heard the lengthy discussion of the potential problems posed by Nixon's joint representation of him, Mr. Vandemoer, and USC. *Id*. at 4–27. In a colloquy with Mr. Abdelaziz, the court explained to him that Mr. Vandemoer might be called as a witness against him. *Id*. at 24–25. The court further informed him that when a defendant and a witness are represented by the same counsel, conflicts could affect the quality of the defendant's representation. *Id*. at 26–27. The court informed Mr. Abdelaziz that witnesses from USC will appear at his trial and will provide direct evidence of his guilt. *Id*. at 25–26. The court described

---

[4] Although Attorney Kelly did not go into further detail at the hearing concerning the overlap between the California matters and this case, in a pleading, Nixon stated that "the attorneys working on Mr. Abdelaziz's case have never worked for USC and do not know any privileged or confidential information about USC—whether related to this case or any other case involving USC[,]" "no potential USC witness interacted with Mr. Abdelaziz in the context of this case[,]" and "any USC witness [at Mr. Abdelaziz's trial] would be a representative of the institutional client, not an individual who is personally represented by Nixon Peabody in any matter." (#444 at 12.)

[5] Nixon made clear in a pleading that, while Attorney Campbell will cross-examine any USC witnesses at trial, in its view, "[n]o further restriction on Nixon Peabody's representation of Mr. Abdelaziz is necessary." (#444 at 11 n.5.) This assertion is muddied by Nixon's further comment that Attorney Campbell might seek discovery from USC in the future (#510-1 at 4 n.1), suggesting that Nixon concedes that it would not be appropriate for Nixon to do so. In any event, for purposes of this order, the court assumes that Nixon agrees that it will not participate in cross-examination of USC witnesses or seek discovery from USC, but Nixon intends to participate in all other parts of the case concerning USC, including strategizing concerning USC and mentioning USC in its opening statement and closing argument. *Id*.

potential issues that could arise from the joint representation, including warning him that there could be "problems with the lawyers at Nixon Peabody attacking USC," and explaining that his legal team would be bifurcated in some respects. *Id.* at 26–27. The court also stressed that, although Mr. Kelly stated that he was confident that any conflicts would not affect Mr. Abdelaziz's defense, there is no way for anyone to know whether that is true, as unforeseen issues could arise in the future. *Id.*

Mr. Abdelaziz acknowledged that he is aware of the risks concerning his attorneys' representation of him, that he is aware that he is entitled to be represented by independent counsel, and that present counsel have discussed the matter with him. *Id.* at 28–29.

Notwithstanding the conflicts of interest in the case, Mr. Abdelaziz chose to be represented by present counsel, *id.* at 29, and he signed a waiver. (#492.) The court took the matter under advisement. (#491.)

III.     The Conflict with Mr. Vandemoer.

Mr. Vandemoer was the sailing coach at Stanford University, and was charged with taking $610,000 in bribes from Rick Singer to admit students. (#506 at 5.) In July 2019, when the hearing with Mr. Abdelaziz was held, Mr. Vandemoer already had pled guilty and been sentenced. The government conceded that any conflict with Mr. Vandemoer "is a completely waivable issue." *Id.* at 12. Even though Mr. Abdelaziz never had any contact with Mr. Vandemoer, Mr. Vandemoer was a coach and Mr. Abdelaziz is a parent, and they were charged with crimes pertaining to different schools, the government's theory is that they were in the same conspiracy. Therefore, there is the potential for the government to call Mr. Vandemoer as a witness at trial against Mr. Abdelaziz, to testify generally about the conspiracy. *Id.* at 4. It appears, however, that this is a remote possibility. Mr. Kelly confirmed that "there's nothing to indicate that Mr. Vandemoer is a

cooperating witness for the government in any way," *id*. at 12, and the government apparently does not plan to call him as a witness.

The court finds that, at least at this time, the conflict with Nixon's representation of Mr. Abdelaziz and Mr. Vandemoer may be waived and that Mr. Abdelaziz's waiver of that conflict is knowing and voluntary, and the court accepts the waiver. Of course, should circumstances change, for example, if the government decides to call Mr. Vandemoer as a witness against Mr. Abdelaziz, the government shall notify the court immediately and the court will revisit this issue.

IV.    The Conflict with USC.

The conflict with USC poses a more difficult question. The Sixth Amendment's guarantee of the right of a criminal defendant to have the assistance of counsel includes "the right to have an attorney of one's own choosing." *United States v. Laureano-Perez*, 797 F.3d 45, 55 (1st Cir. 2015) (quoting *United States v. Lanoue*, 137 F.3d 656, 663 (1st Cir. 1998)). A criminal defendant has a right to have counsel without any conflict represent him, *United States v. Ponzo*, 853 F.3d 558, 574 (1st Cir. 2017), but he may waive that right if the court finds that the waiver is knowing and voluntary, that the conflict in question is not so severe that it is contrary to "the ethical standards of the profession," and that the circumstances are such that "legal proceedings appear fair to all who observe them." *Wheat v. United States*, 486 U.S. 153, 160 (1988).

The erroneous deprivation of the Sixth Amendment right to counsel of choice "unquestionably qualifies as 'structural error,'" so that when defense counsel is disqualified without sufficient justification, any resulting conviction will be reversed, even if the defendant was not otherwise prejudiced. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148, 150 (2006) ("Where the right to be assisted by counsel of one's choice is wrongly denied, therefore, it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation.") The

court is therefore mindful that attorney disqualification is a drastic remedy that "should be a measure of last resort." *United States v. Joyce*, 311 F. Supp.3d 398, 404 (D. Mass. 2018) (quoting *Fonten Corp. v. Ocean Spray Cranberries, Inc.*, 496 F.3d 18, 23 (1st Cir. 2006), and *United States v. Diozzi*, 807 F.2d 10, 12 (1st Cir. 1986)).

In deciding whether there is a conflict, and if so, whether it can be waived, the court is guided by the Massachusetts Rules of Professional Conduct.[6] Rule 1.7, concerning conflicts of interest, provides:

> (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
> (1) the representation of one client will be directly adverse to another client; or
> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.
>
> (b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:
> (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
> (2) the representation is not prohibited by law;
> (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and
> (4) each affected client gives informed consent, confirmed in writing.

Mass. R. Prof. C. 1.7.

Here, a concurrent conflict of interest exists under the "direct adversity" prong of the Rule, 1.7(a)(1), because USC is the alleged victim in this case and witnesses from USC undoubtedly will testify at trial to assist the government in trying to establish Mr. Abdelaziz's guilt. A comment to the Rule addresses this situation: "[A] directly adverse conflict may arise when a lawyer is

---

[6] Under Local Rule 83.6.1, attorneys practicing in this district must comply with the ethical requirements embodied in the Rules.

required to cross-examine a client who appears as a witness in a lawsuit involving another client, as when the testimony will be damaging to the client who is represented in the lawsuit." Mass. R. Prof. C. 1.7 cmt 6. Here, USC is not only an adverse witness, it is the alleged victim in the matter, and in addition to testifying for the government, if Mr. Abdelaziz is convicted, USC will have the rights accorded to it under 18 U.S.C. § 3771(a)(4) to address the court at sentencing and to describe the harm that the defendants' conduct caused.[7]

At the hearing, counsel for Mr. Abdelaziz downplayed the importance of USC witnesses in the case against him, *see, e.g.*, #506 at 12–17, but USC will almost certainly be adverse to all defendants at trial whose cases involve admissions at the school. It is apparent, from other defendants' filings seeking documents from USC and the government, that other defendants are attempting to establish that the university was not only aware of, but sanctioned, its employees' taking money from defendants and advocating for the admission of their children, that the university encouraged Rick Singer's involvement in the admissions process, and that any misrepresentations the defendants made with falsified athletic credentials were not material to admission. *See, e.g.*, #703 (Mr. McGlashen, a parent, seeks "evidence that USC was not the victim of fraud," especially evidence showing that USC was familiar with Rick Singer and his methods of getting students admitted to USC); #801 (Mr. Zangrillo, a parent, sets out theory that "USC is not a victim of any money or property fraud, having instead welcomed donations and the admission of non-athletes supported by the Athletic Department"); #805 (Mr. Wilson, a parent, seeks to

---

[7] The government previously argued that USC would be entitled to restitution, *see* #460 at 2 n.2, but the government has stated at subsequent hearings that in fact, USC will not seek restitution from the defendants. *See also United States v. Jeffrey Bizzack*, 19-cr-10222-DPW, #30, Victim Impact Statement of USC (related case in which USC stated that with regard to Mr. Bizzack, it had been harmed by expending "significant out-of-pocket costs in addressing this matter" and had "dedicated valuable employee time and other resources to this matter").

contradict "the government's theory that USC was defrauded into admitting Wilson's son" or that any misrepresentations were material).

It is equally apparent to this court, which has presided over efforts by defendants to subpoena documents from UCS pursuant to Federal Rule of Criminal Procedure 17(c), and has studied the government's response to defendants' motions for discovery, that USC is contesting the assertions by counsel about its admissions practices. *See, e.g.*, #736 at 32–33, 37. Thus, one reasonably can anticipate that USC witnesses will not be friendly to the defendants.

Of course, it is possible that Mr. Abdelaziz's defense will differ from his codefendants'. However, a motion for discovery that Mr. Abdelaziz has filed suggests strongly that his defense will include asserting that his daughter was legitimately admitted to USC, notwithstanding the fact that her application contained false athletic credentials, and that Mr. Abdelaziz intended for the money he paid, which the government alleges was a bribe to an administrator at USC, Donna Heinel, to be a donation to the school. (##648 at 3–5; 670 at 2–3.) Therefore, the court is skeptical of counsel's assertions that USC witnesses will be "relatively trivial," and will only "discuss protocols and that sort of thing," (#506 at 14), and rejects Mr. Abdelaziz's argument that these witnesses will be so unimportant to his case that there is no direct adversity with USC. (#444 at 10.)

It appears that any disadvantage stemming from the concurrent conflict will accrue to Mr. Abdelaziz, not USC. The court credits Nixon's assertion that Mr. Abdelaziz's attorneys know nothing about USC through Nixon's representation of USC that would assist them in his defense (#444 at 12), and there is the potential for attorneys from Nixon to have a financial interest in currying favor with, and gaining additional business from, USC. (#812 at 7.) One might wonder, as the government does, if counsel's repeated insistence that USC is unimportant to Mr.

Abdelaziz's case indicates that counsel is "abandoning a defense strategy that other, highly-skilled counsel seem to think will benefit their clients, based on his own unwillingness to be in an openly adverse posture to his firm's client[.]" (#811 at 3.) The issue, then, boils down to whether Mr. Abdelaziz may waive the conflict, and whether the waiver he made after the hearing was knowing and voluntary.

There are certain conflicts that are so problematic that they cannot be waived. *Wheat*, 486 U.S. at 159 ("[T]he essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.") Given what the court knows at this stage, the conflict here is not of the sort that mandates disqualification. *See United States v. Arias*, 351 F. Supp.3d 198, 201 (D. Mass. 2019) (disqualifying attorney with "serious" concurrent conflict of interest who represented both criminal defendant and cooperating witness who would testify against defendant at trial, where attorney represented witness in effort to have prior conviction overturned, which conviction could have been used to impeach him at trial). Therefore, it is up to Mr. Abdelaziz whether to waive the conflict. *See United States v. Perez*, 325 F.3d 115, 125 (2d Cir. 2003) ("Where the right to counsel of choice conflicts with the right to an attorney of undivided loyalty, the choice as to which right is to take precedence must generally be left to the defendant and not be dictated by the government.")

With regard to whether Mr. Abdelaziz's waiver is knowing and voluntary, the court considers first, that Mr. Abdelaziz is a highly successful businessman who formerly served as a senior executive of a resort and casino operator in Macau, China, and previously held other senior executive positions in the hotel and casino industries. *See* 19-mj-06087-MPK, #3-3 ¶ 180. In other words, the court presumes he is capable of comprehending the issues here and making an informed

decision. He consulted with outside counsel, Attorney Campbell, who has "been a lawyer for 40 years" and "was the chairman of Nevada's board of disciplinary matters for a couple of years" (#506 at 14–15), about these issues before deciding to waive the conflict. (#444 at 14.) At the hearing, Mr. Abdelaziz was present for the arguments of counsel, which included the court's pressing Mr. Kelly about his nonchalant attitude toward USC witnesses at trial.[8] Mr. Abdelaziz then engaged in a colloquy with the court in which he readily answered questions and appeared clearly to understand everything he was asked. (#506 at 28–29.) As the government acknowledged at the hearing, taking everything into account, Mr. Abdelaziz "can definitely waive the conflict." *Id.* at 22–23. The court finds that Mr. Abdelaziz understands and accepts the risks of having Nixon attorneys represent both him and USC, and knowingly and voluntarily waived that conflict.

Whether Mr. Abdelaziz properly waived the conflict is not the end of the matter, however, because there remains the question whether USC has consented to the conflict under 1.7(b)(4).[9] Nixon argues that USC already has consented for the purposes of the Rule, because it executed a binding waiver of potential conflicts in an engagement letter two years before this case, signed by the general counsel of USC. (#444 at 16.) The waiver states by way of preamble that Nixon represents numerous clients, "nationally and internationally, over a wide range of industries and businesses and in a wide variety of matters." *Id.* It continues:

> Thus, as an integral part of the engagement, you agree that this firm may, now or in the future, represent other entities or persons, including in litigation, adversely to you or any affiliate on matters that are not substantially related to (a) the legal

---

[8] For example, the court asked Mr. Kelly whether he would be able to "go after USC since they're also your client" (#506 at 19), and later said to him, "I do wonder if you're underplaying and underestimating the problems with USC. That's what I'm worried about." *Id.* at 22.

[9] Given that the court finds that USC has consented to Nixon's representation of Mr. Abdelaziz, the court need not address Mr. Abdelaziz's close exegesis of Rule 1.7, at the end of which he concludes that USC's consent is not required under Rule 1.7(b)(4). (#812 at 6–9.)

services that this firm has rendered, is rendering, or in the future will render to you under the engagement and (b) other legal services that this firm has rendered, is rendering, or in the future will render to you or any affiliate (an "Allowed Adverse Representation").

You also agree that you will not, for yourself or any other entity or person, assert that either (a) this firm's representation of you or any affiliate in any past, present, or future matter or (b) this firm's actual, or possible, possession of confidential information belonging to you or any affiliate is a basis to disqualify this firm from representing another entity or person in any Allowed Adverse Representation. You further agree that any Allowed Adverse Representation does not breach any duty that this firm owes to you or any affiliate.

*Id.*

The government argues that the court should conduct an inquiry into whether USC gave informed consent before determining the waiver's applicability here. (#460 at 9.) The court declines to do so. In plain language, the waiver states that USC agrees that Nixon may represent a person in litigation adversely to USC, on matters that are not substantially related to the legal services rendered to USC, and that USC will not assert that Nixon's representation of USC is a basis to disqualify Nixon from representing that person. That is the situation here. "It is not uncommon for parties, especially sophisticated ones, to prospectively waive legal conflicts of interest by agreement." *Max-Planck v. Whitehead Inst. For Biomedical Research*, 850 F. Supp.2d 317, 324–25 (D. Mass. 2011) (citations omitted). That is precisely what USC, a sophisticated party, did in executing a binding conflicts waiver with Nixon, signed by its general counsel.

Mr. Abdelaziz raised the issue of the waiver in June 2019 in a public pleading. (#444 at 15–16.) Experienced counsel from the law firm of Gibson Dunn, in Los Angeles, California, and experienced local counsel from Hogan Lovells US LLP, entered appearances in this case for USC many months ago. They have filed numerous pleadings, have appeared before this court twice for argument, and have vigorously and skillfully advocated for USC concerning documents defendants are seeking from USC. *See, e.g.*, ##657, 667, 668, 694, 700. USC has not filed anything

concerning Nixon's conflict. The court knows no reason, and apparently neither does the government or Nixon, why UCS might consider the conflicts waiver to be invalid. USC's objection to Nixon's representation is baffling, given that another defendant, William McGlashan, is represented by Sidley Austin LLP, which the court understands also represents USC in an unrelated matter, and USC has informed Mr. McGlashan and the government that it does not object to Sidley Austin's representation. (#444 at 16 n.8.)

In conclusion, the court finds that Mr. Abdelaziz's waiver is permissible under the circumstances here, it is knowing and voluntary, and the court accepts it. Nixon may continue to represent Mr. Abdelaziz under the terms stated in note 3, *supra*. The court finds that USC consented to the conflict by executing the waiver.

Counsel shall immediately notify the court should counsel become aware of new information bearing on the question of joint representation.

                      ___/s/ Page Kelley_____
                      PAGE KELLEY
                      UNITED STATES MAGISTRATE JUDGE

February 10, 2020