UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal No.: 19-10080-NMG |
| | ) |
| ELISABETH KIMMEL *et al.*, | ) |
| | ) |
| | ) |
| Defendants | ) |

**GOVERNMENT'S MOTION *IN LIMINE*
TO PRECLUDE ENTRAPMENT DEFENSE**

The government respectfully submits this motion *in limine* to preclude the defendants from asserting an entrapment defense or raising entrapment (or similar terms) before the jury.

**I.    RELEVANT BACKGROUND**

The Court is familiar with the factual background of this case. Accordingly, the government summarizes here only key allegations relevant to this motion.

**A.    Gamal Abdelaziz**

Beginning in 2017, defendant Gamal Abdelaziz agreed with William "Rick" Singer to pay approximately $300,000 to secure his daughter's admission to the University of Southern California ("USC") as a purported basketball recruit, even though Abdelaziz's daughter did not play basketball during her junior or senior years in high school and did not make her high school's varsity basketball team. *See* Fourth Superseding Indictment ("FSI") ¶¶ 114–22. In October 2017, USC athletics administrator Donna Heinel presented Abdelaziz's daughter to the USC subcommittee for athletic admissions using a falsified basketball "profile" that Singer had sent to Abdelaziz. *Id.* at ¶ 119. Shortly after Abdelaziz's daughter was accepted to USC as a purported basketball recruit, Abdelaziz wired $300,000 to Singer's sham non-profit entity, the Key Worldwide Foundation ("KWF"). *Id.* at ¶ 120. Singer thereafter made monthly installment

payments to Heinel of $20,000.  *Id.* at ¶¶ 120–21.  Several months later, after Singer began cooperating with law enforcement, Abdelaziz made several inculpatory statements about his participation in the scheme during consensually recorded phone calls with Singer.  *See* Dkt. 3-3 at ¶ 192; FSI ¶ 122.

### B.     Elisabeth Kimmel

As the Court previously noted, defendant Elisabeth Kimmel is alleged to have "participated in the side-door scheme twice, once in 2012 to secure admission for her daughter to Georgetown University as a purported tennis recruit and once in 2017 to secure admission for her son to USC as a purported track and field athlete."  Dkt. 1334 at 13.  Ultimately, from 2012 to early 2018, she is alleged to have paid Singer approximately $525,000 to secure the admission of her children to college as recruited athletes for sports they did not play.  FSI ¶¶ 165–81.  During a July 2018 call intercepted pursuant to a Court-authorized wiretap of Singer's phone, Kimmel made inculpatory statements.  *See, e.g.*, *id.* at ¶ 181.  Later, after Singer began cooperating with law enforcement, Kimmel made additional inculpatory statements during phone calls that Singer consensually recorded.  *See, e.g.*, Dkt. 3-4 at ¶¶ 376–78.

### C.     Marci Palatella

The indictment alleges that defendant Marci Palatella engaged in both the side-door and test-cheating aspects of the scheme in order to secure her son's admission to USC.  *See* FSI ¶¶ 210–24.  In 2017, Palatella paid Singer $75,000 to arrange for Mark Riddell to pose as a proctor for her son's SAT exam and correct his answers.  *Id.* at ¶¶ 210–16.  In December 2017, after Heinel presented Palatella's son for admission as a football recruit based on falsified credentials, Palatella mailed Heinel a $100,000 check payable to the USC Women's Athletic Board, and in May 2018, after Palatella's son received a formal acceptance letter, Palatella caused her company to wire

$400,000 to KWF. *Id.* at ¶¶ 221–22. After Singer became a cooperating witness, Palatella made several inculpatory statements about her participation in the scheme during consensually recorded phone calls. *See, e.g., id.* at ¶ 223; Dkt. 3-4 at ¶ 348.

### D.      John Wilson

Beginning in 2013, defendant John Wilson agreed to pay Singer an amount totaling $220,000 to secure his son's admission to USC as a purported water polo recruit. FSI ¶¶ 225–30. He made those payments after telling Singer that, "[o]bviously his skill level may be below the other freshmen," and asking, "[w]ould the other kids know [my son] was a bench warmer side door person?" Dkt. 3-4 at ¶ 292.

In September 2018, before Singer began cooperating with law enforcement, Wilson contacted Singer to inquire about additional "side door" opportunities for his twin daughters. Dkt. 3-4 at ¶ 304. On the call, which was intercepted over the wiretap, Wilson first asked, "Does it have to be a sports side door?" *Id.* He then asked Singer, "What if they're not really that good? I mean, they can do some crew, but I don't know they're gonna be good. [One daughter's] not even that good competitively at sailing. She just taught sailing and did sailing in, you know . . . yacht club." *Id.*

The following month, Singer – by this point acting at the direction of law enforcement – provided Wilson with potential side door opportunities, noting that Wilson's daughters "don't have to play. They just--that's the path I'm gonna get 'em in on," to which Wilson responded, "Gotcha." *Id.* at ¶ 305. Wilson indicated that he wanted to pursue "side doors" for his daughters at Stanford and Harvard, and two days later, his company wired $500,000 to an account in the name of Singer's non-profit. FSI ¶¶ 239–41. Later that month, Singer told Wilson that he would use the $500,000 to secure a "side door" deal for one of Wilson's daughters with the Stanford sailing coach, John

Vandemoer, in a deal that was hidden from Stanford:

> Singer: So essentially if you're--I want you to have first dibs, like I told you. So if you want I can provide John Vandemoer--which I'm going to essentially send John directly the check, to the coach, I can send him your [$]500,000 that you wired into my account to secure the spot for one of your girls. I asked him for a second spot in sailing and he said he can't do that because he has to actually recruit some real sailors so that Stanford doesn't--
>
> Wilson: [Laughter]
>
> Singer: --catch on.
>
> Wilson: Right.
>
> Singer: Okay. So--
>
> Wilson: Yeah, no. He's got to--
>
> Singer: --Stanford--
>
> Wilson: actually have some sailors. Yeah.
>
> Singer: Yeah. So that Stanford doesn't catch on to what he's doing.
>
> Wilson: Right.

Dkt. 3-4 at ¶ 308. A month later, Singer, at the direction of law enforcement agents, told Wilson that he had secured an admissions spot at Harvard through a "senior women's administrator," and that in exchange for a $500,000 payment to her, as well as a subsequent payment, the administrator would falsely designate one of Wilson's daughter as an athletic recruit. FSI ¶ 243. Shortly thereafter, Wilson caused his company to wire another $500,000 to an account in the name of KWF. *Id.* at ¶ 244.

## II.     ARGUMENT

In pre-trial briefing, the defendants have repeatedly used the term "entrapment," contending, for example, that the consensual recordings Singer made at the government's direction "were orchestrated to entrap defendants by having them acquiesce to false inculpatory statements."

4

Dkt. 972 at 35. In making this claim, the defendants have relied in part on notes Singer took during the early days of his cooperation – at a time when he had not fully accepted responsibility for his crime, and was obstructing the government's investigation – when he suggested that the investigating agents wanted "to nail" another target of the government's investigation and "to entrap him." But as this Court has already concluded, Singer's statement "was 1) made before Singer was fully cooperative with the government; 2) relative (primarily) to a sting operation involving parents not yet committed to Singer's 'program'; and 3) insofar as it did relate to future calls to be made to defendants, was in response to the agents' efforts to get Singer to corroborate, not fabricate, evidence." Dkt. 1169 at 7. And, of course, Singer's use of the term "entrap" was colloquial. Indeed, the inculpatory statements the defendants made during the consensual calls with Singer were – with the exception of Wilson's calls, discussed further below – exclusively about *past* bribe payments, fake athletic profiles, and test-cheating, as well as about lies the defendants were prepared to tell to cover up what they had done.

Accordingly, the defendants cannot proffer evidence supporting an entrapment defense, and they should be precluded from presenting evidence or argument regarding entrapment or ensnarement, and from otherwise suggesting that the government sought to "trap" the defendants.[1] To allow otherwise would permit the defendants to improperly appeal to juror sympathies and seek acquittal – not because they were legally entrapped – but because the jury disapproves of the manner in which evidence of the defendants' knowledge and intent was collected. *See, e.g.*, *United States v. Tajeddini*, 996 F.2d 1278, 1285 (1st Cir. 1993) ("[A]rgument which is intended to appeal to emotions rather than to reason is improper.").

---

[1] Ensnare or ensnarement often appear as synonyms for entrap or entrapment. *See United States v. Cortes-Caban*, 691 F.3d 1, 20–21 & n.20 (1st Cir. 2012); *United States v. Rios-Calderon*, 80 F.3d 194, 197 (7th Cir. 1996).

A. **Applicable Law**

Entrapment is an affirmative defense that hinges on two elements: (i) that the government induced the defendant to commit the crime; and (ii) that the defendant was not predisposed to commit the crime. *United States v. Vasco*, 564 F.3d 12, 18 (1st Cir. 2009). For an entrapment defense to be considered by the jury, the "defendant must adduce some hard evidence" that would lead a reasonable person to conclude that both of those elements existed. *Id.*; *see also United States v. Diaz-Maldonado*, 727 F.3d 130, 136 (1st Cir. 2013) (explaining that the evidence to satisfy these twin burdens must be admissible). This burden "requires more than self-serving assertions." *United States v. Shinderman*, 515 F.3d 5, 14 (1st Cir. 2008).

Where a defendant fails to adduce sufficient admissible evidence pre-trial showing that he was induced and not predisposed, he should be precluded from referring to entrapment in his opening statement. *See United States v. DeAraujo*, No. 19-10210-NMG, 2020 WL 5793358, at *1 (D. Mass. Sept. 25, 2020) (Gorton, J.) (granting government's motion to preclude defendant from referring to entrapment in his opening statement). Accordingly, "the entrapment defense is a difficult defense to [even] raise," much less "prevail on." *Diaz-Maldonado*, 727 F.3d at 139.

As to inducement, the First Circuit "accept[s] sting operations as an important tool of law enforcement" because the law "expect[s] innocent persons to decline such opportunities in the absence of some additional importuning by the government." *Id.* at 137; *see United States v. Gendron*, 18 F.3d 955, 961 (1st Cir. 1994) ("It is proper (*i.e.*, not an 'inducement') for the government to use a 'sting,' at least where it amounts to providing a defendant with an 'opportunity' to commit a crime."). Indeed, "[i]t is well settled that mere solicitation cannot be equated with entrapment, and . . . entrapment does not arise just because government agents resort to pretense." *United States v. Coady*, 809 F.2d 119, 122 (1st Cir. 1987). As explained by the First

6

Circuit in *Gendron*, the types of conduct that courts have found might rise to the level of inducement are sparse, such as where agents:

> (1) used "intimidation" and "threats" against a defendant's family; (2) called every day, "began threatening" the defendant, and were belligerent; (3) engaged in a "forceful" solicitation and "dogged" insistence until [defendant] "capitulated"; (4) played upon defendant's sympathy for informant's common narcotics experience and withdrawal symptoms; (5) played upon sentiment on "one former war buddy . . . for another" to get liquor (during prohibition); (6) used "repeated suggestions which succeeded only when defendant had lost his job and needed money for his family's food and rent"; (7) told defendant that she (the agent) was suicidal and in desperate need of money.

*Gendron*, 18 F.3d at 960; *see also United States v. Acosta*, 67 F.3d 334, 337 (1st Cir. 1995) ("There is no better means of getting a sense of what the courts have regarded as improper inducement than the . . . list of cases and parentheticals set forth in the *Gendron* opinion."). For example, the First Circuit has affirmed a district court's preclusion of a defendant from offering an entrapment defense during his opening statement even where a government agent repeatedly "actively solicited" the defendant to participate in a drug transaction and the defendant initially declined. *Diaz-Maldonado*, 727 F.3d at 137–38.

Predisposition, in turn, requires consideration of "how the defendant likely would have reacted to an ordinary opportunity to commit the crime." *Gendron*, 18 F.3d at 962. Prior criminal conduct "can easily be relevant to this assessment." *United States v. Santiago*, 566 F.3d 65, 72 (1st Cir. 2009); *see also United States v. Van Horn*, 277 F.3d 48, 57 (1st Cir. 2002) (prior bad acts are "highly probative" in evaluating predisposition). Other "[f]actors to be weighed in making this determination include:

> (1) [defendant]'s character or reputation; (2) whether the initial suggestion to commit the crime was made by the government; (3) whether [defendant] was engaged in criminal activity for profit; (4) whether he showed reluctance to commit the offense, which was overcome by governmental persuasion; and (5) the nature of such persuasion or inducement."

*United States v. Tom*, 330 F.3d 83, 90 (1st Cir. 2003); *see also United States v. Montoya*, 844 F.3d

63, 69 (1st Cir. 2016) (finding predisposition where defendant "frequently initiated contact" with the cooperator). Further, "[p]redisposition can be shown where a defendant 'promptly avail[s]' himself of a government-provided opportunity to commit a crime." *Tom*, 330 F.3d at 90.

### B. Analysis

The defendants should be precluded from arguing entrapment to the jury, or from otherwise suggesting it during opening statements (including through the use of synonymous terms), because they cannot meet their threshold burden of proffering evidence of improper inducement and lack of predisposition.

As an initial matter, the government did not solicit any of the defendants to participate in Singer's scheme. Rather, all four defendants are alleged to have conspired with Singer to secure their children's admission to college as fake athletic recruits long before Singer became a cooperating witness in late 2018. The telephone calls Singer consensually recorded with the defendants *after* he became a cooperating witness in late 2018 are simply additional evidence of their intent in *previously* entering into a criminal conspiracy.

Nor did the government solicit Wilson to pursue the side door scheme again for his daughters in 2018. Rather, *Wilson contacted Singer* in September 2018 – *before* Singer began cooperating with the government – to inquire about potential side-door opportunities for his daughters. After Singer became a cooperating witness, he merely provided Wilson with the opportunity to commit the crime Wilson had already asked him about – and which Wilson had previously committed for his son. *See Gendron*, 18 F.3d at 961. For these same reasons, Wilson cannot establish lack of predisposition.

Under such circumstances, permitting the defendants to plant the seed of "entrapment" or "ensnarement" in jurors' minds risks confusing or misleading the jury. That is particularly so

8

because, although entrapment is a legal term of art, *Hampton v. United States*, 425 U.S. 484, 492 n.2 (1976) (Powell, J., concurring), it is commonly understood (as Singer apparently understood it) as simply "the laying of a 'trap'" – an investigative technique that, without more, is not improper, *Cross v. United States*, 347 F.2d 327, 331 (8th Cir. 1965). *See also United States v. Abdullah*, No. 98-4906, 2000 WL 690248, at *3 (4th Cir. May 26, 2000) (where defense contended, in opening, that government "trapped" defendant, district court did not err in instructing jury that entrapment was not an issue, because entrapment "is not necessarily understood in its legal sense . . . [and] an instruction was necessary to prevent the possibility that the jury would improperly conclude that [the defendant] had been entrapped"). Allowing the defendants to raise, or hint, at entrapment would, accordingly, prejudice the government by forcing it to address an issue that is not properly before the jury, or risk having the jury ruminate on its own about whether the defendants were entrapped. It would also invite jury nullification, by encouraging the jury to act out of sympathy for the defendants or distaste for the government's investigative techniques.

### III.   CONCLUSION

For the foregoing reasons, the Court should preclude the defendants from asserting an entrapment defense or raising the issue of entrapment before the jury.

Respectfully submitted,

NATHANIEL R. MENDELL
Acting United States Attorney

By: */s/ Ian J. Stearns*
JUSTIN D. O'CONNELL
KRISTEN A. KEARNEY
LESLIE A. WRIGHT
STEPHEN E. FRANK
IAN J. STEARNS
Assistant United States Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants .

                                          */s/ Ian J. Stearns*
                                          IAN J. STEARNS
                                          Assistant United States Attorney