**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

UNITED STATES OF AMERICA

v.

GREGORY COLBURN, et al.,

Defendants.

Cr. No. 19-10080-NMG

**Redacted Version of Sealed Filing**

Leave to File Under Seal Granted September 27, 2021, in ECF 2277

**DEFENDANTS' OFFER OF PROOF FOR**
**EVIDENCE EXCLUDED IN THE EXAMINATION OF REBECCA CHASSIN**

Defendants Gamal Abdelaziz and John Wilson should be able to defend themselves when a Government witness provides false testimony regarding material issues. Under the Federal Rules of Evidence and controlling First Circuit precedent, Defendants have a right to introduce evidence on cross-examination that will impeach a witness' false representations and provide the jury with the truth.

Rebecca Chassin's recent testimony before this Court was demonstrably false on several material issues. Yet, during cross-examination, the Court severely restricted Defendants' introduction of evidence, denying the admission of nine pieces of evidence and advising that further efforts to admit similar evidence would be futile. The evidence that Defendants sought to admit during cross-examination of Chassin—a USC employee testifying about the USC admission department's policies, practices, and knowledge—was documentary evidence created by USC employees, including correspondence from Chassin, correspondence on which she was a recipient, and correspondence between her admission department colleagues. This evidence would have shown that Chassin made false statements when testifying as to both her own knowledge and the views and practices of others at USC. Impeachment by extrinsic evidence was appropriate because

the issues were material, relating to the issue of how USC defined the "honest services" of its coaches and administrators.

Further, the evidence was not hearsay and was independently admissible. The following offer of proof demonstrates that Defendants had and have a right to introduce this evidence and that the jury must have the opportunity to hear it.

## I. In accordance with the Government's strategy, Chassin's testimony included false statements—by Chassin and non-testifying declarants—on material issues.

Chassin made affirmative representations on direct and cross-examination that were demonstrably false.[1] This was due, in large part, to the fact that Chassin's testimony extended beyond her own knowledge. She repeatedly testified on behalf of other groups of people, purporting to present the knowledge and beliefs of USC's entire admission department and Subco.[2] When asked by counsel, Chassin confirmed that her representations also included the views of specific USC employees: Timothy Brunold and Kirk Brennan.[3] Chassin, however, did not have

---

[1] *E.g.*, Trial Tr. dated Sept. 21, 2021 at 34:23-25 ("There were folks who were of interest to the Athletic Advancement Office, but [Pat Haden] didn't have a separate [VIP] list.").

[2] *E.g.*, Trial Tr. dated Sept. 20, 2021 at 127:2 ("Because *we* don't offer admission in exchange for money.") (emphasis added); Trial Tr. dated Sept. 21, 2021 at 100:20-22, 101:2-3 ("The work of the SUBCO was to consider students for athletic talent alone. . . . that is the expectations that all of the members of the office of admission have around what happens at SUBCO."). Chassin repeated similar remarks almost like a mantra throughout her testimony.

[3] Chassin's testimony left no doubt that she was providing the views of entire USC departments and USC employees who were not testifying:

> Q. Okay. You said earlier, "We don't make offers of admission in exchange for money." Do you recall saying that earlier today?
> A. Yes.
> Q. Who is the "we" you're referring to?
> A. The Office of Undergraduate Admission.
> Q. So -- and you're referring to yourself, correct?
> A. I'm referring to the authority that the Office of Undergraduate Admission has in making admission decisions.
> Q. Okay. So that would include Tim Brunold, correct?
> A. Yes.

Trial Tr. dated Sept. 21, 2021 at 52:17-53:1-7; *see also* Trial Tr. dated Sept. 21, 2021 at 54:2-55:5:

> A. The Athletics Subcommittee is for athletic talent only, so that's the only thing that would be considered in that process. . . .
> Q. What? Did Coach Vavic tell you that?
> A. That was the expectation of SUBCO. It was very clear.

the requisite information to express accurately the views of USC's entire admission department, Subco, Brunold, and Brennan.[4] She neither knew it at relevant times nor was she informed of it before she testified on behalf of Brunold, others, and the entire "Subco". Certainly, there are witnesses who have sufficient information and involvement to provide truthful testimony on the topics and on behalf of the groups and individuals Chassin covered in her testimony. The Government chose not call these witnesses,[5] and that is no doubt a strategic choice. Brunold, Chassin's supervisor, whose views, conduct, and knowledge she claimed to present in her trial testimony, previously submitted an affidavit making strikingly similar claims to those Chassin provided:

> The Admission Department has no involvement with respect to donations or potential donations. The Admission Department does not track donations by an applicant's family. Information concerning donations by an applicant's family is not included in an applicant's file.[6]

---

Q. Well, you say that expectation of SUBCO was very clear. Did they give a written statement to Coach Vavic about that?
A. I don't know.
Q. Okay. You're not aware of any written guidance given by SUBCO in 2014 to Coach Vavic saying you cannot consider a donation when looking at a walk-on candidate, correct?
A. If we believe that was the basis for a coach recruiting a student, it would not have been appropriate for it to be in SUBCO.
Q. Okay. You said, "we." Are you including Tim Brunold in the "we" that you're talking about?
A. The Office of Admissions, yes, including Tim Brunold.

[4] *E.g.*, Trial Tr. dated Sept, 21, 2021 at 12:16-18, 16:15-24 (advising she is "not aware" of how inclusion on the VIP list affects odds of admission); *id*. at 29:11-12 ("I'm just not familiar with how the coaches manage their rosters."); *id.* at 35:9-13 (admitting Brunold never discussed the athletic department's VIP list with her); *id*. at 36:3-12, 46:12-24 (explaining she does not know the workings of the athletic department's fundraising office); *id*. at 45:8-17 (confirming she was unaware Brennan had met with Abdelaziz' daughter on a recruiting trip); *id*. at 53:21-54:5 (providing that she does not know whether there were rules, written or otherwise, in the athletic department establishing criteria for presenting applicants through Subco); *id*. at 56:10-12 (answering affirmatively that "she had no idea what Tim Brunold and Pat Haden discussed by e-mail and telephone calls about fundraising and SUBCO"); *id*. at 58:23-59:5 (confirming that she "wouldn't know anything about" how often the athletic department provided Haden's VIP list to Brunold and that she had never seen the list).

[5] The University of Southern California continually seeks to quash Defendants' trial subpoenas to many of these individuals.

[6] Declaration of Timothy Brunold in Support of Non-Party University of Southern California's Motion to Quash at 2, United States v. Colburn et al, No. 1:19-CR-10080-NMG (D. Mass. Aug. 29, 2019), ECF 532-3.

The above-quoted portion of Brunold's affidavit was not specific to students noted as VIP candidates; it presented a broad and unqualified view applicable to all USC applicants. And it is this broad view, restated by Chassin, that Magistrate Judge Kelley found to be wholly incredible and unsupported by the documentary evidence available:



Putting a witness on the stand who does not know all of the contrary evidence, and allowing them to testify for those who do, does not make their testimony truthful. Chassin's actual or feigned ignorance (apparently the reason why the Government chose her as a witness) contributed to the falsity of her testimony. The Defendants had and have every right to rebut her misrepresentations by introducing contradictory evidence. The Government possessed numerous documents that contradict Chassin's testimony, indicating this stratagem was not unintentional.

## II. The Court compounded the harm of Chassin's false testimony by allowing Defendants to impeach only Chassin and limiting the introduction of evidence to selective and inadequate opportunities to refresh Chassin's recollection.

Under the Federal Rules of Evidence, a party is entitled to do more than attempt to help an adverse witness remember that she is wrong. Refreshing recollection is neither exclusively a means of impeachment, *see* Fed. R. Evid. 612, nor the only permissible way to impeach, *e.g.*,

[7] Tr. of Motion Hearing at 27-28, United States v. Colburn et al, No. 1:19-CR-10080-NMG (D. Mass. Nov. 26, 2019), ECF 673.

Fed. R. Evid. 613. When a witness makes false or inaccurate statements in her testimony, the opposing party may impeach the witness by contradicting her statements, regardless of whether the witness is willing to testify that she remembers her lie or error. *United States v. Perez-Perez*, 72 F.3d 224, 227 (1st Cir. 1995) ("Impeachment by *contradiction* is a recognized mode of impeachment. . . ."). Further, when the false statement is made about a material issue—one relating to elements of a claim or defense—a party may accomplish impeachment by introducing extrinsic evidence on cross-examination. 1 McCormick On Evid. § 49 (8th ed.) (advising that "when the matter is not collateral, extrinsic evidence may be introduced to dispute the witness's testimony on direct examination or cross"). Moreover, impeachment is not limited to the testifying witness. When the testifying witness includes the purported statements of others in her own testimony, the opposing party may also impeach those non-testifying declarants. Fed. R. Evid. 806. Finally, evidence used for impeachment purposes may also be introduced by a party as substantive evidence if it is relevant and admissible. *See* Fed. R. Evid. 402.

This Court erred when it refused to allow the introduction of Defendants' extrinsic evidence for impeachment and substantive purposes. By testifying not just to her own views but also the views of others, Chassin opened the door for impeachment on multiple levels. Defendants had the right to impeach Chassin for any false statements she made, and it was appropriate for Defendants to impeach the non-testifying declarants whose views she repeatedly expressed during her testimony—for instance, Brunold. Defendants could not properly impeach Chassin or the non-testifying declarants whose views Chassin expressed to the jury because the Court improperly limited Defendants' introduction of evidence relating to Chassin's false statements. This Court instructed that Defendants were only allowed to impeach Chassin by

attempting to refresh her recollection,[8] barred the presentation of evidence impeaching the declarants whose views Chassin introduced through her testimony,[9] and refused to allow the Defendants to introduce any substantive evidence. These rulings deprived Defendants of their right to impeach and to present their defense. Limiting the Defendants to refreshing Chassin's recollection was a denial of their right to introduce evidence, as Chassin was not merely suffering from lapses of memory but making entirely false statements.

## III. The evidence offered by Defendants was appropriate impeachment because it demonstrated that the testimony of Chassin and non-testifying declarants was false on material issues and there were independent grounds for its admission.

Defendants attempted to introduce nine pieces of evidence to impeach Chassin and support their defense. But the Court denied the introduction of this evidence. Each piece of rejected evidence (1) was offered for a proper impeachment purpose, pertaining directly to a door opened by Chassin's testimony or a hearsay declarant whose statements Chassin introduced; (2) concerned a material issue, relating to witness credibility or the crucial issue of the honest services owed to USC; and (3) was independently admissible. Defendants offer the following proof for the evidence the Court wrongly excluded:

- ***Exhibit 1116***: This exhibit is an email exchange between USC employees Alex Garfio and Donna Heinel and an attachment—the Subco admission spreadsheet for 2013-2014. Chassin's testimony on direct included claims about the grades and scores of students admitted through the Subco,[10] and the statement that Wilsons' son was "a less competitive student academically."[11] Chassin also claimed that athletic ability was the sole consideration for Subco admission.[12] Defense counsel was entitled to impeach Chassin on (1) the competitiveness of Wilson's son and (2) the claim that the only possible

[8] Trial Tr. dated Sept. 21, 2021 at 95:2-5 ("You can present it to her and ask her the preliminary question is: Did you testify X, Y, and Z, and put that in front of her and say, Does that refresh your memory that that is not true."); Trial Tr. dated Sept. 21, 2021 at 96:5-7 ("You can impeach her, you can put it in front of her if it becomes appropriate to refresh her memory, but I'm not letting it in.").

[9] Trial Tr. dated Sept. 21, 2021 at 88:11-25.

[10] Trial Tr. dated Sept. 20, 2021 at 93:12-13 ("Generally, I would say their grades and test scores are far below our general students we admit.").

[11] Trial Tr. dated Sept. 20, 2021 at 103:18-19.

[12] Trial Tr. dated Sept. 20, 2021 at 100:20-21 ("The work of the SUBCO was to consider students for athletic talent alone.").

consideration for his admission was his athletic credentials by establishing that there were additional considerations for the water polo program. Exhibit 1116 shows grades, scores, and other information about the entire water polo walk-on class during Johnny Wilson's year. This evidence demonstrates the size of the class, supporting that argument that the program needed players for reasons other than starting at games, and that Wilson's son's academic credentials—far from being "less competitive"—were a benefit to the team. The Court limited Defendants to refreshing Chassin's recollection, which had the result of wholly depriving the jury of this evidence, as Chassin claimed that her memory was unrefreshable on the size and academics of the water polo walk-on class despite a clearly organized spreadsheet with that precise information being presented to her. This evidence should also have come in independent of impeachment. The Subco spreadsheet and corresponding email are admissible as business records of USC[13] and satisfy the residual exception of Rule 807.

- ***Exhibit 1297***: Chassin was copied on email correspondence between USC employees Brenda Mallory and Tim Brunold wherein Mallory asked Brunold for a transfer applicant to be updated to "2nd tier" status on the VIP admission list. Chassin claimed on direct that "we don't offer admission in exchange for money."[14] Chassin also testified that there were VIP spreadsheets recording the interest that university advancement and others had in a student, and that a family's donations were often the motivation behind this interest.[15] Chassin then attempted to distance the admission department from VIP spreadsheets stating "[t]hat wasn't really information [admissions] used"[16] and "[i]t wasn't really something that was important to admissions."[17] When using the terms "we" or "admissions" Chassin confirmed she was also speaking for Brunold.[18] Exhibit 1297 directly impeaches Chassin and Brunold, as it indicates that admissions was not only well aware of the VIP spreadsheets but involved in updating and maintaining them. Indeed, Chassin admitted she was copied on the email because "I'm one of the people that can, you know, add and change things in the spreadsheet." This is relevant and material because it goes to the issue of

---

[13] Rule 803(6) provides a hearsay exception for Records of Regularly Conducted Business Activity. Fed. R. Evid. 803(6). The foundation requirements of Rule 803(6) were met by Exhibit 1116 and the other exhibits detailed below: the correspondence and attachments were contemporaneous in time to the receipt of the information, the records were created and kept in the course of USC's regularly conducted activity, and creating and keeping these records was a regular practice of USC employees. These facts were testified to by Chassin, satisfying 803(6)(d). *See* Trial Tr. dated Sept. 21, 2021 at 51:10-22 ("Would it be fair to say using e-mail was a **fairly regular practice** for members of SUBCO, correct? A. We use e-mail every day in our work. . . Q. Okay. That was part of your **regularly conducted business** on the SUBCO, correct? A. I think that's part of my every day at the University, to talk to folks around the University") (emphasis added); *see also* 57:9-14 ("Q. . . . it was **a routine practice** of the Admissions Department to use e-mail **to conduct its business**, correct? A. Yes. Q. And . . . to **conduct SUBCO business**, correct? A. Yes.) (emphasis added); 116:2-117:3 ("A. We sometimes would use e-mail to discuss SUBCO candidates, yes. . . . From time to time we might [use email to] ask questions or communicate about decisions. . . . Q. Okay. And Donna Heinel would be one of the people doing that? A. She could be. Q. And Alexander Garfio would be? A. She could be."). Further, the Government has provided no showing that these exhibits lack trustworthiness, but has instead stipulated as to the authenticity of many of them.

[14] Trial Tr. dated Sept. 20, 2021 at 127:2.

[15] Trial Tr. dated Sept. 21, 2021 at 10:8-10 ("One of the reasons they may be tracking an applicant may be due to fundraising efforts that the University Advancement Office is doing, or other offices.").

[16] Trial Tr. dated Sept. 21, 2021 at 39:4-6.

[17] Trial Tr. dated Sept. 21, 2021 at 39:9-10.

[18] *E.g.*, Trial Tr. dated Sept. 21, 2021 at 54:2-55:5.

credibility and honest services. It should also have come in as substantive evidence because it is a business record,[19] provides information on the state of mind of Chassin and Brunold, and satisfies Rule 807.

- 

- ***Exhibit 1085***: Donna Heinel emailed Tim Brunold, including an attachment labeled "PatVIPList." The attachment is a spreadsheet, which identifies Pat Haden's VIP candidates for admission. The student referenced in Exhibit 7238 is included on the list and is tagged as "Subco" in addition to VIP. This directly impeaches Chassin's false statement that Haden did not have a VIP list.[22] It also impeaches her claim that Subco is a wholly separate process from VIP lists.[23] Further, it impeaches Tim Brunold by demonstrating that admissions was aware of the donor status of Subco applicants, and regularly updated on the donation-related admission preferences of the athletic department. The Government contended that because this was extrinsic evidence it was inadmissible

[19] Trial Tr. dated Sept. 21, 2021 at 39:2-16 ("Those [records] were created by some of the offices. . . . . This was more recordkeeping. . . . I'm one of the people that can, you know, add and change things in the spreadsheet.").

[20] Trial Tr. dated Sept. 20, 2021 at 127:2; Trial Tr. Sept. 21, 2021 at 63:6-10 ("Again, we were sometimes aware that there were students who were also of interest to other folks around the University, of interest to the Advancement Office, but in the Athletic Subcommittee, we were focused solely on the student's athletic talent.").

[21] The Government conceded the admissibility of Sucbo packets as business records. Trial Tr. dated Sept. 21, 2021 at 92:24- ("Business records are things like subcommittee packets which are standardized in format, which are compiled in the ordinary course of business which are maintained in a file.").

[22] Trial Tr. dated Sept. 21, 2021 at 34:23-25.

[23] Trial Tr. dated Sept. 21, 2021 at 121:18-25.

under Rule 608(b), but when evidence is offered to impeach by contradiction the First Circuit has recognized that Rule 608(b)'s bar on extrinsic evidence does not apply. *Perez-Perez*, 72 F.3d at 227 (1st Cir. 1995) (confirming that "[i]mpeachment by *contradiction* is a recognized mode of impeachment not governed by Rule 608(b)"). Rather, as the issues addressed by Exhibit 1085 are material, going to what honest services athletic department employees owed to the athletic department, the admission department, and USC, extrinsic evidence was permissible. This email and Haden's VIP list were not hearsay, as they are business records of USC, demonstrate Brunold's state of mind, and fall under Rule 807.

- ***Exhibit 1288:*** Two admission department employees, Alexander Alvendia and Kelsey Bradshaw (a voting member on the Subco alongside Chassin)[24] communicated via a USC messaging service about a Subco applicant in March of 2018. The conversation casts significant doubt on the actual athletic ability of Subco applicants and indicates that admissions staff, including Subco members, were aware of students lacking athletic potential, yet admitted them via Subco anyway. Indeed, Alvendia, referring to Bradshaw's Subco work chides, "keep doing the lord's work," to which Bradshaw replies, "(headbang)." This evidence impeaches statements by Chassin on behalf of (1) the Subco—"[w]e believe that . . . all of this information is accurate"[25]—and (2) admissions—"the expectations that all of the members of the office of admission have around what happens at SUBCO" is that "[t]he work of the SUBCO was to consider students for athletic talent alone."[26] By speaking of the views of Subco and "all of the members of the office of admission" Chassin opened the door for Defendants to impeach Subco and the admission department. Exhibit 1288 directly contradicts the representations provided to the jury on what Subco and admissions believed and understood. These representations relate to the issue of honest services and the credibility of Chassin testifying for Subco and admissions, thus extrinsic evidence is entirely appropriate. They also provide rich insight into the state of mind of Subco and admissions (that is, are non-hearsay), in addition to being business records and meeting the requirements of 807. Exhibit 1288 is independently admissible.

- ***Exhibit 7358:*** Tim Brunold emailed Kirk Brennan, copying Chassin, instructing Brennan to reverse the denial of a student on the VIP list because the student was "of interest to athletics" and "if admitted, he's going to serve as a practice player." Brennan responds that he cleared the "'scion deny.'" This impeaches Chassin's claim that Subco is a wholly separate process from VIP lists,[27] and her related contention that athletics were not relevant to the VIP list, only to Subco.[28] Further, it impeaches representations Chassin made regarding Brunold and Brennan, by demonstrating that admissions was apprised of donation-related admission preferences of the athletic department. This is relevant to the policies and practices of USC admissions, thus it relates to the material issue of honest services. Exhibit 7358 shows the state of mind of Brunold and Brennan, is a business record, and is admissible under Rule 807.

---

24 Trial Tr. dated Sept. 21, 2021 at 18:24-25.

25 Trial Tr. dated Sept. 20, 2021 at 95:14-16.

26 Trial Tr. dated Sept. 21, 2021 at 100:20-22, 101:2-3.

27 Trial Tr. dated Sept. 21, 2021 at 121:18-25.

28 Trial Tr. dated Sept. 21, 2021 at 108:15-16 ("The athletic piece of it isn't really relevant if they're not in the SUBCO process.).



- ***Exhibit 1565***: One employee in the USC admission office emails all of the other admissions employees the VIP or special interest spreadsheets collected from the various offices and department across USC. Chassin had testified that admission slots are not given in exchange for donations,[32] and that raising money is "not the work of the office of admissions."[33] Yet, this correspondence indicates that giving extra consideration to students who were highlighted, often due to their fundraising commitments and potential,[34] was a routine part of the work of the admission department. That other USC offices and departments had submitted their information for dissemination to the admission department indicates that this admissions practice was known and understood throughout USC. Exhibit 1565 is thus incredibly relevant to the material issue of honest services, and is admissible extrinsic evidence. Further, this exhibit is independently admissible because it includes records collected and maintained in the regular course of business at USC, falling squarely within the business records exception; relates to the state of mind of Chassin, the

29 Trial Tr. dated Sept. 20, 2021 at 100:20-21.

30 Trial Tr. dated Sept. 21, 2021 at 104:5-105-1.

31 Trial Tr. dated Sept. 21, 2021 at 106:8-107:16.

32 Trial Tr. dated Sept. 20, 2021 at 127:2.

33 Trial Tr. dated Sept. 21, 2021 at 141:9-11.

34 Trial Tr. dated Sept. 21, 2021 at 10:8-9 ("One of the reasons they may be tracking an applicant may be due to fundraising efforts that the University Advancement Office is doing, or other offices.").

athletic department, and the admission department (that is, non-hearsay); and is allowed by Rule 807.

## IV. The additional evidence that Defendants intended to present would have provided essential impeachment and substantive proof necessary to the Defendants' defense.

Not only did the Court exclude the evidence detailed above, but the Court also firmly advised defense counsel that it would not admit any similar evidence.[35] Defendants have a significant amount of evidence that they had planned to offer but ultimately did not attempt to introduce due to the Court's ruling. The additional evidence is admissible and establishes facts relevant to both impeachment and the claims and defenses central to this case.

The evidence would establish that there was regular contact between Tim Brunold and the athletic department about the status of athlete VIPs and Subco applicants. Brunold routinely received a copy of Pat Haden's VIP list,[36] as well as correspondence from athletics following up on particular students[37] and advising that certain students needed to be a top priority because of a family's donations.[38] The evidence would also show that VIP and Subco admissions were intertwined. The list provided to Brunold included both VIP and Subco applicants, and often noted actual, negotiated donations and potential donations (not athletic talent) for those Subco applicants:[39]

[redacted]

35 Trial Tr. dated Sept. 21, 2021 at 88:19-22 ("[Y]ou can take what I've ruled so far during your first 45 minutes of cross as guidance as to what I'm going to let in and what I'm not. I'm not going to let in the documents, such as those you've offered thus far.").

36 *E.g.*, Ex. 3628 (providing Brunold with Haden's VIP list).

37 Ex. 7527 (checking in on the status of an athletics VIP).

38 Ex. 7529 (advising that student on VIP list need to be top priority because of family's donations).

39 Ex. 1085.

Additionally, athletics spreadsheets coded some students as both Subco and VIP.[40] Brunold's correspondence also confirms that any line between VIP and Subco sometimes disappeared. Evidence would include correspondence from Brunold to the athletic department advising that he had cross-referenced the athletics VIP list with the university-wide VIP list in order to update athletics on the status of their VIP students. He advised athletics that he had noted several VIP students as "wait for Subco," and asked athletics to report their Subco decisions "so that I can updated the VIP spreadsheet."[41] Not only did VIP and Subco frequently overlap, but evidence would indicate that donations were a central factor for both admission processes.[42]

The evidence would also refute other claims Chassin made about Subco: Specifically, that athletic potential was the sole factor considered by Subco and that all Subco members expected that students admitted through Subco would in all instances compete as Division I athletes for USC. The evidence is clear beyond cavil that USC did not expect all Subco athletes to be players on their respective teams. USC records indicate there were substantially lower athletic standards for walk-on recruits,[43] and that Subco admitted applicants whose Subco packets unequivocally indicated the student's athletic abilities were far below even the walk-on standards.[44] Teams also openly advertised non-playing positions,[45] and offered students admitted through Subco opportunities to serve as social media managers.[46] A family's donation commitment or potential

---

[40] *E.g.*, Ex. 7807 (attaching a cumulative special interest sheet showing the intersection of VIP and Subco, the links between VIP and donations, and that Subco entries were often coded with donor status).

[41] Ex. 7409.

[42] *See* Ex.7807; *see also* Ex. 7387 (describing an applicant as a "$10 mil opportunity").

[43] Ex. 7107 (demonstrating significantly different recruiting standards for walk-ons versus scholarship athletes).

[44] Ex. 7207.

[45] Ex. 9748 (advertising the existence of student managers, which were a publicly listed part of the men's basketball team in 2015). This directly impeaches Chassin's claim: "If someone was represented as a manager, we would not have considered them in SUBCO." Trial Tr. dated Sept. 21, 2021 at 109:20-21; *see also* Ex. 1219.

[46] Ex. 7242. This student's family, unsurprisingly, was alerted by athletics that they would need to make a six figure donation as a "gift of gratitude" for their child being admitted through Subco. Ex. 8045.

was often the reason why a student was suggested to or admitted through Subco. For example, athletics maintained spreadsheets of Subco applicants that only noted donations as relevant descriptive information:[47]



Defendants also have additional evidence concerning the golf prospect whose Subco packet the Court did not permit Defendants to admit.

Further, various individuals within USC knew to refer students for Subco admission, not because of their athletic abilities, but because of their fundraising potential.[49] And there is significant evidence that it was a long-standing practice, predating any alleged collusion between Donna Heinel and Rick Singer, for students to be admitted through Subco even though they were not

47 Ex. 7332.

48

49 Ex. 7341 (explaining to Heinel that he referred a student to her for Subco admission because the student is her wealthy father's heir apparent).

athletes.[50] There are myriad examples of athletics and Subco considering applicants for reasons other than their athletic talents, with the primary reason being their families' past or potential donations. Defendants attach a summary chart and spreadsheet to indicate the pattern and wide scope of these practices.[51]

These exhibits—and others Defendants would have offered—have the same independent grounds for admission as those offered at trial, namely, they indicate state of mind, are non-hearsay offered to show a pervasive practice rather than offered for the truth of the matter asserted, are business records, and are covered by Rule 807. And they are both material to the charges in the indictment and necessary for the Defendants to obtain a fair trial. Defendants previously should have been permitted the opportunity to introduce additional evidence for impeachment and substantive purposes. They should now be permitted to introduce that evidence to avoid compounding the harm caused by the earlier ruling.

## CONCLUSION

This Court wrongly prohibited Defendants from introducing evidence during their cross-examination of Chassin. Defendants request that the Court admit the excluded evidence and, as Chassin is no longer testifying, allow Defendants to read the evidence into the record and to use it in connection with other testifying USC witnesses.

---

[50] Ex. 7223 (suggesting Subco admission for a student, although she was not an athlete, because the student was a legacy and her parents were donors).

[51] Defendants have documentary evidence supporting all entries on the attached summary and spreadsheet, which are identified by bates number. The Government is in possession of all of these documents, and Defendants' will provide any documents requested.

Respectfully submitted:

By their counsel

/s/ *Michael Kendall*
Michael Kendall (BBO # 544866)
Lauren M. Papenhausen (BBO# 655527)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
Telephone: (617) 979-9310
michael.kendall@whitecase.com
lauren.papenhausen@whitecase.com

Andrew E. Tomback (pro hac vice)
MCLAUGHLIN & STERN, LLP
260 Madison Avenue
New York, NY 10016
Telephone: (212) 448-0066
atomback@mclaughlinstern.com

*Counsel for John Wilson*

/s/ *Brian T. Kelly*
Brian T. Kelly (BBO # 549566)
Joshua C. Sharp (BBO # 681439)
Lauren M. Maynard (BBO # 698742)
NIXON PEABODY LLP
53 State Street
Boston, MA 02109
617-345-1000
bkelly@nixonpeabody.com
jsharp@nixonpeabody.com
lmaynard@nixonpeabody.com
Robert Sheketoff (BBO # 457340)
One McKinley Square
Boston, MA 02109
(617) 367-3449

*Counsel for Gamal Abdelaziz*

Dated: September 27, 2021

**CERTIFICATE OF SERVICE**

This document is being filed on the date appearing in the header through the ECF system, which will provide electronic copies to counsel of record.

/s/ *Michael Kendall*
Michael Kendall