## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

v.

GREGORY COLBURN et al.,

Defendants.

Case No. 1:19-cr-10080-NMG

**ORAL ARGUMENT REQUESTED**

## DEFENDANTS' MOTION FOR JUDGMENT OF ACQUITTAL
## UNDER FEDERAL RULE OF CRIMINAL PROCEDURE 29

## **INTRODUCTION**

Pursuant to Federal Rule of Criminal Procedure 29, Defendants Gamal Abdelaziz and John Wilson ("Defendants") hereby move for a judgment of acquittal on all counts. As set forth below, and as will be further and fully developed at oral argument, the government has failed to prove any of the elements of each of the charged crimes.

In this misguided prosecution against Defendants, the government seeks to dramatically expand the scope of the mail and wire fraud, honest services fraud, and federal programs bribery statutes. The government charged Defendants with conspiracy to commit property fraud based on an alleged scheme to obtain admissions "slots" from the University of South California. But admissions "slots" are not property, so an alleged scheme to obtain them falls outside the scope of the mail and wire fraud statutes. The government also charged Defendants with conspiracy to commit honest services mail and wire fraud and conspiracy to commit federal programs bribery, asserting that the alleged victim of the conspiracies was USC. But the alleged "bribes" at issue are payments Defendants made to USC, and a payment to an alleged victim cannot constitute a bribe as a matter of law. Thus, the purported conspiracies fall outside the scope of the honest services mail and wire fraud and federal programs bribery statutes.

The government brought additional charges against Mr. Wilson that suffer from the same legal deficiencies. The government charged Mr. Wilson with wire fraud based on alleged schemes to obtain admissions "slots" from Harvard University and Stanford University, but these charges are fatally flawed because admissions "slots" are not property. The government also charged Mr. Wilson with honest services wire fraud and federal programs bribery, but these charges are likewise flawed because the alleged "bribes" at issue were payments intended for his alleged victims: Harvard and Stanford. Grasping at straws, the government also charged Mr. Wilson with aiding and abetting Rick Singer, a con man turned government cooperator, in committing these crimes. But Singer had already agreed to cooperate with the government at the time of the alleged criminal activity, and it is black letter law that one cannot aid and abet a cooperator where the cooperator is not actually committing any crime.

1

Despite the legal deficiencies in its case, the government elected to proceed to trial, and spent 11 days attempting to convince a jury that Defendants had committed the charged crimes. To prove its case, the government had to show, among other things, (1) Defendants caused (or intended to cause) tangible economic harm to the universities; (2) the university employees at issue in this case owed fiduciary duties to their employers, and breached those duties; (3) these university employees violated the customs, practices, and policies of the department or unit in which they worked; (4) Defendants agreed and specifically intended that the university employees at issue in this case would perform an "official act"; (5) Defendants agreed and specifically intended to join a nationwide "hub-and-spoke" conspiracy; and (6) Defendants did not act in good faith. But the government failed to prove any of these required facts, as well as several other required facts. In addition, with respect to Mr. Wilson, the government also failed to, among other things, (1) prove that Mr. Wilson conspired to make false statements to USC, or that any of the allegedly false statements were in fact material; and (2) rebut the defense of factual impossibility.

In addition, in seeking to prove each of the charged crimes, the government relied heavily on out-of-court statements, but failed to meet its burden under *United States v. Petrozziello*. Thus, the jury cannot consider these statements for their truth.

In short, the government has brought a property fraud case that has nothing to do with property; a bribery case that has nothing to do with bribery; and an aiding and abetting case where the alleged principal is the government's own cooperating witness. Even setting aside these legal deficiencies, the government has failed to prove any of the elements of the charged crimes. In these circumstances, a rational jury simply could not convict Defendants of these crimes. Accordingly, this Court should enter a judgment of acquittal on all counts pursuant to Fed. R. Crim. P. 29.

## **LEGAL STANDARD**

A district court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). A judgment of acquittal is required if the evidence is not "sufficient to permit a rational jury to find each essential fact to have been

proven beyond a reasonable doubt." *United States v. Pappathanasi*, 383 F. Supp. 2d 289, 290 (D. Mass. 2005); *see also United States v. Appolon*, 715 F.3d 362, 367 (1st Cir. 2013).

Although a district court must look at the evidence in the light most favorable to the government, the Rule 29 standard is not a "free pass" for the prosecution. *United States v. Martin*, 228 F.3d 1, 10 (1st Cir. 2000). The court must "reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative." *Pappathanasi*, 383 F. Supp. 2d at 290-91 (internal quotation marks omitted). "[I]f the evidence, when viewed in the light most favorable to the government, gives equal or nearly equal circumstantial support to theories of guilt and innocence," acquittal is required. *Martin*, 228 F.3d at 10. "This is so because . . . where an equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence . . . , 'a reasonable jury must necessarily entertain a reasonable doubt.'" *United States v. Andujar*, 49 F.3d 16, 20 (1st Cir. 1995); *accord United States v. Cassese*, 428 F.3d 92, 99 (2d Cir. 2005).

In addition, where the government fails to submit any evidence supporting an element of the charged crime, the Court must enter a judgment of acquittal. *United States v. Fernandez*, 913 F.3d 244, at 247-51 (1st Cir. 2019) (holding that the district court should have granted the defendants' Rule 29 motion where the government failed to submit any evidence concerning one of the elements of federal programs bribery).

## **ARGUMENT**

Count One charges Defendants with conspiracy to commit mail fraud, wire fraud, honest services mail fraud, and honest services wire fraud. The elements of conspiracy are that (1) the agreement specified in the Indictment existed between those people as alleged in the Indictment, and the Defendant specifically intended and agreed that a member of the conspiracy would commit conduct that constituted the underlying crimes alleged; (2) the Defendant joined in that agreement willfully; and (3) the conspirators committed an overt act during the period of the conspiracy in an effort to further the purpose of the conspiracy. *See* Defendants' Proposed Jury Instructions, ECF No. 2015-1, which is hereby incorporated by reference, at 28. The government failed to prove any of these elements, including for the reasons set forth in Sections I-IV, VII-VIII, and XII-XIII

below, and because the government has failed to adduce evidence of an overt act during the period of the alleged conspiracy in an effort to further the purpose of the alleged conspiracy.

Count Two charges Defendants with conspiracy to commit federal programs bribery.[1] The government failed to prove any of the elements of Count Two, including for the reasons set forth in Sections II, VII-X, and XII-XIII below, and because the government failed to adduce evidence (1) of an overt act during the period of the alleged conspiracy in an effort to further the purpose of the alleged conspiracy; (2) that this business, transaction, or series of transactions involved a thing with a value of $5,000 or more; or (3) that the money USC allegedly received from the federal government constituted "benefits."

Counts Six, Eight, and Nine charge Mr. Wilson with committing wire fraud. The crime of wire fraud has three elements. *First*, a scheme to obtain money or property by means of materially false or fraudulent pretenses. *Second*, that the defendant knowingly and willfully participated in the scheme, with intent to defraud. And *third*, that the defendant caused an interstate wire communication to be used for the purpose of executing the scheme, or in furtherance of the scheme, or that it was reasonably foreseeable that an interstate wire communication would be used. *See* ECF No. 2015-1 at 38. The government failed to prove any of these elements, including for the reasons set forth in Sections I, VI, and VIII-IX below, and because the government has failed to adduce evidence that Mr. Wilson caused an interstate wire communication to be used for the purpose of executing the alleged scheme, or in furtherance of the alleged scheme, or that it was reasonably foreseeable that an interstate wire communication would be used.

Count Six, Eight, and Nine also charge Mr. Wilson with committing honest services wire fraud. The crime of honest services wire fraud has six elements. The first element is that an employee owed a fiduciary duty to an entity. The second element is that the defendant agreed and specifically intended that the fiduciary would perform an official act that violated his or her fiduciary duty, and deprive the entity to which he or she owed a fiduciary duty of his or her honest

---

[1] The three elements of conspiracy for Count Two are the same as the elements for Count One.

services, in exchange for a bribe or kickback. The third element is that there was in fact a bribe or kickback. The fourth element is that the defendant agreed and specifically intended that the fiduciary would deceive the entity to which he or she owed a fiduciary duty through a material misrepresentation, false statement, false pretense, or a deliberately misleading statement. The fifth element is that it was foreseeable to the defendant that the entity to which the employee owed a fiduciary duty might suffer an economic harm as a result of the breach of fiduciary duty. The sixth is that, for the purpose of executing the scheme or in furtherance of it, the defendant agreed and specifically intended to cause an interstate wire communication to be used, or it was reasonably foreseeable that an interstate wire communication would be used on or about the date alleged. *See* ECF No. 2015-1 at 50-51. The government failed to prove any of these elements, including for the reasons set forth in Sections I.C, II-III, VI, VIII-IX, and XIII below, and because the government has failed to adduce evidence that (1) it was foreseeable to Mr. Wilson that the entity to which the employees allegedly owed a fiduciary duty might suffer an economic harm as a result of the alleged breach of fiduciary duty; or (2) Mr. Wilson caused an interstate wire communication to be used for the purpose of executing the alleged scheme, or in furtherance of the alleged scheme, or that it was reasonably foreseeable that an interstate wire communication would be used.

Counts Six, Eight, and Nine also charge Mr. Wilson with aiding and abetting Rick Singer in committing wire fraud and honest services wire fraud. The crime of aiding and abetting has three elements. The first element is that someone else has committed the crime charged. The second element is that the defendant knowingly and willfully associate himself in some way with the crime. The third element is that he knowingly and willfully participate in the crime by doing some act to help make the crime succeed. *See* ECF No. 2015-1 at 78-79. The government failed to prove any of these elements, including for the reasons set forth in Sections I.C, II-III, V-VI, VIII-IX, and XIII below, and because the government has failed to adduce evidence that (1) it was foreseeable to Rick Singer that the entity to which the employees allegedly owed a fiduciary duty might suffer an economic harm as a result of the alleged breach of fiduciary duty; or (2) Rick Singer caused an interstate wire communication to be used for the purpose of executing the alleged

5

scheme, or in furtherance of the alleged scheme, or that it was reasonably foreseeable that an interstate wire communication would be used.

Counts Eleven and Twelve charge Mr. Wilson with federal programs bribery. The crime of federal program bribery has five elements. The first element is that the person acts with corrupt intent. The second element is that the person gives, offers, or agrees to give a thing of value to another person that constitutes a bribe. The third element is that the foregoing is done to corruptly influence or reward an agent of an organization in connection with some business, transaction, or series of transactions of that organization. The fourth element is that this business, transaction, or series of transactions involved a thing with a value of $5,000 or more. The fifth element is that the organization, in a one-year period preceding or following the bribe, received benefits of more than $10,000 under any federal program involving a grant, contract subsidy, loan, guarantee, insurance, or other assistance. *See* ECF No. 2015-1 at 64-65. The government failed to prove any of these elements, including for the reasons set forth in Sections II, VI, VIII-X, and XIII below, and because the government has failed to adduce evidence that (1) this business, transaction, or series of transactions involved a thing with a value of $5,000 or more; or (2) the money Harvard and Stanford allegedly received from the federal government constituted "benefits."

Counts Eleven and Twelve also charge Mr. Wilson with aiding and abetting Rick Singer in committing federal programs bribery.[2] The government failed to prove any of the elements of this crime, including for the reasons set forth in Sections II, V-VI, VIII-X, and XIII below, and because the government has failed to adduce evidence that (1) this business, transaction, or series of transactions involved a thing with a value of $5,000 or more; or (2) the money Harvard and Stanford allegedly received from the federal government constituted "benefits."

Count Thirteen charges Mr. Wilson with willfully filing a false tax return. This crime has four elements. The first element is that Mr. Wilson made, or caused to be made, a federal income tax return for the year in question that he verified to be true. The second element is that the tax

---

[2] The three elements of aiding and abetting for Counts Eleven and Twelve are the same as the elements of aiding and abetting for Counts Six, Eight, and Nine.

return was false as to a material matter. The third element is that Mr. Wilson signed the return willfully and knowing it was false. The fourth element is that the return contained a written declaration that it was made under the penalty of perjury. *See* ECF No. 2015-1 at 83. The government failed to prove any of the elements of this crime, including for the reasons set forth in Sections VIII-IX below,[3] and because the government has failed to adduce sufficient evidence that (1) Mr. Wilson made, or caused to be made, a federal income tax return for the year in question that he verified to be true; or (2) that the alleged return contained a written declaration that it was made under the penalty of perjury.

I.  **BECAUSE ADMISSIONS AND ATHLETIC RECRUITMENT "SLOTS" ARE NOT PROPERTY, AND BECAUSE THE UNIVERSITIES RECEIVED THE FULL BENEFIT OF THEIR BARGAIN, THE PROPERTY FRAUD AND CONSPIRACY TO COMMIT PROPERTY FRAUD CHARGES CANNOT GO TO THE JURY.**

A.  **As a Matter of Law, Admissions "Slots" and Athletic Recruitment "Slots" Are Not Property.**

In order to convict a defendant of wire fraud, the government must prove (among other things) that a purpose of the relevant scheme was to obtain money or property. *Kelly v. United States*, 140 S. Ct. 1565, 1573-74 (2020). It is not enough that the scheme involved, or may have caused, an incidental loss of money or property by the alleged victim. *Id.* Rather, the evidence must show that obtaining money or property was an object of the scheme. *Id.*

Here, up until the eve of trial, the Government's theory was that Defendants conspired to commit mail or wire fraud because they intended to deprive universities of their "property" in the form of admissions "slots."[4] Similarly, with respect to Mr. Wilson, the Government's theory was that he committed wire fraud because he intended to deprive Harvard and Stanford of admissions

---

[3] Section IX expressly discusses, among other things, the elements of willfulness and materiality.

[4] *See, e.g.*, Indictment ¶ 370 (alleging Defendants conspired to commit mail and wire fraud through scheme to obtain "admission to the Universities"); ECF No. 2014 at 14 (Government's proposed jury instruction stating: "The defendants are accused of conspiring to commit these crimes by engaging in a fraudulent scheme to obtain property, specifically, admission to the University of Southern California . . . ."); *id.* at 24 (Government's proposed jury instruction stating: "[F]or purposes of the mail and wire fraud statutes. . . admission spots are the property of the Universities.").

"slots" against their will.[5] The Court relied on these theories in denying Defendants' motions to dismiss. *See* ECF No. 1334 at 17 (holding that "the definition of 'property' extends readily to encompass admission slots" and that such "slots" are "property interests owned by the university cognizable under the mail and wire fraud statutes").

However, this theory is deficient. For the reasons set forth in (1) Defendants' Memorandum of Law in Support of Their Motion to Dismiss Count One Insofar as It Alleges Conspiracy to Defraud Universities of Property (ECF No. 1042), which Defendants hereby incorporate by reference; and (2) Judge Talwani's well-reasoned opinion in *United States v. Ernst*, 502 F. Supp. 3d 637, 647-53 (D. Mass. 2020), admissions "slots" cannot, as a matter of law, constitute "property" within the meaning of the mail or wire fraud statutes. Thus, a scheme to obtain admissions "slots" is necessarily beyond the scope of these statutes.

At trial, the government abandoned its original theory and presented a brand new theory: that the property at issue is not admissions "slots," but "athletic recruitment slots."[6] But this theory is deficient as a matter of law for substantially the same reasons that the government's original theory is deficient. For instance, there is no historical basis for treating athletic recruitment "slots" as a form of property. *See* ECF No. 1042 at 2, 7-11. Indeed, this theory is even more attenuated than the government's original theory. In addition, even assuming this theory is not deficient as a matter of law, it cannot go to the jury because that would constitute a constructive amendment of

---

[5] *See, e.g.*, Indictment ¶¶ 238-44, 376 (alleging Mr. Wilson committed wire fraud through scheme to obtain "admission to the Universities," and particularly admission to Harvard and Stanford); ECF No. 2014 at 15 ("Counts Six, Eight, and Nine charge the defendant John Wilson with substantive wire fraud . . . . Wilson is accused of committing these crimes by engaging in a fraudulent scheme to obtain property, specifically, admission to Harvard and Stanford Universities . . . .").

[6] 9/13/21 Tr. at 29:20-23 (AUSA Wright: "[I]n exchange for their payments, the coach or athletic department insider would secure an athletic recruitment slot for their children . . . ., and that would effectively guarantee their admission to the universities."), 43:1-3 (AUSA Wright: "Of course, Wilson did receive something in exchange for his purported donation, an ***athletic recruitment slot*** for his son."), 46:2-4 (AUSA Wright: "You will hear him agree to pay over a million dollars to secure those recruitment slots for his daughters at Harvard and Stanford . . . ."), 46:24-25 (AUSA Wright: "That's what this case is about, lies, lies to obtain ***athletic admissions slots*** that were bought and paid for.") (emphases added). The government's use of "athletic recruitment slot" is misleading. There is no evidence that Mr. Wilson or his son got a "slot" or guarantee of admission. Rather, they received, at most, a commitment by USC water polo coach Jovan Vavic to give Johnny a boost in his chance of being admitted by presenting Johnny to Subco.

the indictment. *See, e.g.*, *United States v. Iacaboni*, 363 F.3d 1, 7 (1st Cir. 2004) (constructive amendment where government modified its theory of the case).

  **B.**  **The Government Has Failed to Adduce Any Evidence that the Admissions "Slots" and Athletic Recruitment "Slots" at Issue Are Property.**

  Assuming the question of whether admissions "slots" and athletic recruitment "slots" are property is a mixed question of fact and law,[7] the government has failed to submit any evidence showing the admissions "slots" and athletic recruitment "slots" at issue in this case are in fact property. In determining whether admissions "slots" and athletic recruitment "slots" constitute property, the relevant factors include:

1. Whether the university at issue holds onto admissions "slots" and athletic recruitment "slots" in order to trade or sell them in the ordinary commercial sense of the word. *See Ernst*, 502 F. Supp. 3d at 650 ("[T]here is no argument presented that the universities hold onto admission slots in order to trade or sell admission to the universities in the ordinary commercial sense of the word.").

2. Whether in offering students "slots," the university at issue also conveyed to the students ownership over the universities' property rights, such as a trademark, brand name, business strategy, or other product that the students may trade or sell in the open market. *See id.* at 651 ("Nor is there any argument that when the universities offered the students admission, they also conveyed to the students ownership over the universities' property rights, such as 'a trademark, brand name, business strategy, or other product that [the admittees] may trade or sell in the open market.'" (quoting *Cleveland v. United States*, 531 U.S. 12, 24 (2000))).

3. Whether a person who has gained a "slot" from the university may transfer that "slot" to another person. *See United States v. Frost*, 125 F.3d 346, 367 (6th Cir. 1997) ("[T]he concept of 'property' refers to a 'bundle of rights' which includes the right[] to . . . dispose."); Property, Black's Law Dictionary (11th ed. 2019) ("It is common to describe property as a 'bundle of rights.' These rights include . . . the right to transfer.").

  Here, with respect to Harvard and Stanford, the government has not submitted *any* evidence concerning these factors. Indeed, with respect to athletic recruitment "slots," the government has failed to submit evidence showing that Harvard and Stanford even have such "slots." In the absence of evidence concerning these factors, a rational juror simply could not conclude that Harvard's or

---

[7] For the avoidance of doubt, Defendants do not concede this point (or any other point that is "assumed" in this motion). Rather, as explained in Section I.A above, admissions "slots" and athletic recruitment "slots" are not "property" as a matter of law. The argument presented in this section is an alternative argument.

Stanford's admissions "slots" or athletic recruitment "slots" constitute property. The government cannot rely on the jurors' "common sense" or "general knowledge" to fill the gaps in its evidence, whether with respect to this issue or any other issue. *United States v. Fernandez*, 913 F.3d 244, 249-50 (1st Cir. 2019).

As for USC, the government has not submitted any evidence suggesting that its admissions "slots" or athletic recruitment "slots" are property. With respect to the second and third factors, the government has not submitted any evidence at all. And, with respect to the first factor, the only relevant evidence is testimony from Rebecca Chassin denying that USC's admissions office holds onto admissions "slots" in order to trade or sell admission to USC in the ordinary commercial sense of the word.[8] Accordingly, a rational jury could not find that these admission "slots" or athletic recruitment "slots" are property.[9]

### C. The Government Failed to Admit Any Evidence that the Alleged Scheme Deprived the Universities of Potentially Valuable Economic Information or Caused Tangible Economic Harm.

Some courts have suggested a property fraud charge is proper where the alleged scheme deprives a private victim of the right to control the use of its assets. Under these cases, "a defendant may be guilty of federal property fraud where his scheme 'den[ies] the victim the right to control

---

[8] *See, e.g.*, 9/21/21 Tr. at 9:9-12 (Ms. Chassin: "[W]e don't make offers of admission in exchange for money."), 101:22-103:4 (Ms. Chassin stating that USC's admission office was not willing to sell slots to people for money, and did not want people to be under the impression that they were selling slots).

[9] Defendants submit that, as a matter of law, the three factors discussed above are the only factors that bear on whether admissions "slots" and athletic recruitment "slots" are property. Defendants note, however, that the government has failed to submit any evidence concerning other alleged factors that this Court discussed when it denied Defendants' motion to dismiss. For instance, the government has failed to submit any evidence showing that if Harvard, Stanford, or USC "admit[] students who are unqualified," that "decreases the value of [their] degrees, hurts [their] reputation and [their] ability to attract qualified tuition-paying students and recruit accomplished professors," or "impairs [their] ability to solicit donations." *United States v. Sidoo*, 468 F. Supp. 3d 428, 442 (D. Mass 2020). Nor has the government submitted any evidence demonstrating that admissions "slots" or athletic recruitment "slots" at Harvard or Stanford are somehow "limited." *Id.* at 441. And, with respect to USC, witnesses testified that the Dean of Admissions determines how many admissions "slots" to offer each year, and that the number of admissions "slots" and athletic recruitment "slots" varies from year-to-year. See 9/21/21 Tr. at 7:16-17, 134:23-135:2 (Ms. Chassin: "Our admit targets are created by our dean of admissions."); 9/20/21 Tr. at 151:20-22, 152:5-15 (explaining that about 200 to 250 students were presented to Subco each year); 9/27/21 Tr. at 65:14-21; 9/28/21 Tr. at 94:23-95:7. Clearly, these "slots" are not in fact limited. Accordingly, assuming these other alleged factors are relevant, the government has still failed to show that admissions "slots" or athletic recruitment "slots" at Harvard, Stanford, or USC are property.

its assets by depriving it of information necessary to make discretionary economic decisions.'" *Ernst*, 502 F. Supp. 3d at 651 (quoting *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015)).[10]

But "the right to control theory is not so broad as to criminalize 'every non-disclosure or misrepresentation that could affect someone's decision of how to use his or her assets.'" *Id.* (quoting *United States v. Finazzo*, 850 F.3d 94, 111 (2d Cir. 2017)). Rather, a property interest in the intangible right to control the use of one's assets may be injured *only* when the alleged scheme (1) "deprived the victim of 'potentially valuable *economic* information'" and (2) "'implicate[s] *tangible* economic harm.'" *Id.* (quoting *Finazzo*, 850 F.3d at 111-12). Accordingly, courts have "repeatedly rejected application of the mail and wire fraud statutes where the purported victim received the full economic benefit of its bargain," and therefore did not suffer tangible economic harm. *Binday*, 804 F.3d at 570.

Here, in order to convict Defendants of conspiracy to commit mail and wire fraud, the government had to prove that the alleged scheme (1) deprived USC of potentially valuable economic information; and (2) caused tangible economic harm to USC. Similarly, in order to convict Mr. Wilson of wire fraud, the government had to prove that Mr. Wilson (1) intended to deprive Harvard and Stanford of potentially valuable economic information; and (2) intended to cause tangible economic harm to Harvard and Stanford.

The government has failed to submit evidence supporting any of these points. In fact, the evidence shows that each of the universities at issue received or would have received the full economic benefit of its bargain—and more. For USC, the evidence shows that Defendants not only paid full tuition for their children,[11] but also made and tried to make sizable contributions to certain

---

[10] "The Supreme Court has not yet stated its position on the 'right-to-control' theory as applied to the federal property fraud statutes." *Ernst*, 502 F. Supp. 3d at 651 n.6. The First Circuit relied on this theory "in upholding convictions in *United States v. Bucuvalas*, 970 F.2d 937, 945 (1st Cir. 1992)," but "the Supreme Court expressly abrogated *Bucuvalas* in *Cleveland*." *Id.* For purposes of this motion, and without conceding that this theory is valid, Defendants "assume[] the validity of the right-to-control theory under the parameters set by the Courts of Appeal that have applied it." *Id.*

[11] *See, e.g.*, 9/13/21 Tr. at 27:23-28-3, 31:19-32:1; 9/15/21 Tr. at 157:21-158:5, 161:9-162:7 (testimony of Rebecca Chassin explaining that Johnny Wilson did not receive an athletic scholarship).

university programs.[12] As for Harvard and Stanford, the evidence shows that Mr. Wilson intended to contribute a total of $1.5 million to certain university programs or accounts.[13] Accordingly, a reasonable jury could not find Defendants guilty of conspiracy to commit mail and wire fraud or Mr. Wilson guilty of wire fraud. *See Binday*, 804 F.3d at 570.

## II.   ABSENT EVIDENCE OF A BRIBE OR AN OFFICIAL ACT, THE CHARGES FOR HONEST SERVICES FRAUD, CONSPIRACY TO COMMIT HONEST SERVICES FRAUD, FEDERAL PROGRAMS BRIBERY, AND CONSPIRACY TO COMMIT FEDERAL PROGRAMS BRIBERY CANNOT GO TO THE JURY.

### A.   A Bribe Cannot Consist of a Payment to the Alleged Victim, and There Is No Evidence of an Actual Bribe.

In *Skilling v. United States*, the Supreme Court held that "honest-services fraud does not encompass conduct more wide ranging than the paradigmatic cases of bribes and kickbacks," and that the honest services fraud statute "criminalizes *only* the bribe-and-kickback core of the pre-*McNally* case law." 561 U.S. 358, 409-11 (2010). Accordingly, to prove a violation of the honest services fraud statute, the government needed to show (among other things) that Defendants participated in a scheme to defraud the universities of their intangible right to the honest services of their coaches or administrators through bribery or kickbacks. *See id.* at 368, 409-11. Similarly, to prove a violation of the federal programs bribery statute, the government needed to show (among other things) that Defendants bribed the college's coaches or administrators. *See United States v. Fernandez*, 913 F.3d 244, 247 (1st Cir. 2019). As explained below, the government failed to prove either of these points, and instead effectively concedes that Defendants did not engage in bribery.

The government does not assert that Defendants ever intended to make payments that went into the pockets of university coaches or administrators. Rather, the evidence shows, and the government concedes, that Defendants intended to make contributions to certain university

---

[12] For instance, Mr. Wilson contributed $100,000 to the USC Men's Water Polo Program. *See, e.g.*, 9/13/21 Tr. at 34:6-11; 9/15/21 Tr. at 95:1-96:5 (Special Agent Brown reading letter from USC to the Wilsons thanking them for donation). Mr. Wilson intended to contribute another $100,000 to this program, but it was stolen by Rick Singer. *See, e.g.*, 9/24/21 Tr. at 12:7-13:8 (testimony of Agent Keating regarding the $200,000 that Mr. Wilson intended to contribute to the USC Men's Water Polo Program, and how Rick Singer stole $100,000 for himself).

[13] *See, e.g.*, 9/13/21 Tr. at 23:3-8, 45:14-46:5; Ex. 602 at 2:6-23 (Rick Singer and John Wilson discussing these contributions); Ex. 623 at 7:16-17 (same).

accounts or athletic programs. *See, e.g.*, 9/13/21 Tr. at 29:2-14 (AUSA Wright: "Singer told the parents that this money that they paid to KWF, or The Key, would go to support the insider's program. . . . The evidence will show that Singer was not honest with the parents. He did not tell them about these payments to the insiders' pockets, and he did not tell them that he kept a large chunk of their money for himself."); *accord id.* at 26:21-27:1, 33:14-34:4, 34:15-35:1; *see also* 9/24/21 Tr. at 12:7-13:8 (testimony of Agent Keating regarding Mr. Wilson's contributions intended for the USC Men's Water Polo Program). As explained in Defendants' Supplemental Objection to Government's Jury Instructions Regarding the Meaning of "Bribe" (ECF No. 2077), which Defendants hereby incorporate by reference, a payment to an alleged victim cannot constitute a bribe or kickback, even where a coach or administrator may receive some psychic or indirect benefit from the payment. As there is no evidence showing actual bribery or kickbacks, a rational jury could not convict Mr. Wilson of honest services fraud or federal programs bribery. Nor could a rational jury convict Defendants of conspiracy to commit honest services fraud or conspiracy to commit federal programs bribery. Accordingly, these charges cannot go to the jury.

**B.     There Is No Evidence that Defendants Agreed and Specifically Intended that the University Employees at Issue Would Perform an Official Act.**

In order to convict a defendant of honest services fraud or conspiracy to commit honest services fraud, the government must show (among other things) that the defendant agreed and specifically intended that an official would perform an official act in exchange for a bribe or kickback.[14] Similarly, in order to convict a defendant of federal programs bribery or conspiracy to commit federal programs bribery, the government must show (among other things) that the defendant agreed and specifically intended to give a thing of value to an official in exchange for an official act. *See United States v. Martinez*, 994 F.3d 1, 6-7 (1st Cir. 2021) ("To convict López on Count Eleven, which was for federal programs bribery . . . the government was required to

---

[14] *See McDonnell v. United States*, 136 S. Ct. 2355, 2361 (2016) ("To convict the McDonnells of bribery, the Government was required to show that Governor McDonnell committed (or agreed to commit) an 'official act' in exchange for the loans and gifts."); *accord United States v. Sidoo*, 468 F. Supp. 3d 428, 444 (D. Mass. 2020); *United States v. Napout*, 332 F. Supp. 3d 533, 549, 565-66 (E.D.N.Y. 2018).

prove . . . López accepted a thing of value while 'intending to be influenced' by it to perform an official act."). Here, the government failed to submit any evidence that Defendants agreed and specifically intended that the coaches and administrators at issue would perform an official act.

An "official act" is a decision or action on a question or matter "which may at any time be pending" before an official "in such official's capacity, or in such official's place of trust." *McDonnell* 136 S. Ct. at 2365, 2367 (internal quotation marks omitted). The question or matter must be "'specific and focused'" and involve a formal exercise of the relevant "organization's power akin to awarding a contract or instituting a lawsuit." *Napout*, 332 F. Supp. 3d at 565 (quoting *McDonnell*, 136 S. Ct. at 2372). To qualify as an official act, the official must make a decision or take an action on that question or matter, or agree to do so. *McDonnell* 136 S. Ct. at 2365, 2372; *Napout*, 332 F. Supp. 3d at 565-66. That decision or action may include using his official position to exert pressure on another official to perform an official act, or to advise another official, knowing or intending that such advice will form the sole basis for an official act by that official. *McDonnell* 136 S. Ct. at 2365, 2372; *Napout*, 332 F. Supp. 3d at 565.

In this case, the government originally argued that the relevant official act in this case is admitting a student to a university. *See, e.g.*, Government's Memorandum in Opposition to Defendants' Proposed Jury Instructions, ECF No. 2079, at 29 (requesting jury instruction stating that "[a]n official act is a decision or action on a matter . . . . [I]n the context of this case, [the decision or matter is] admitting a student."). But, of course, only admissions officers have the power to perform this official act. Coaches and administrators lack this power, and can merely express support for a student's admission.[15]

Here, even assuming Wilson believed that Vavic would express support for his son's applications, that cannot form the basis for criminal liability. As a matter of law, simply expressing support for an application (or an applicant), or even engaging in puffery with regard to that

---

[15] *See, e.g.*, 9/13/21 Tr. at 30:11-19, 125:3-12; 9/20/21 Tr. at 152:16-53:5 (AUSA Frank: "Do coaches themselves ever present candidates to the subcommittee?" Rebecca Chassin: "No."), 166:1-2 (Rebecca Chassin stating that "the only voting members of the SUBCO are the folks in the Office of Admissions"); 9/21/21 Tr. at 139:25-140:5.

applicant, is not an official act.[16] Thus, a rational jury could not find that Defendants agreed and specifically intended that the coaches and administrators would themselves perform an official act.

The government may assert that, in theory, the official act requirement could be satisfied if Defendants agreed and specifically intended that the coaches and administrators would pressure another official to perform an official act, or to advise another official, knowing or intending that such advice will form the sole basis for an official act by that official. *See McDonnell* 136 S. Ct. at 2365, 2372; *Napout*, 332 F. Supp. 3d at 565. But, in this case, a rational jury could not find that Defendants agreed and specifically intended that the coaches and administrators would (1) pressure the admissions officers into admitting their children; or (2) provide advice that could form the sole basis for the admissions officers to admit their children.

For instance, with respect to Johnny Wilson's application to USC, all Jovan Vavic did was express support for his admission. *See, e.g.*, Ex. 107; 9/20/21 Tr. at 161:9-21, 166:8-16, 167:13-16. But as a matter of law, advocating for an applicant does not constitute "pressure" on another official.[17] It would be one thing if Jovan Vavic ordered or effectively forced the admissions officers to admit Johnny Wilson, or if the admissions officers admitted Johnny based solely on Vavic's recommendation.[18] But that is simply not what happened here. Rather, the evidence shows that Jovan Vavic's recommendation was simply one factor the admissions officers considered in determining whether to admit Johnny Wilson. *See, e.g.*, 9/15/21 Tr. at 83:14-19 (AUSA Frank:

---

[16] *See United States v. Fattah*, 914 F.3d 112, 155 (3d Cir. 2019) (explaining that the defendant's efforts to secure an ambassadorship for another person, including by sending emails, sending letters of recommendation, and making a phone call in support of that person, did not itself constitute an official act).

[17] *See, e.g.*, *United States v. Jefferson*, 289 F. Supp. 3d 717, 738-39 (E.D. Va. 2017) ("Jefferson wrote a letter on congressional letterhead in support of Kachikwu's visa application and made a phone call to individuals at the London embassy. . . . [T]here is no indication that Jefferson exerted pressure as required to make his actions official; instead, it appears that Jefferson was, as was true in *McDonnell*, '[s]imply expressing support' for [the] visa application.").

[18] *Compare Jefferson*, 289 F. Supp. 3d at 736-37 (official act requirement not met because "while Jefferson made several encouraging statements about iGate's technology," he "never ordered [the other official] to test iGate products"), *with id.* at 741-43 (Jefferson pressured officials to approve a "feasibility study" where he "call[ed] on several occasions to check on the status of the project," requested a "status update" from another official, required that same official to "draft a memo for the Congressman to describe where the project stood," and summoned that official to his office "to address why the project was being held up," and thereby succeeded in keeping the project alive even though "there were issues with the . . . project . . . that would have killed any other deal").

"[H]ow does Mr. Vavic respond?" FBI Agent Brown, reading Ex. 101: "This will be a big class . . . I cannot guaranty (sic) anything."); 9/20/21 Tr. at 166:4-69:4.

More generally, the evidence shows that coaches' recommendations were simply one factor USC admissions officers considered in determining whether to admit a student, and that admissions officers often rejected students notwithstanding such recommendations.[19] Thus, there is no basis for the jury to find that Defendants agreed and specifically intended that the coaches and administrators would pressure USC admissions officers into admitting their children, or provide advice that could form the sole basis for USC admissions officers to admit their children.

Similarly, with respect to Stanford and Harvard, there is no basis for the jury to find that Mr. Wilson agreed and specifically intended that John Vandemoer and the senior women's administrator would pressure admissions officers into admitting his children, or provide advice that could form the sole basis for the admissions officers to admit his children. When Rick Singer spoke with Mr. Wilson about Stanford and Harvard, he provided little information about what precisely Vandemoer and the senior women's administrator would do to help his children. Singer suggested that the process would be similar to the Subco process at USC and that Mr. Wilson's children would probably be admitted as walk-on recruits, but he provided little information beyond that. *See, e.g.*, Ex. 623 at 8:5-15. Crucially, Singer never suggested that Vandemoer or the senior women's administrator could order or effectively force the admissions officers to accept his children, or that the admissions officers would rely solely on their recommendations in accepting his children. Absent such a suggestion, a rational jury could not find that Mr. Wilson agreed and specifically intended for Vandemoer and the senior women's administrator to pressure the admissions officers into admitting his children, or provide advice that could form the sole basis for the admissions officers to admit his children.

---

[19] *See, e.g.*, 9/20/21 Tr. at 151:20-25; 9/21/21 Tr. at 26:14-21, 66:18-21, 130:4-10 (Chassin confirming that 10 to 15 percent of students submitted to Subco are ultimately denied admission, and indicating that Subco considers various factors in determining whether to admit a student, including academic ability). The government's assertion that Rick Singer offered parents a "money back guarantee" effectively concedes that admissions officers do not admit students based solely on a coach's recommendation. *See* 9/13/21 Tr. at 26:24-25, 38:20-29:6, 41:17-23; *see also* 9/29/21 Testimony of C. Ranahan. After all, if a recommendation from a coach could guarantee admission, there would be no need for the money back guarantee in the first place.

The government may argue that some of the statements Singer made during his conversations with Mr. Wilson could suggest that the senior women's administrator had guaranteed that Mr. Wilson's daughter would be admitted to Harvard. *See, e.g.*, Ex. 602 at 2:12-14. But even if Mr. Wilson believed that the senior women's administrator had made such a guarantee, that would not be enough to satisfy the official act requirement. Rather, the official act requirement would be satisfied only if Mr. Wilson believed that she would order or effectively force the admissions officers to accept his daughter, or that the admissions officers would rely solely on her recommendations in accepting his daughter.[20] In any event, Singer subsequently clarified that nothing was guaranteed for either of Mr. Wilson's children, as they would still need to obtain good grades and test scores and stay out of trouble in order to obtain admission. Ex. 602 at 4:18-5:12; Ex. 625 at 2:9-19. Further, Mr. Wilson's own statements confirm that he knew there was no guarantee that his children would be admitted to Harvard and Stanford.[21] Thus, Singer's out-of-context statements cannot satisfy the official act requirement.

In addition, to the extent the government's position is that the act of assigning an athletic recruitment "slot" is itself an official act, the government is mistaken. As noted above, an official act must involve a formal exercise of the relevant "organization's power akin to awarding a contract or instituting a lawsuit." *Napout*, 332 F. Supp. 3d at 565 (quoting *McDonnell*, 136 S. Ct. at 2372). While the government may argue that admitting a student to a university is akin to awarding a contract, offering a student a boost in his chances of getting admitted to USC by presenting him to Subco is not. When a coach presents a student to Subco, that is, at most, akin to

---

[20] *See Jefferson*, 289 F. Supp. 3d at 740 ("Jefferson said he would 'make sure' W2's Ex–Im Bank application 'got approved.' What the trial evidence does not make clear is how Jefferson intended to 'make sure' that approval would be forthcoming from Ex–Im Bank officials. There is no evidence that Jefferson agreed to exert pressure on Bank officials, and that lack of specificity might mean that Jefferson intended only to assist W2 by showing support and arranging meetings . . . .").

[21] *See, e.g.*, Ex. 602 at 4:15-21 (RICK SINGER: "[W]e got both settled. I mean, life is good over at the Wilson house." JOHN WILSON: "Yeah. Well . . . I'm on pins and needles here, know, because it's like, OK, they gotta still get good test grades, of course, all that stuff.").

writing a letter of recommendation for an applicant, which is not an official act. *See Fattah*, 914 F.3d at 155.[22]

In sum, the government has failed to satisfy the official act requirement with respect to the charges against Mr. Wilson for honest services fraud and federal programs bribery. And, the government has failed to satisfy this requirement for the charges against Defendants for conspiracy to commit honest services fraud and conspiracy to commit federal programs bribery.

## III.   BECAUSE THERE IS NO EVIDENCE OF A FIDUCIARY RELATIONSHIP, AND BECAUSE THE GOVERNMENT FAILED TO PROVE THE HONEST SERVICES OWED, THE CHARGES FOR HONEST SERVICES FRAUD AND CONSPIRACY TO COMMIT THIS OFFENSE CANNOT GO TO THE JURY.

### A.   The Government Failed to Prove the Existence of a Fiduciary Relationship.

In order to convict a defendant of honest services fraud, the government must prove (among other things) a breach of a fiduciary duty. *See Skilling*, 561 U.S. at 407; *accord United States v. Ernst*, 502 F. Supp. 3d 637, 653 (D. Mass. 2020). Of course, there cannot be a breach of a fiduciary duty unless there is a fiduciary relationship in the first place.[23] Thus, as a threshold matter, the government had to prove that the coaches and administrators at issue in this case owed a fiduciary duty to their employers. But as explained below, the government failed to submit any evidence showing that these employees owed fiduciary duties.

State law governs the existence of a fiduciary relationship under the honest services statute.[24] *See, e.g.*, *United States v. Brumley*, 116 F.3d 728, 734 (5th Cir. 1997) (en banc) (honest

---

[22] Notably, as discussed below, the government has failed to demonstrate that Harvard and Stanford even have a process that is akin to Subco. Nor has the government demonstrated that Mr. Wilson believed they had such a process.

[23] *See, e.g.*, *O'Byrne v. Santa Monica-UCLA Med. Ctr.*, 94 Cal. App. 4th 797, 812 (2001) ("In the absence of a fiduciary relationship, there can be no breach of fiduciary duty as a matter of law."); *accord Mattel, Inc. v. MGA Ent., Inc.*, No. CV 04-9049 DOC RNBX, 2011 WL 8427611, at *3 (C.D. Cal. Mar. 28, 2011); *TalentBurst, Inc. v. Collabera, Inc.*, 567 F. Supp. 2d 261, 266-67 (D. Mass. 2008).

[24] The First Circuit has recognized that there is a circuit split concerning the relationship between state law and the honest services statute. *See United States v. Urciuoli*, 513 F.3d 290, 298-99 (1st Cir. 2008) (explaining "[t]he relationship between state law and the federal honest services statute is unsettled" and stating in dicta that "just how far state law might be a premise for honest services fraud, or, alternatively, might 'immunize' conduct that would otherwise be a federal crime, are tricky questions and may depend *inter alia* on precisely what the government has charged). As recognized in *Skilling¸* one aspect of this circuit split concerns the source of the fiduciary duties that apply for purposes of the honest services statute. *See* 561 U.S. at 403 & n.36, 408 n.41 (noting that there are "divisions in the Courts of Appeals regarding the source . . . of [the] fiduciary duties" that apply for purposes of the honest services statute); *accord id.* at 417-19 & n.1 (Scalia, J. dissenting). The Supreme Court has not resolved this aspect of

services fraud conviction required defendant to have breached a duty concerning the services he owed to his employer under state law); *see also United States v. Rabbitt*, 583 F.2d 1014, 1025-26 (8th Cir. 1978) (looking to state law to determine whether the defendant violated a fiduciary duty). While "the general rule is that employees owe a duty of loyalty to their employers, not all states hold the relationship between employer and employee to be presumptively fiduciary." Charion L. Vaughn, Note, *Power Corrupts: Honest Services Fraud and Fiduciary Duties*, 50 Washburn L.J. 713, 734-35 (2011). In fact, as explained below, the states at issue here—California and Massachusetts—hold that this relationship is generally *not* a fiduciary one.

Under California law, "[a] fiduciary is 'a person having a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking.'" *Patriot Sci. Corp. v. Korodi*, 504 F. Supp. 2d 952, 966 (S.D. Cal. 2007) (quoting *Tyler v. Children's Hm. Soc.*, 29 Cal. App.4th 511, 548-49 (1994)). "A fiduciary relationship is a relationship *created by law*, such as that of guardian and ward, trustee and beneficiary, principal and agent, or attorney and client." *Id.* (citing *PersSon v. Smart Inventions, Inc.*, 125 Cal.App.4th 1141, 1160 (2005)). "The essence of a fiduciary . . . relationship is that the parties do not deal on equal terms, because the person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party. *See Korodi*, 504 F. Supp. 2d at 966 (quoting *Barbara A. v. John G.*, 145 Cal.App.3d 369, 383 (1983)). "In general, employment-type relationships are not fiduciary relationships." *O'Byrne v. Santa Monica-UCLA Med. Cent.*, 94 Cal. App. 4th 797, 811-12 (2001).

Massachusetts law is much the same. It "makes clear that only certain employees owe their employers a fiduciary duty of loyalty." *TalentBurst, Inc. v. Collabera, Inc.*, 567 F. Supp. 2d 261, 266 (D. Mass. 2008). Specifically, only employees "*occupying positions of trust and confidence* owe a duty of loyalty to their employer." *Id.* at 265. Such employees include (1) "officers,

---

the circuit split, and the First Circuit has not yet weighed in on this issue. *See United States v. Sawyer*, 239 F.3d 31, 41-42 (1st Cir. 2001) (stating that the duty of honest services owed by government officials derives from both state statutes and fiduciary duties, but not explaining whether these fiduciary duties derive from state common law or some other source). Defendants submit that state law is the exclusive source of these fiduciary duties.

directors, or key executives," (2) branch managers who operate with autonomy, (3) key employees who are involved in all aspects of their employer's business, who share in their employer's profits, and who have authority to bind their employer in contracts with third parties, and (4) attorneys working in a law firm who "have access to client information of a highly sensitive nature and [are] bound by the attorney-client privilege to hold it in the strictest confidence." *Agero, Inc. v. Rubin*, No. 14–P–932, 2015 WL 5206557, at *5-6 (Mass. App. Ct. Sept. 8, 2015). As these examples demonstrate, it is not enough that an employee is in a managerial position or interacts with clients. *See id.* at *1-2, 5-7. Nor is it enough that an employee has access to confidential information. *See id.* at 6-7. Rather, an employee occupies a position of trust and confidence based on access to confidential information only where it holds "substantial value" for the employer, is a "carefully guarded secret," and is "the cornerstone of [the employer's] business." *Id.* at *6.

Here, the relevant employees at USC are Donna Heinel and Jovan Vavic. Yet the government has not produced any evidence showing that these individuals owed fiduciary duties to USC under California law, or that Defendants believed that these individuals owed such duties to USC. Nothing in evidence suggests that they "d[id] not deal on equal terms" with USC, i.e., that USC was dependent on them, in the same way that a guardian and ward, trustee and beneficiary, principal and agent, or attorney and client do not deal on equal terms. *Patriot*, 504 F. Supp. 2d at 966. Nor does any of the evidence suggest that Defendants believed that Donna Heinel and Jovan Vavic were in a superior position vis-à-vis USC as a dependent party.

As for Stanford, the relevant employee is John Vandemoer. Yet, here too, the government has not produced any evidence concerning whether Vandemoer owed fiduciary duties to Stanford, or whether Mr. Wilson believed that he owed such duties to Stanford. In fact, other than labeling him Stanford's sailing coach, there is no evidence describing his relationship to Stanford.  Is he an employee or volunteer? Who supervises him? What is his relationship to the process that admits athletes? Does Stanford have a process akin to USC's Subco or something entirely different? The evidence does not shed any light on these questions. Ultimately, nothing in evidence suggests that

Vandemoer did not deal with Stanford on equal terms, or that Mr. Wilson believed that he did not deal with Stanford on equal terms.

As for Harvard, the relevant employee is the "senior women's administrator," who does not actually exist. *See* 9/23/21 Tr. at 14:16-18. The government has not produced any evidence suggesting that Mr. Wilson believed that the senior women's administrator owed fiduciary duties to Harvard, or that she had the types of powers and responsibilities that would make her a fiduciary under Massachusetts law. The evidence confirms that Mr. Wilson knew almost nothing about the senior women's administrator except that she had a position in the athletic department. *See* Ex. 602 at 3:3-14 (Mr. Wilson asking Singer about the senior women's administrator's responsibilities, and Singer dodging the question). This would not be enough to make her a fiduciary under Massachusetts law. *See, e.g.*, *Agero*, 2015 WL 5206557, at *1-2, *5-7. There is not even evidence to suggest that Mr. Wilson believed she had any specific authority at Harvard, or role with admissions, or that he had any understanding of what would be the admissions process at Harvard.

As the government failed to prove that the coaches and administrators at issue in this case owed a fiduciary duty to the universities, and failed to prove that Defendants believed these coaches and administrators owed such duties to the universities, the charges for honest services wire fraud and conspiracy to commit honest services mail and wire fraud cannot go to the jury.[25]

In addition, during its case-in-chief, the government raised a new theory: that the victim at issue here is not USC as a whole, but the USC admissions department. *See* 9/20/21 Tr. at 142:23-25 (AUSA Frank: "The Admissions Department was the victim of the fraud . . ."). But even

---

[25] The Third Circuit has held that to prove a violation of the honest services fraud statute, the government must generally show a violation of "a state-created fiduciary duty." *United States v. Gordon*, 183 F. App'x 202, 211 (3d Cir. 2006) (summarizing Third Circuit case law). At the same time, the Third Circuit has left unresolved the question of whether the government could bring an honest services fraud prosecution based on a violation of a fiduciary duty expressly established by federal law. *See United States v. Murphy*, 323 F.3d 102, 116-17 (3d Cir. 2003). Assuming the government may bring an honest services fraud prosecution based on a violation of a fiduciary duty expressly created by federal law, the charges for honest services fraud and conspiracy to commit honest services fraud still cannot go to the jury. This is because the government has failed to identify any fiduciary duties expressly created by federal law that bound the employees at issue in this case, let alone prove a violation of these fiduciary duties. *See United States v. Conigliaro*, 384 F. Supp. 3d 145, 154–55 (D. Mass. 2019) (explaining that to overcome the defense of pure legal impossibility, the government has the burden of proving that the alleged conduct at issue, or the goal or means of the alleged conspiracy, violated an identifiable legal prohibition).

21

assuming the admissions department is the victim here, the government would have to prove that the USC employees at issue in this case owed fiduciary duties to the admissions department. Whether or not these employees owed fiduciary duties to USC, there is no reason to believe that they would somehow owe fiduciary duties to the admissions department, especially because they worked for the athletic department—a completely separate department. *See* 9/21/21 Tr. at 34:16-18 (testimony of Rebecca Chassin confirming that the athletic department and the admissions department are completely separate departments). Moreover, with respect to Jovan Vavic, his connection to the admissions department is particularly tenuous because he did not even interact with the Subco. *See* 9/21/21 Tr. at 68:2-5. Thus, the notion that he would somehow owe fiduciary duties to the admissions department (or Subco itself) is a nonstarter.

There are also other, serious deficiencies with this theory. For instance, the evidence shows that it is within the athletic department's purview to put someone on the athletic recruitment list. *See, e.g.*, 9/20/21 Tr. at 153:18-24 (AUSA Frank: "Who decides which student athletes get recruited and presented to the subcommittee for admission?" Ms. Chassin: "So the coaches will decide who they want to recruit . . . ."). Thus, by the government's own reasoning, athletic recruitment "slots" must be the "property" of the athletic department. But the government has not presented any evidence that the athletic department was somehow defrauded by Defendants or their alleged co-conspirators, or that Defendants intended to deceive the athletic department. Absent such evidence, a rational jury simply could not convict Defendants of conspiracy to commit honest services fraud. *See* ECF No. 2015-1, which is hereby incorporated by reference, at 50, 61 (explaining the law regarding honest services fraud).[26]

In the alternative, assuming this new theory is valid, it cannot go the jury because that would constitute a constructive amendment of the indictment. *See Iacaboni*, 363 F.3d at 7.

---

[26] Another deficiency with the government's new theory is it assumes one part of an entity can defraud another part of that entity. This is absurd. Either the entity was defrauded or it wasn't. Either the entity as a whole was deprived of the honest services of its employees or it wasn't. Internal politics among divisions of a single entity does not generate federal criminal liability.

**B.** **The Government Failed to Prove the Honest Services Owed and that They Were in Fact Violated.**

A conspiracy requires either an agreement to accomplish an unlawful goal or an agreement to accomplish a lawful goal through an unlawful means.[27] The government has the burden of demonstrating that the goal or means of the alleged conspiracy violates some identifiable legal prohibition. *Conigliaro*, 384 F. Supp. 3d at 155-56 (citing *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000)). In other words, it is not enough for the government simply to assert that the goal or means of an alleged conspiracy violated an identifiable legal prohibition; rather, the government must introduce evidence which proves that the goal or means of the alleged conspiracy did in fact violate an identifiable legal prohibition. *See id.* at 155-59.

Similarly, where the government charges a substantive crime, the government has the burden of proving that the conduct at issue violated some identifiable legal prohibition. In other words, the government must show that the actions which the defendant performs or sets in motion, if fully carried out as he desires, would constitute a crime. *Conigliaro*, 384 F. Supp. 3d at 152 (citing *United States v. Oviedo*, 525 F.2d 881, 883 (5th Cir. 1976)).

Here, the government had to prove that the goal or means of the conspiracy set forth in Count One violated an identifiable legal prohibition—namely, the prohibition on depriving USC of the honest and faithful services of its employees. More specifically, the government needed to show that "admitting students through Subco with falsified athletic profiles deprived USC of the honest services of its employees." ECF No. 2265 at 5. In quashing Defendants' trial subpoenas for Alexandra Reisman and Scott Wandzilak, the Court stated that this case is about "whether admitting students through Subco with falsified athletic profiles deprived USC of the honest services of its employees." ECF No. 2265 at 5. By framing the honest services charges in this way, and denying Defendants' ability to obtain testimony from Reisman and Wandzilak concerning how USC treated applicants that contributed money to USC but did not knowingly submit false

---

[27] *United States v. Fernandez*, 722 F.3d 1, 32 (1st Cir. 2013) ("[S]ince the conduct allegedly underlying the conspiracy was not a crime, no . . . conspiracy to commit that conduct can exist either."); *see United States v. Driscoll*, 449 F.2d 894, 897-98 (1st Cir. 1971) ("[S]ince the conversation between the defendant and the Deputy District Director was an act directed towards obtaining a lawful result by a lawful means . . . it cannot support a conviction for conspiracy.").

information to Subco, this Court has effectively restricted the charge for conspiracy to commit honest services fraud. Specifically, to convict Defendants of conspiracy to commit honest services fraud, the Government must specifically show that "admitting students through Subco with falsified athletic profiles deprived USC of the honest services of its employees." ECF No. 2265 at 5. And the government must show that the athletic profiles were actually false and that Defendants were aware of the falsified athletic profiles, which the government has not done.

To meet its burden, the government had to adduce evidence concerning the customs, practices, and policies of the particular department or unit in which the USC employees at issue worked in order to demonstrate: (1) what services actually were expected of the employee; and (2) whether the alleged conduct actually and fraudulently deprived the employer of those services. In quashing Defendants' trial subpoenas for Reisman and Wandzilak, the Court stated "Defendants have not demonstrated that Reisman and Wandzilak have information relevant to the honest services question as to these defendants, i.e. the customs, practices and policies of Subco or the relevant expectations of the Admissions Department." ECF No. 2265 at 5. This suggests that the relevant customs, practices, and policies are those of Subco and the admissions department. Respectfully, that is incorrect. As discussed above, the USC employees at issue did not owe fiduciary duties to Subco or the admissions department, and Vavic was not even part of Subco, so the customs, practices, and policies of Subco and the admissions department are irrelevant. Indeed, with respect to Vavic, there is no reason to believe that he was even aware of these customs, practices, and policies, let alone that bound by them. The relevant customs, practices, and policies are those of the department where Vavic and Heinel worked—the athletic department.

The government failed to submit any of this evidence. The USC employees at issue here—Donna Heinel and Jovan Vavic—both worked in the athletic department, which was completely separate from the admissions department. See 9/21/21 Tr. at 34:16-18 (testimony of Rebecca Chassin). One of the USC witness who testified in this case worked for the admissions department

24

and had no knowledge of the athletic department's customs, practices, and policies.[28] And another witness who worked in the athletic department expressly admitted that he "ha[d] no idea" whether "the Athletic Department's top administrators permitted coaches to raise money by getting donations for walk-on recruits." 9/28/21 Tr. at 224:9-28; *see also* 9/24/24 Tr. at 199:15-18, 200:1-4 (similar testimony from yet another witness from USC's athletic department). No other evidence established these customs, practices, and policies. Absent such evidence, a rational jury could not convict Defendants of conspiracy to violate the honest services statute.

Further, even assuming there is custom, practice, or policy in the athletic department which prohibited "admitting students through Subco with falsified athletic profiles," ECF No. 2265 at 5, there is no evidence that Jovan Vavic violated this policy. For instance, to the extent Johnny Wilson's profile was "falsified,"[29] there is no evidence that Jovan Vavic knew this. The government did submit evidence in the form of an email where Rick Singer informed Mr. Wilson that "Jovan has Johnny's stuff and asked me to embellish his profile more, which I am doing." Ex. 83 at 3. But this is not enough for the jury to find beyond a reasonable doubt that Jovan Vavic knew that Johnny Wilson's athletic profile was false. First of all, Jovan Vavic did not ask Singer to "embellish" this profile; rather, he wrote: "Rick, I need his resume, needs to be a good resume." Ex. 81. At most, this email suggests that a student's athletic skills mattered to Jovan Vavic. And, in any event, one of the plain meanings of "embellish" is simply to add details to something or improve its appearance, not to falsify or exaggerate.[30] Absent evidence that Vavic knew that

---

[28] *See, e.g.*, 9/21/21 Tr. at 35:9-13 (admitting Brunold never discussed the athletic department's VIP list with her); *id.* at 46:12-24 (explaining she does not know the workings of the athletic department's fundraising office or what direction Heinel was given about her fundraising obligation); *id.* at 53:21-54:5 (stating she does not know whether there were rules in the athletic department establishing criteria for presenting applicants through Subco); *id.* at 56:10-12 (answering affirmatively that "she had no idea what Tim Brunold and Pat Haden discussed by e-mail and telephone calls about fundraising and SUBCO"); *id.* at 58:23-59:5 (confirming that she "wouldn't know anything about" how often the athletic department provided Haden's VIP list to Brunold and that she had never seen the list); *id.* at 117:23-118:1 (stating she does not know whether Mr. Singer was authorized to do fund-raising for USC athletic department).

[29] Mr. Wilson does not concede that Johnny Wilson's profile was "falsified" and, if it was, that he had knowledge of that. In fact, as discussed below, the government has failed to demonstrate that this athletic profile was inaccurate.

[30] *See, e.g.*, *United States v. Noone*, 913 F.2d 20, 29 n.14 (1st Cir. 1990) (using "embellish" in this way); *In re Stern*, 44 B.R. 15, 17 (Bankr. D. Mass. 1984) (same); 9/14/21 Tr. at 66:10-67:13 (acknowledging "embellish" has this meaning); *see also* Ex. 9621 (using the word "embellish" to mean adding additional interests and experiences to a resume, not to falsify or exaggerate).

Johnny Wilson's athletic profile was false, a reasonable jury simply could not find that Mr. Wilson and Vavic conspired to admit Johnny Wilson through Subco by using a falsified athletic profile.

In addition, with respect to the charges for honest services fraud the government has brought against Mr. Wilson, the government had to prove beyond a reasonable doubt that the conduct at issue violated the prohibition on depriving Harvard and Stanford of the honest and faithful services of their employees. To do this, the government had to produce evidence concerning the customs, practices, and policies of the particular department or unit in which the employees at issue worked in order to demonstrate: (1) what services actually were expected of the employee; and (2) whether the conduct at issue, if completed, would fraudulently deprive the employer of those services. *See Conigliaro*, 384 F. Supp. 3d at 152 (citing *Oviedo*, 525 F.2d at 883). But, again, the government failed to submit any of this evidence. The evidence has revealed nothing about the customs, practices, and policies of the athletic department at Harvard or Stanford—or, for that matter, the customs, practices, and policies of the admissions department or any other department at Harvard or Stanford. Accordingly, a rational jury could not convict Mr. Wilson of honest services wire fraud.

## IV. THE GOVERNMENT HAS FAILED TO PROVE THAT MR. WILSON CONSPIRED TO MAKE FALSE STATEMENTS OR THAT ANY OF THE ALLEGEDLY FALSE STATEMENTS WERE MATERIAL.

As explained below, the government has failed to prove that Mr. Wilson conspired to make false statements to USC or that any of the allegedly false statements at issue were material. Accordingly, a rational jury could not convict Mr. Wilson of conspiracy to commit mail and wire fraud or conspiracy to commit honest services mail and wire fraud.

To convict a defendant of mail or wire fraud, or a conspiracy to engage in these offenses, the government must prove (among other things) a scheme to obtain money or property by means of materially false or fraudulent pretenses. *See United States v. DiRosa,* 761 F.3d 144, 150-51 (1st Cir. 2014); *United States v. Appolon*, 715 F.3d 362, 367-68 (1st Cir. 2013). Similarly, to convict a defendant of honest services mail or wire fraud, or a conspiracy to engage in these offenses, the

government must prove (among other things) that the defendant agreed and specifically intended that the fiduciary at issue would deceive the entity to which he owed a fiduciary duty through a materially false misrepresentation, false statement, false pretense, or a deliberately misleading statement. *See, e.g.*, ECF No. 2265 at 5 (stating that this case is about whether Defendants conspired to use "falsified athletic profiles" to obtain admission for their children to USC); *see also* ECF No. 2015-1 at 50, 61 (explaining the law regarding honest services fraud).

"[A] statement or representation is false if it is untrue when made and was then known to be untrue by the person making it or causing it to be made; a statement or representation is fraudulent if it is made falsely with intent to deceive." *United States v. Brennan*, 832 F. Supp. 435, 439-40 (D. Mass. 1991), *aff'd*, 994 F.2d 918 (1st Cir. 1993). A statement or representation is "material" if it has "a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed." *United States v. Blastos*, 258 F.3d 25, 29 (1st Cir. 2001) (brackets and internal quotation marks omitted). If the alleged victim would have made the same decision if it knew the true facts, the misstatement at issue cannot be material.[31]

Here, the government has failed to prove that Johnny Wilson's profile included any false or misleading statements, let alone any that are materially false or misleading. The government suggests that the profile misrepresented Johnny Wilson's swim times, but there is no evidence that the swim times in the profile were false. Rather, the evidence merely shows that a prior version of the profile contained slower swim times from Johnny Wilson's sophomore year in high school. *See* 9/15/21 Tr. at 71:8-73:20. The government has not submitted any evidence disputing that the times in the updated version of the profile are true. Further, even if the times in the updated version of the profile were false, the government has not submitted any evidence suggesting that the difference between the times was material. Indeed, the evidence suggests that the difference was

---

[31] *See United States v. Williams*, 12 F.3d 452, 457 (5th Cir. 1994) ("[O]ne way of determining whether the statements were capable of influencing a bank's decision is to extrapolate from the facts and ask, 'If the bank had relied on the defendant's statements, would it have made any difference?'"), *abrogated on other grounds by United States v. Wells*, 519 U.S. 482 (1997); *see also id.* at 458 (framing the relevant question as whether "a bank or federal institution, armed with the truth, would have arrived at a different decision on a pending application").

not material as Casey Moon testified both times were impressive for a waterpolo applicant. *See* 9/28/21 Tr. at 178:14-179:6; *accord* 9/21/21 Tr. at 82:11-83:1; Ex. 22.

Instead of attempting to prove that the difference between the swim times was material to either Vavic or Subco, or that any other supposedly false aspect of Johnny Wilson's profile was material, the government elicited testimony suggesting that USC would not have admitted Johnny if they believed that he had lied on his application. *See* 9/21/21 Tr. at 130:24-131:2. This is irrelevant. If Johnny lied on his application, that is different from whether his father knew there were false statements on the profile. And, in any event, this testimony has no bearing on whether the statements at issue are themselves either false or material.[32]

Further, the government has failed to show that Mr. Wilson was even aware of the contents of the profile, and actually would have known what was not accurate. He had been living in Europe for a year, and there is no evidence he had tracked the details of his son's waterpolo accomplishments. None of the evidence suggested that he opened the email from Rick Singer containing the updated profile, read the profile, understood if there was any falsity, forwarded the profile, replied to the email containing the profile, or ever discussed the profile with Singer or anyone else.[33] The agents purposely chose not to raise this profile on any of the consensually recorded conversations with Vavic or Wilson; a clear concession they thought it futile to raise the issue. Absent such evidence, a reasonable factfinder could not find beyond a reasonable doubt that

---

[32] *See Williams*, 12 F.3d at 457, where the court stated: "The government marshalled evidence showing that the banks would not have made the loans if they had known that these statements were false. In actuality, the bank officers merely testified that they would not have approved the loans if they had discovered that the applicant had lied. **That does not make the lies themselves material, however.** This is a crucial distinction. Aided by hindsight, the banks undoubtedly would not have made these loans. Any bank would be understandably reluctant to lend money to a corporation when its officers lie on the loan application. In sum, the government's evidence demonstrates only that the banks maintain a policy that warns against loaning money to entities which do not tell the truth; **it is no way probative of the materiality of these particular statements.**" (Emphases added).

[33] As noted above, the government did submit evidence in the form of an email where Rick Singer informed Mr. Wilson that "Jovan has Johnny's stuff and asked me to embellish his profile more, which I am doing." Ex. 83 at 3. But this is not enough for the jury to find that Mr. Wilson understood that information on the profile would be falsified, particularly where a plain meaning of "embellish" is simply to add details to something, not to falsify or exaggerate.

Mr. Wilson read the updated profile or Singer's cover email. *See, e.g.*, *Bartlett v. Heibl*, 128 F.3d 497, 499 (7th Cir. 1997) ("[R]eceiving a letter doesn't imply that the letter is read . . . .").[34]

Because the government has failed to submit evidence showing that Mr. Wilson conspired to make false statements to USC or that any of the allegedly false statements at issue were material, a rational jury could not convict Mr. Wilson of conspiracy to commit mail and wire fraud or honest services mail and wire fraud. Thus, these charges cannot go to the jury.

## V.   THE GOVERNMENT HAS FAILED TO PROVE THAT MR. WILSON AIDED AND ABETTED RICK SINGER.

The Government has charged Mr. Wilson with, among other things, aiding and abetting wire fraud, aiding and abetting honest services wire fraud, and aiding and abetting federal programs bribery. To convict a defendant of aiding and abetting a crime, the government must prove, among other things, that the crime charged was in fact committed by someone else. *United States v. Perez-Melendez*, 599 F.3d 31, 40 (1st Cir. 2010). Here, the only other person involved in the alleged crimes was Rick Singer, and he was acting as a government agent, informant, and cooperator. *See* 9/23/21 Tr. at 47:13-47:19, 134:22-25. It was therefore impossible for him to actually commit any of these crimes. *United States v. Samuels*, 308 F.3d 662, 668 (6th Cir. 2002) (recognizing that a "person cannot be guilty of aiding and abetting [an] informant because the informant isn't committing any crime"); *see also* ECF No. 2011, which is hereby incorporated by reference. Accordingly, a rational jury could not find Mr. Wilson guilty of aiding and abetting the crimes charged in the indictment. Thus, the aiding and abetting charges cannot go to the jury.

## VI.   THE GOVERNMENT HAS FAILED TO OVERCOME MR. WILSON'S DEFENSE OF FACTUAL IMPOSSIBILITY.

The charges against Mr. Wilson for wire fraud, honest services wire fraud, federal programs bribery, and aiding and abetting cannot go to the jury because the government has failed

---

[34] The government also elicited testimony that Jovan Vavic informed Subco that Johnny Wilson would be an "immediate impact player, due to his speed." Ex. 7355 at 38. This is no more than puffery and vague compliments; not actionable fraud. But there is no evidence that Mr. Wilson was aware of Jovan Vavic's statement or intended for him to make such a statement. Thus, even assuming Jovan Vavic made this statement knowing that the times in the updated profile were false (for which there is no evidence), that fact cannot support a conviction Count One.

to overcome the defense of factual impossibility.[35] Factual impossibility refers to those situations in which, unknown to the defendant, the consummation of the intended criminal act is physically impossible. *See United States v. Luttrell*, 889 F.2d 806, 810 (9th Cir. 1989); *see also* Defendants' Proposed Jury Instructions, ECF No. 2015-1, at 91 (explaining the law regarding factual impossibility). As explained in Section IV.B of Defendant John Wilson's Consolidated Memorandum of Law in Support of his Motions to Sever, to Dismiss, and to Strike (ECF No. 995), which is hereby incorporated by reference, this defense applies here because Rick Singer's status as a cooperator made it impossible for Mr. Wilson to commit wire fraud, honest services wire fraud, or federal programs bribery, or to aid and abet Singer in committing these crimes. The government does not and cannot dispute that Singer's cooperation made the consummation of these crimes impossible. Accordingly, the charges for wire fraud, honest services wire fraud, federal programs bribery, and aiding and abetting cannot go to the jury.

## VII. THE GOVERNMENT HAS FAILED TO PROVE THE EXISTENCE OF A "HUB-AND-SPOKE" CONSPIRACY, LET ALONE THAT DEFENDANTS INTENDED TO JOIN SUCH A CONSPIRACY.

As explained below, the conspiracy charges against Defendants cannot go to the jury because the government has failed to prove the existence of any "hub-and-spoke" conspiracy, let alone that Defendants intended to or did join such a conspiracy.

With respect to the conspiracy charges against Defendants, the government's theory is that Defendants and their alleged co-conspirators joined a "hub-and-spoke" conspiracy. Until Rick Singer began to cooperate with the government in September 2018, he was the alleged hub, with his employees and alleged confederates clustered in close orbit and assisting him on the "sell" side of his client transactions. Radiating from the hub were more than a hundred spokes, and at the end of each spoke was an individual client (or a married couple) who acted exclusively on the "buy" side of those transactions—i.e., "who made payments to Singer's entities, . . . or otherwise worked with Singer . . . ." Government's Automatic Discovery, ECF 1991-1, at 4.

---

[35] The government bears the burden of overcoming this defense. *See, e.g.*, *United States v. Guzman*, 85 F.3d 823, 827 (1st Cir. 1996); *United States v. Rodriguez*, 858 F.2d 809, 813-15 (1st Cir. 1988).

When Defendants moved to dismiss the Indictment, they explained that the Indictment was insufficient to sustain charges based on the government's single-conspiracy theory. This was because the Supreme Court long ago held that a hub and a group of spokes make up only a "rimless wheel" unless the government proves that the person at the end of each spoke intentionally joined an overlapping, interdependent arrangement for a common purpose. Absent such proof, each relationship between the hub and an individual spoke is, at most, a separate conspiracy.[36] A multiplicity of independent connections (even to a common hub), when made for a variety of individual purposes, cannot constitute a "single" conspiracy.[37] Further, in *Kotteakos*, the Supreme Court held that it was reversible error to convict on a single-conspiracy charge when the evidence at best might prove multiple conspiracies. Whether such error is treated as a variance between indictment and evidence, or as the misjoinder of defendants on distinct charges, it is inherently prejudicial. *See Kotteakos*, 328 U.S. at 774.

Here, the government has utterly failed to prove the existence of any "hub-and-spoke" conspiracy, as it failed to introduce evidence showing that Defendants and their alleged co-conspirators had any connection beyond the fact that they knew Rick Singer. Nor did the government introduce any evidence suggesting that Defendants agreed and specifically intended to enter into a vast conspiracy involving hundreds of other parents, or that they shared a goal with the other alleged conspirators of getting multiple children admitted to various universities, or that they believed they would somehow benefit from the involvement of other parents in the conspiracy. In the absence of such evidence, a reasonable jury could not convict Defendants of either conspiracy charge. *See* ECF No. 1032 at 4-17; ECF No. 1991 at 1-12.

---

[36] And not even that if, as here, the person at the end of the spoke merely purchased products or services from the hub. *See, e.g., United States v. Moran*, 984 F.2d 1299, 1302 (1st Cir. 1993) ("a mere buyer-seller relationship, without more, is inadequate" to establish a conspiracy).

[37] *See* ECF No. 1991 at 4-6; Memorandum in Support of Defendants' Motion to Dismiss Pursuant to Federal Rules of Criminal Procedure 8 and 12(b)(3)(B)(i), (iv), and (v), ECF No. 1032, which his hereby incorporated by reference, at 4-17 (citing *Kotteakos v. United States*, 328 U.S. 750, 772 (1946)); *accord* Memorandum In Support of Defendants' Motion In Limine to Require the Government to Proffer Its Corroborating Evidence of the Alleged Conspiracy Under *Petrozziello*, ECF No. 1991, which is hereby incorporated by reference, at 4-6.

## VIII.   THE GOVERNMENT HAS FAILED TO MEET ITS BURDEN UNDER *PETROZZIELLO.*

In seeking to prove each of the charged crimes, the government relied heavily on out-of-court statements. It sought to introduce such statements pursuant to Federal Rule of Evidence 801(d)(2)(E). *See e.g.*, 9/13/21 Tr. at 13:5-8; 9/20/21 Tr. at 189:7-13. This rule provides that a statement is not hearsay—even if it was made out of court, and even if it is submitted for its truth—if it is offered against an opposing party and was made by that party's coconspirator, and if the declarant made the statement both during and in furtherance of the conspiracy. Fed. R. Evid. 801(d)(2)(E). *See generally United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977). The government bore the burden of showing by a preponderance of the evidence that the requirements of Rule 801(d)(2)(E) were satisfied. *See id.* at 23. As Defendants anticipated in their Memorandum In Support of Defendants' Motion In Limine to Require the Government to Proffer Its Corroborating Evidence of the Alleged Conspiracy Under *Petrozziello* (ECF No. 1991), which Defendants hereby incorporate by reference, the Government failed to satisfy this burden. Crucially, the government failed to introduce any evidence suggesting that Defendants specifically intended to enter into a vast conspiracy involving hundreds of other people. Nor did the government introduce evidence showing that Defendants and their alleged co-conspirators had any connection beyond the fact that they all knew—and separately worked with—Rick Singer. *See* ECF No. 1991 at 1-12 (explaining that without such evidence, the government would be unable to satisfy its burden under *Petrozziello*). Because the government failed to satisfy *Petrozziello*, the jury cannot consider the out-of-court statements for their truth. Without these statements, the government's entire case against Defendants collapses.

## IX.   THE GOVERNMENT HAS FAILED TO PROVE THAT DEFENDANTS DID NOT ACT IN GOOD FAITH.

The parties agree that good faith is a complete defense to each of the charges in this case. *See* ECF No. 2015-1 at 24; Government's Proposed Jury Instructions, ECF No. 2014, at 27; *accord*

*United States v. Dockray*, 943 F.2d 152, 155 (1st Cir. 1991). It is the government's burden to prove that the Defendants did not act with good faith.[38]

Here, the evidence of Defendants' good faith is so strong that a rational jury could not find that the government has met this burden. *See, e.g.*, 9/23/21 Tr. at 51:9-20; 165:24-167:6; 174:5-12; 179:4-1 (Agent Keating's testimony indicating various deficiencies in the government's investigation). Take, for instance, the tax charges against Mr. Wilson. The evidence shows that Mr. Wilson did not intend to pay money into the pockets of any coaches or administrators, or Rick Singer. *See* 9/24/21 Tr. at 77:20- 79:10; 9/13/21 Tr. at 26:24-27:1, 29:11-15 (the government conceded in its opening that Singer told parents that the donation would go to the university insider's program and Singer did not tell them about these payments to the insiders' pockets). Rather, Mr. Wilson sought to make donations to two 501(c)(3) entities: USC and The Key Worldwide Foundation. Both of these organizations were listed on the IRS website as qualified tax-exempt organizations.[39] See 9/24/21 5:25-8:23; 9/27/21 Tr. at 137:1-14; 9/28/21 Tr. at 62:10-16 (testifying private universities are 501(c)(3) entities) . Each organization sent him a letter thanking him for his contribution, and neither suggested that goods or services were provided in exchange for his contributions. In these circumstances, it was entirely reasonable for Mr. Wilson to conclude that his contributions were deductible.

In addition, while it is true that the tax return listed his contribution to USC as a business expense rather than a charitable deduction, Mr. Wilson did not see the invoices or give any instruction on how to record the expenses for tax purposes. He needed an invoice from Mr. Singer to generate the wire transfer of funds. On an annual basis, he relied on his accountant, Mr. Nahmens, to "clean up" the books for his company and adjust the accounting entries. *See* 9/27/21

---

[38] *See* ECF No. 1991 at 4-6; Memorandum in Support of Defendants' Motion to Dismiss Pursuant to Federal Rules of Criminal Procedure 8 and 12(b)(3)(B)(i), (iv), and (v), ECF No. 1032, which his hereby incorporated by reference, at 4-17 (citing *Kotteakos v. United States*, 328 U.S. 750, 772 (1946)); *accord* Memorandum In Support of Defendants' Motion In Limine to Require the Government to Proffer Its Corroborating Evidence of the Alleged Conspiracy Under *Petrozziello*, ECF No. 1991, which is hereby incorporated by reference, at 4-6.

[39] The IRS publishes a document on its website called "Publication 78," which is a "[l]ist of organizations eligible to receive tax-deductible charitable contributions." Tax Exempt Organization Search Bulk Data Downloads, last reviewed or updated Sept. 23, 2021, https://www.irs.gov/charities-non-profits/tax-exempt-organization-search-bulk-data-downloads. Taxpayers "may rely on this list in determining deductibility of their contributions." Ex. 9864.

Tr. at 121:14-122:21. Mr. Nahmens would have recharacterized the contribution to USC as a charitable contribution had he seen the letter from USC thanking the Wilsons for their contribution, but he did not see it because Debbie Rogers did not provide him with a copy. *See* 9/27/21 Tr. at 138:20-139:1 And, the fact that this contribution was listed as a business expense rather than a charitable deduction had little (if any) impact on the taxes Mr. Wilson owed, so he would have no motive to falsely characterize the contribution. *See* 9/29/21 Testimony of C. Ranahan. At most, describing it as the wrong type of deduction saved $1425 on a $966,821 tax bill. *See* 9/29/21 Tr. at 176:3-11, 183:12-20. This is not a material amount. Thus, the fact that this contribution was listed as a business expense rather than a contribution does not suggest that Mr. Wilson was acting in bad faith. *See* ECF No. 2015-1 at 85 (citing *United States v. Wilson*, 887 F.2d 69, 74-76 (1st Cir. 1989) and explaining the law concerning the relationship between motive and bad faith).

Finally, there is a compelling basis to find the $20,000 in expenses was intended for the foundation, not Mr. Singer personally, given the extensive taped discussions that Singer did not earn anything for arranging the donation.

Moreover, evidence from the government's witness, Ms. Ranahan, concerning taxes allegedly due from Mr. Wilson may not be considered by the jury. Ms. Ranahan testified that Mr. Wilson allegedly owes $88,000 as a tax deficiency. Her claim, supporting the theory advanced by the government, is that Mr. Wilson should have offset the value of any positive admissions consideration that his son received when he deducted his donation from his tax return. Yet, by Ms. Ranahan's own admission, she had no basis for providing this testimony under the Tax Code and IRS regulations. Ms. Ranahan agreed that it was incumbent on USC to inform Mr. Wilson if there was any value he should have offset from his donation. She advised that she had not investigated whether USC informed Mr. Wilson of an offset or if it had a practice of informing any donor to make such an offset. Further, Ms. Ranahan agreed that the way to determine the value (if any) of positive admissions consideration in accordance with IRS regulations would be to investigate comparables. She advised she had not looked at any comparables. The $88,000 figure provided by Ms. Ranahan was erroneous and not supported by law or fact. Mr. Wilson has moved to strike Ms.

Ranahan's testimony, and incorporates by reference his Motion to Strike Testimony of IRS Agent Concerning Tax Calculation, ECF No. 2321. Absent admissible evidence of any tax owed by Mr. Wilson, the government cannot meet its burden under 26 U.S.C. § 7206. A lack of tax owed goes to more than Mr. Wilson's motive and good faith; it also goes to the element of materiality. There is no evidence of a willful or material violation by Mr. Wilson. *See* ECF No. 2321.

## X. THE GOVERNMENT HAS FAILED TO PROVE THAT DEFENDANTS VIOLATED 18 U.S.C. § 666.

The government has failed to present evidence sufficient to support a conviction for conspiracy to commit federal programs bribery under 18 U.S.C. § 666 or for the substantive count under 18 U.S.C. § 666. The bribery statute makes it unlawful to "give[], offer[], or agree[] to give anything of value **to any person**, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more[.]" (Emphasis added).

According to the plain language of the statute, federal programs bribery occurs only when a thing of value is given to "a person." While the statute does not define "person," the rule of lenity requires that criminal statutes be construed narrowly. *See Burrage v. United States*, 571 U.S. 204, 216 (2014) (Scalia, J.) ("Especially in the interpretation of a criminal statute subject to the rule of lenity, we cannot give the text a meaning that is different from its ordinary, accepted meaning, and that disfavors the defendant." (citations omitted)).

In *United States v. Jain*, the court considered whether a "thing of value" given to an organization, rather than a "person," could constitute bribery, and determined that the answer was no.[40] The government has offered zero evidence that Mr. Abdelaziz or Mr. Wilson gave anything

---

[40] *See* No. 94-00087-01, 1995 WL 9301, at *1 (W.D. Mo. Jan. 9, 1995), *aff'd in part, rev'd in part on other grounds*, 93 F.3d 436 (8th Cir. 1996): "Count Three, the bribery count, alleges violation of 18 U.S.C. § 666(a)(2), which forbids corruptly giving something of value to any person . . . Defendant Jain contends this simply bars bribery in the ordinary sense, where something is given to an agent personally, intending to influence or subvert the loyalty of the agent in connection with the transaction of business affairs, in this case, the affairs of the hospital. Since the alleged "bribe," the sending of patients to the hospital itself, did not involve giving "anything of value to any person" (as distinguished

of value to any **person** with the intent to influence an agent of USC. Instead, the government's evidence shows that Mr. Abdelaziz wrote a check to The Key Worldwide Foundation (an entity), that Mr. Wilson also contributed to this entity, and that Mr. Wilson made a separate payment to USC. See 9/24/21 Tr. at 13:3-19. Moreover, the government has conceded multiple times throughout trial that Mr. Abdelaziz believed his donation was going to a program at USC.[41]

The government has admitted that Mr. Abdelaziz and Mr. Wilson did not know that any money would go to anyone personally, and that Mr. Abdelaziz and Mr. Wilson did not know that Mr. Singer was going to steal any money for himself. *See, e.g.*, Trial Day 4 Tr. at 29:11-15 (government stating during opening "The evidence will show that Singer was not honest with the parents. He did not tell them about these payments to the insiders' pockets, and he did not tell them that he kept a large chunk of their money for himself"); 9/23/21 Tr. at 167:15-19 (Agent Keating explaining that Singer "kept some of the money for himself and didn't tell the parents"). Thus, because the government has failed to produce any evidence that Mr. Abdelaziz or Mr. Wilson gave or agreed to give anything of value to any "person" in order to influence an agent of USC—and in fact, has conceded just the opposite—there is not sufficient evidence to sustain a conviction for conspiracy to commit federal programs bribery.

## XI.    THE GOVERNMENT HAS FAILED TO PROVE VENUE

The government has failed to prove venue for Counts One and Two as to both Defendants. As to Count One, the government has failed to prove a single conspiracy. Without the web of a single conspiracy, each defendant's ties to the District must be analyzed separately. The government has failed to put forth any evidence tying Defendant Abdelaziz to the District of Massachusetts. The best that the government did was to suggest (without really proving) that Rick Singer was in Boston when he made some recorded calls. But those calls were not in furtherance

---

from the organization), defendant says the statute was not violated. On further consideration of the issue, I agree with defendant's construction of the statute, particularly in the absence of any citations by the Government contrary to the plain meaning of the statutory language."

[41] *See* Trial Day 10 Tr. at 71:15-16 (Agent Keating: "I remember Mr. Singer saying that [Mr. Abdelaziz's] payment was going to USC"). Similarly, the evidence indicates that Mr. Wilson had a good faith belief that all $220,000 of his contribution was a donation and ultimately would be provided to, or used to support, USC. *See, e.g.*, 9/23/21 Tr. at 167:15-168:21 (Agent Keating testifying that Singer "kept some of the money for himself and didn't tell the parent").

of the conspiracy for the reasons set forth in Defendants' Memorandum of Law In Support of Defendants' Motion to Dismiss for Lack of Venue (Dkt. 1020), which is hereby incorporated, as well as Defendants' Reply in Support of Motion to Dismiss for Lack of Venue (Dkt. 1234). In fact, the government admitted at Dkt. 1104 that the so-called "audit calls" regarding USC were made only to corroborate past conduct and were not in furtherance of any scheme or conspiracy. This means that they were not sufficient for venue.[42] Similarly, with respect to Mr. Wilson, the government has failed to establish a sufficient connection to the District of Massachusetts.[43]

As to Count Two, there is likewise no venue for either defendant. Count Two is limited to USC. Indeed, the indictment refers to Count Two as the "USC Federal Programs Bribery Conspiracy." There has been zero evidence connecting any of the Count Two allegations to Massachusetts. Even if there was a single Count Two conspiracy, as alleged in the indictment, the government has not set forth any evidence connecting any USC related bribery to the District of Massachusetts. There was evidence that Defendant Wilson was in California and the Netherlands

---

[42] It might be true that telephone calls from a government agent in the trial district to a co-conspirator outside of the trial district can create venue, but that is only the case where the co-conspirator uses the telephone call to further the conspiracy. See *United States v. Rommy*, 506 F.3d 108, 122 (2d Cir. 2007) ("What is determinative of venue . . . is whether the conspirator used the telephone call to further the objectives of the conspiracy."). As this Court has noted in a different context, "Statements qualifying as 'mere idle chatter' or 'narratives of past events' are not sufficient to be considered in furtherance of a conspiracy." See *United States v. DeNunzio*, No. 14-CR-10284-NMG, 2015 WL 2226251, at *4 (D. Mass. May 12, 2015) (*citing United States v. Ciresi*, 697 F.3d 19, 28 (1st Cir. 2012). The government essentially stipulated that the calls regarding USC were not in furtherance of any conspiracy. At Dkt. 1104, the government explained that all of Singer's calls regarding USC "concern historical context." Dkt. 1104 at 5-6 (emphasis added). The government refers to these calls as the "audit calls," *id.*, and they were not "targeting ongoing and future conduct," but were calls with parents "who had already engaged in the scheme," id. at 8. The sworn declarations are even more direct. Agent Keating declares that the USC "audit calls" were made to "parents who had completed the fraud and bribery scheme." Dkt. 1104-1 at ¶ 11. Agent Smith declares that Singer's USC "audit calls" were with "parents who had already completed the fraud and bribery scheme." Dkt. 1104-2 at ¶ 11. And AUSA Rosen declares that Singer made the consensually-recorded USC "audit calls" to "parents who had already completed the scheme before Singer began cooperating." Dkt. 1104-3 at ¶ 8. According to the government's brief: "The purpose of those calls was to corroborate what the evidence indicated those parents knew and understood about the fraud and bribery. . . . Singer repeated back to the defendants a summary of the crime they had committed and asked them if they agreed they had done it. The calls were the equivalent of a wired-up cooperator asking a drug dealer, to whom the cooperator has previously sold drugs: 'Do you remember when I sold you those drugs?'" Dkt. 1104 at 8-9. Put another way, if the sworn declarations are to be believed, these calls did not further the conspiracy and therefore cannot, as a matter of law, constitute the basis for venue.

[43] To the extent the government has shown any conduct that was related to the District of Massachusetts, it was after Rick Singer was already a cooperator, at which point any conspiracy between Singer and John Wilson had ended. As this conduct post-dated the supposed conspiracy, it cannot serve as a basis to establish venue.

during the relevant Count Two time period when his son was applying to and being admitted to USC, but no evidence of any connection to the District of Massachusetts. *See, e.g.*, 9/15/21 Tr. 164:22-24; 9/15/21 Tr. at 124:22-125:7; 9/27/21 Tr. at 183:12-17; 185:19-25. As to the consensual calls, they are not in furtherance of the conspiracy for the reasons set forth above, and they certainly did not further Johnny's USC admission, which occurred four years prior, or Sabrina's admission, which had occurred over six months prior.

With respect to both counts, the government previously relied on the allegation in the indictment that Rick Singer mailed Donna Heinel checks from Boston. **But the government failed to prove up this allegation in its case-in-chief.** The Court had previously declined to dismiss Count Two on the basis that the indictment alleged Signer dropped a check in a mailbox in Massachusetts. *See* Dkt. 1402 at 7 ("Because the FSI alleges that Singer mailed a January, 2019, check from Massachusetts in furtherance of the conspiracy, venue as to Count Two is proper."). Now that the government has failed to prove up this allegation, Count Two must be dismissed for lack of venue regardless of whether there is a single conspiracy or not.[44]

Even if the government had put on evidence of a check going to Donna Heinel sent from Boston, the government has not adequately proven that the separate Singer-Heinel agreement for $20,000 per month was anything other than a separate conspiracy between Singer and Heinel and not part of either charged conspiracy. *See* Dkts. 1020 and 1234.

## XII.   THE GOVERNMENT HAS FAILED TO PROVE THAT MR. ABDELAZIZ CONSPIRED TO DEFRAUD USC.

The government has failed to put on sufficient evidence to prove that Mr. Abdelaziz conspired in any way to defraud USC. In particular, the government has not put on any evidence that Mr. Abdelaziz saw the phony profile that Rick Singer has submitted to USC. There has been no forensic evidence, no documentary evidence, and no testimony that Mr. Abdelaziz ever saw or opened the Singer email containing the phony profile. Indeed, the evidence shown at trial showed

---

[44] Regardless, the unilateral action of a cooperator cannot create venue and, in any case, was pursuant to a separate conspiracy between Singer and Heinel alone of which Defendants were not a part. *See* Dkt. 1234.

that Singer sent the phony profile to the wrong email address for Mr. Abdelaziz. *See, e.g.*, 9/17/21 Tr. at 156:20-158:7.

## XIII. THE GOVERNMENT HAS FAILED TO PROVE THAT ANY PAYMENTS WERE MADE TO "DESIGNATED UNIVERSITY ACCOUNTS OVER WHICH THE BRIBE RECIPIENTS EXERCISED DISCRETION OR THAT OTHERWISE BENEFITD THEM PROFESSIONALLY."

The government's theory in this case has been that a bribe is a payment to a coach's / administrator's personal pocket or to a coach's /administrator's "program," meaning a university account over which the coach or administrator exercised discretion or control or that otherwise benefited the coach or administrator. *See e.g.,* Indictment at 279. But the government has simply failed to prove up this allegation. With respect to Ms. Heinel, there has been zero evidence that any payments were made to an account over which she exercised control. There have been no documents showing her control over any particular accounts, and there has been no testimony that she controlled any particular accounts. Nor has there been any documents or testimony to show that payments to certain USC athletics accounts benefitted Heinel professionally. The government made the bare allegation in the indictment and then simply failed to prove it at trial. Similarly, with respect to Jovan Vavic, one government witness initially suggested that Vavic had control over the gift account for the Men's Water Polo Team, but then walked back this statement, explaining that he had "no idea" what kind of "checks and controls" are associated with the account. 9/28/21 Tr. at 91:6-20, 183:15-184:4; *see also id.* at 187:5-7 (Mr. Kendall: "You're not testifying that the coach can just spend money any way they want, correct?" Casey Moon: "I don't know."). The result is a legally insufficient case on the honest services aspect of Count One, as well as the bribery conspiracy of Count Two. The only allegation is that money was going to USC, not to funds controlled by any co-conspirators, to the extent that had any relevance to begin with. Additionally, there is no evidence whatsoever that the Stanford coach or Harvard administrator that Singer raised in the consensual calls with Wilson had discretion over the accounts to which Wilson believed his payments would be directed, or that Wilson believed they did.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion for judgement of acquittal on Counts One, Two, Six, Eight, Nine, Eleven, Twelve, and Thirteen of the Indictment.

## REQUEST FOR ORAL ARGUMENT

Defendants respectfully request oral argument on their motion.

Respectfully submitted,

*/s/ Brian T. Kelly*

Brian T. Kelly (BBO No. 549566)
Joshua C. Sharp (BBO No. 681439)
Lauren M. Maynard (BBO No. 698742)
NIXON PEABODY LLP
53 State Street
Boston, MA 02109
617-345-1000
bkelly@nixonpeabody.com
jsharp@nixonpeabody.com
lmaynard@nixonpeabody.com

*Counsel for Gamal Abdelaziz*

*/s/ Michael Kendall*

Michael Kendall (BBO #544866)
Lauren M. Papenhausen (BBO #655527)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
(617) 979-9310
michael.kendall@whitecase.com
lauren.papenhausen@whitecase.com

Andrew E. Tomback (pro hac vice)
MCLAUGHLIN & STERN
260 Madison Avenue
New York, NY 10016
(212) 448-1100
atomback@mclaughlinstern.com

*Counsel for John Wilson*

DATED: September 30, 2021

## LOCAL RULE 7.1(A)(2) CERTIFICATION

The undersigned counsel hereby certifies that I have conferred with counsel for the government and attempted in good faith to resolve or narrow the issues raised by this motion.

*/s/ Michael Kendall*

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on September 30, 2021 this document, filed through the CM/ECF system, will be sent electronically to all registered participants in this matter as identified on the Notice of Electronic Filing (NEF).

*/s/ Michael Kendall*