UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal No.: 19-10080-NMG |
| | ) |
| GAMAL ABDELAZIZ, | ) |
| | ) |
| | ) |
| Defendant | ) |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The government submits this memorandum in connection with the sentencing of defendant Gamal Abdelaziz, who was convicted at trial of conspiracy to commit federal programs bribery and conspiracy to commit mail fraud, wire fraud, honest services mail fraud, and honest services wire fraud. The defendant paid a $300,000 bribe to secure the college admission of his daughter based on a lie: that she was a Division I basketball recruit, even though she did not play basketball at the time. He then repeatedly lied to cover up his crimes. After continually arguing to a jury that the FBI "framed" him and that the charges against him were a "set up," he was convicted on all counts.[1] Even to this day at sentencing, the defendant lodges "not credible" and "not believable" objections to facts establishing his culpability, and he accepts no responsibility for his conduct.[2] For the reasons set forth below, the government respectfully recommends that the Court impose the following sentence: 14 months of incarceration to run concurrently on all counts of conviction; 24 months of supervised release, with 400 hours of community service; and a $250,000 fine.

---

[1] *See, e.g.*, 10/6/2021 Trial Tr. at 62 ("[T]hey're trying to frame the guy[.]"); *id.* at 73–74 ("They're trying to smear Abdelaziz and frame him for something he didn't do. I don't say that lightly."); *id.* at 77 ("[H]e's trying to frame [the defendant] and set him up.").

[2] *See, e.g.*, Def. Obj. PSR 5, 7, 10 (Probation finding defendant's factual objections to PSR "not credible" and "not believable").

I.     **THE OFFENSE AND RELEVANT CONDUCT**

The Court is by now familiar with the facts of this case and the defendant's involvement in the charged fraud and bribery scheme. *See generally* PSR ¶¶ 24–62. The defendant, a successful gaming and hospitality executive, was convicted following a four-week jury trial of conspiring with William "Rick" Singer and others to pay a $300,000 bribe to secure the admission of his daughter to the University of Southern California ("USC") as a purported basketball recruit. *Id.* ¶ 44. As part of the scheme, Abdelaziz funneled his bribe payment, styled as a "donation," to Singer's sham charity, the Key Worldwide Foundation ("KWF"), in exchange for the fraudulent admission of his daughter to USC as a fake basketball player. *Id.*

A.     **The Defendant's Involvement In His Daughter's False Basketball Profile**

The defendant's corrupt and fraudulent agreement with Singer and others began in 2017. *Id.* ¶ 47. In July 2017, the defendant received an e-mail from Singer, with the subject "for me to complete USC athletic profile," seeking information for his daughter's falsified basketball resume. *Id.* ¶ 49. The defendant forwarded this e-mail to his wife. *Id.* Singer's e-mail requested awards and accolades to justify the purported recruitment, regardless of "if they play the sport." *Id.*

At the time, the defendant's daughter did not "play the sport." *Id.* ¶ 48. She had not played basketball in more than a year, and as the defendant knew, even when his daughter had played basketball in the past, she was a member of her high school's junior varsity team. *Id.* Even the varsity basketball players in her class were not recruited to play Division I basketball by any college, let alone by an athletic powerhouse such as USC. *Id.*

For the fake profile, the defendant sent Singer a series of e-mails attaching photographs of his daughter's team, including the photograph Singer ultimately chose of a young woman playing basketball who was not Abdelaziz's daughter. *Id.* ¶ 49. Singer replied to the defendant's e-mail

2

confirming that this was the photograph he would use on the athletic profile, noting, "we will use this one." *Id.*  Even now, in the context of his sentencing, the defendant maintains that his e-mails with Singer "do[] not indicate that the profile would be falsified," and that there "was no evidence that [the defendant] provided any false or inaccurate information." Def. Obj. PSR 5.  But that is not true, as the jury properly concluded.  The defendant's daughter did not play basketball at the time the defendant sent Singer photographs to use in a basketball profile for USC.  She had not played in well over a year.  She had never made it past her junior varsity team.  The defendant sent photographs to Singer of young women who were not his daughter.  And Singer specifically advised the defendant that it was one of these photographs, of a different young woman, that he would use in the profile he would create.

A month later, Singer sent the defendant his daughter's fake basketball profile for review. PSR ¶ 50.  The e-mail to the defendant, forwarded by Singer from co-conspirator Laura Janke, stated "let me know if you want me to add any other awards to her profile or if you think that is enough." *Id.*  The profile Singer sent to the defendant was a lie in essentially every possible way: it (i) contained the photograph of another young woman; (ii) falsely stated that the defendant's daughter was a "team captain" and the "starting point guard;" and (iii) highlighted numerous other fake honors, awards, and credentials. *Id.*  At trial, the defense told the jury that Singer's e-mail to the defendant attaching the fake profile was lost "in cyberspace."[3]  To this day, the defendant maintains he never "opened" the profile. Def. Obj. PSR 7.  But as the jury heard, the fake profile was found in a search of the defendant's e-mail account—the same account the defendant used to

---

[3] 9/17/2021 Trial Tr. at 75 ("It's off in cyberspace."); *id.* at 158 ("Off in cyberspace time traveling somewhere."); 10/6/2021 Trial Tr. at 90 ("[I]t's off in cyberspace."); *id.* at 92 ("All they got are these two flimsy setup tapes, which they effectively concede are not enough because they're trying to pepper you with this e-mail nonsense, this photo nonsense, stuff that goes into cyberspace that he doesn't see.").

3

correspond with Singer and others, and from which he later corresponded with one of Singer's associates about his daughter's fake recruitment. PSR ¶ 54.

      **B.**      <u>**The Admission Of The Defendant's Daughter To USC As A Basketball Recruit**</u>

After Singer shared the fraudulent profile with the defendant, Singer sent the profile to corrupt USC athletics administrator Donna Heinel. *Id.* ¶ 51. Heinel added even more lies to the profile to ensure that the recruitment of the defendant's daughter would not raise suspicions with the USC admissions department. *Id.* The defendant's daughter was not academically competitive for admission to USC on her own, but the lies and agreed-upon payoff for Heinel worked: admissions officers on USC's Subco conditionally approved the admission of the defendant's daughter as a basketball recruit, pending a formal application and registration with the NCAA. *Id.* ¶ 52.

Heinel sent Singer the conditional acceptance letter for Abdelaziz's daughter from USC's dean of admissions, and they then began to discuss how to "structure" the defendant's payment since it was a "larger amount of money" than other side-door clients. *Id.* ¶¶ 52–53. Singer sent the defendant the conditional acceptance letter, which informed him that his daughter—who by that time had not played basketball in more than 18 months—had been provisionally admitted as a basketball recruit who had "the potential to make a significant contribution" to USC's Division I basketball team. *Id.* ¶¶ 52, 54.

The defendant's lies and involvement in the fraud continued. For example, he falsely told his daughter's college counselor in Hong Kong that she was going to "pass on applying" to USC, in order to hide the fact that she had already been conditionally admitted as a recruited athlete through fraud. *Id.* ¶ 55. He continued to oversee his daughter's formal application to USC, such as by directing co-conspirator Mikaela Sanford to complete the application in accordance with

4

"the exact requirements" in the conditional acceptance letter, which included registering with the NCAA. *Id.* ¶ 54. The defendant was also involved in many communications with Singer and his associates discussing the need for basketball to be listed on his daughter's application, so as not to raise red flags. *Id.* ¶ 56. And two years after his daughter stopped playing basketball, the defendant reviewed and edited her college essay for USC, which began with a lie: "The basketball court is like my art studio." *Id.* The defendant's lies to further the scheme and avoid detection were successful, and his daughter was formally admitted to USC in March 2018. *Id.* ¶ 57.

### C. The Bribe And Fake Charitable Receipt Letter

Shortly after his daughter's admission, the defendant received the bill: a fraudulent invoice from KWF thanking him for his "generous donation." *Id.* The defendant paid it by wiring $300,000 to KWF. *Id.* A month later, the defendant received a phony donation receipt letter from KWF falsely stating that his "donation" would "provide educational and self-enrichment programs to disadvantaged youth," and that "no goods or services were exchanged" for his $300,000 payment. *Id.* ¶ 58.

Originally, Heinel directed Singer to have the *quid pro quo* payment of $200,000 for the admission of the defendant's daughter made out to a gift account for USC's Galen Center. *Id.* ¶ 58 n.3. Singer and the defendant later agreed to increase the amount of the defendant's payment to $300,000. *Id.* ¶ 57. In July 2018, Singer began passing the defendant's money to Heinel personally—instead of to the Galen Center account—by paying fake "consulting" fees of $20,000 per month, for eight months, to an entity that Heinel had set-up. *Id.* ¶ 58; *see also* Ex. 721 (summary chart); Exs. 533, 548, 564, 573, 600, 611, 624, 628 (monthly checks). The checks were deposited in Heinel's personal bank account. PSR ¶ 58.

5

### D.     The Defendant Agreed To Lie To Cover-Up His Fraud And Bribery

In September 2018, the defendant's daughter matriculated at USC but did not join the basketball team. *Id.* ¶ 59. A month later, Singer made a consensually recorded phone call to Abdelaziz. *Id.* ¶¶ 60–61. In the call, Singer told Abdelaziz that KWF was being audited, and Abdelaziz agreed that Singer should lie to the IRS about the purpose of his $300,000 payment. Singer said, "I'm not going to tell the IRS anything about the fact that your $300,000 was paid to Donna – Donna Heinel at USC to get [your daughter] into school even though she wasn't a legitimate basketball player at that level," and asked, "you're ok with that, right?" The defendant responded: "Of course." *Id.* ¶ 60.

During the same call, Singer—acting at the direction of law enforcement agents—told Abdelaziz that Donna Heinel "actually called me and said – she called me and says, 'hey Rick, that profile that you did for [Abdelaziz's daughter], I loved it. It was really well done and going forward, anybody who isn't a real basketball player that's a female, I want you to use that profile going forward.'" Abdelaziz responded: "I love it." *Id.* ¶ 61.

Three months later, the defendant agreed to lie to USC's admissions department during another consensually recorded phone call with Singer. *Id.* ¶ 62. In that call, Singer—again acting at agents' direction—told Abdelaziz that USC's admissions department had asked Heinel why the defendant's daughter had never shown up for basketball practice. *Id.* After Singer advised the defendant that Heinel had invented a fake injury and lied to admissions in order to excuse his daughter's absence, the defendant responded, "That's fine. I will answer the same, should they [admissions] call me." *Id.*

6

## II.     THE SENTENCING GUIDELINES

The government submits that the defendant's total offense level is 24, and his resulting Guidelines sentencing range is 51 to 63 months, because the defendant intended to pay, and did pay, $300,000 in exchange for his daughter's admission to USC as a fake basketball recruit. U.S.S.G. §§ 2C1.1(a)(2), (b)(2), 2B1.1(b)(1)(G).  Accordingly, for the reasons explained more fully in its objections to the initial PSR, the government respectfully disagrees, on both a legal and factual basis, with Probation's finding that the relevant bribe amount is $200,000, and with its conclusion that the total offense level is 22 and Guidelines range is 41 to 51 months.  *See* PSR ¶¶ 71, 126.  Other than that two-level difference, the government agrees with Probation's calculation of the applicable Guidelines range, including the application of § 2C1.1 (which the defendant concedes is appropriate).  *See* Def. Obj. PSR 10.

## III.    SENTENCING RECOMMENDATION

The government respectfully requests that the Court impose a sentence of 14 months of incarceration, 24 months of supervised release (with 400 hours of community service), and a $250,000 fine.  The government recognizes that such a sentence would be the longest custodial term imposed by the Court in this case to date, but submits that it is a reasonable and just outcome that is sufficient but not greater than necessary to achieve the goals of sentencing under 18 U.S.C. § 3553(a) for this defendant.

The seriousness of the defendant's crimes and his deep involvement in the bribery and fraud scheme justify a meaningful term of incarceration.  *See* 18 U.S.C. §§ 3553(a)(1), (2)(A). The defendant agreed to pay $300,000 in exchange for having Singer and Heinel secure his daughter's admission to USC as a fake basketball recruit, a sport she had not played in years. Unlike many parents who participated in Singer's side-door scheme, the defendant was intimately

involved in the lies at every step of his daughter's fraudulent admission to USC. He sent Singer a photograph of another girl playing basketball for the fake athletic profile. Singer specifically told him that this was the photo he would use. Singer sent the defendant the fake profile of his daughter, depicting fake achievements in a sport she no longer played. The defendant lied to another college counselor to hide his daughter's admission to USC as a basketball recruit. He oversaw the editing of his daughter's USC application and essay to include basketball, so as not to raise suspicions. The defendant agreed that Singer should lie to the IRS to cover-up his bribe payment as a purported donation, and he "love[d]" that his daughter's false athletic profile was so convincing that it would be used as a model to secure the admission of other fake athletes to USC. And he even agreed to lie to USC's admissions department—again—about a fake injury to excuse his daughter's absence from basketball practice.

The defendant's history and characteristics underscore the bewildering nature of his crimes. *See* 18 U.S.C. § 3553(a)(1). Having lifted himself from poverty in Egypt to become a successful business executive who saw his first two children attend prestigious universities on their own merit, the defendant had no need to rely on cheating, lies, and bribery to secure his third child's admission to college. And he knew better. Whatever misguided reasons motivated him— love for his child, self-aggrandizement, or simply the spoiled desire to secure for his daughter something she wanted but could not herself achieve—the defendant was fully aware, at the time he was committing crimes, that what he was doing was wrong. And that is why he repeatedly agreed to lie to cover it up.

A significant period of incarceration for this defendant is necessary to promote respect for the law, to provide just punishment for his crimes, and to serve the interests of general and specific deterrence. 18 U.S.C. § 3553(a)(2). These interests are particularly acute where, as here, the

defendant has not only failed to accept responsibility for his conduct (PSR ¶ 77), but continues, even now, to minimize his culpability with deflections and excuses. *See, e.g.*, Def. Obj. PSR 5 (suggesting that the defendant's communications with Singer did "not indicate that the profile would be falsified"); *id.* at 6 ("No reasonable inference can be drawn that Mr. Abdelaziz intentionally sent Mr. Singer a picture of someone other than his daughter."); *id.* at 7 ("no evidence" that defendant "ever opened" his daughter's fake athletic profile found in his e-mail account). *See also United States v. Cruzado-Laureano*, 527 F.3d 231, 237 (1st Cir. 2008) (defendant's minimization "falls well within" the considerations of §§ 3553(a)(1), (a)(2), and gives "relevant insight into his character and rais[es] concerns about his respect for the law"); *United States v. Garrasteguy*, 559 F.3d 34, 39 (1st Cir. 2009) (noting that considerations of acceptance of responsibility and remorse serve "legitimate societal interests").

Though a 14-month term of incarceration would not be inconsiderable, the government's recommended sentence is significantly below the applicable Sentencing Guidelines ranges as calculated by both Probation and the government, and would avoid an "unwarranted" disparity relative to similarly situated defendants. 18 U.S.C. § 3553(a)(6). As an initial matter, the defendant's relative culpability to his parent co-conspirators who have been sentenced is not the governing inquiry, as the First Circuit has repeatedly observed. *See United States v. Vargas*, 560 F.3d 45, 52 (1st. 2009) ("Congress's concern [with unwarranted disparities] was mainly with minimization of disparities among defendants nationally rather than with disparities among codefendants engaged in a common conspiracy."); *accord United States v. Jimenez*, 946 F.3d 8, 16 (1st Cir. 2019) (rejecting argument that defendant's sentence "should not substantially exceed her co-conspirators'" sentences for the same reason); *United States v. Davila-Gonzalez*, 595 F.3d 42, 49–50 (1st Cir. 2010) ("A district court's consideration of sentencing disparity "aims primarily

at the minimization of disparities among defendants nationally," and collecting cases). A 14-month term of incarceration is reasonable because, as the First Circuit has recognized, the best measure for avoiding unwarranted sentencing disparities on a national level is the defendant's applicable Guidelines range. *See Jimenez*, 946 F.3d at 16 (noting that below-Guidelines sentence did not impose unwarranted sentencing disparity); *United States v. King*, 741 F.3d 305, 310 (1st Cir. 2014) (same); *United States v. Floyd*, 740 F.3d 22, 39–40 (1st Cir. 2014) (same); *United States v. Saez*, 444 F.3d 15, 19 (1st Cir. 2006) ("[T]he [G]uidelines themselves are almost certainly the best indication of ordinary practice" and avoiding unwarranted disparities). From 2015 to 2020, of the approximately 1,000 defendants with Criminal History Categories of I who were, like the defendant, sentenced under U.S.S.G. § 2C1.1 nationally, the average length of imprisonment was 32 months.[4]

Further, the defendant is the first parent defendant before this Court convicted of and being sentenced for federal programs bribery—a more serious offense with a higher base offense level than mail or wire fraud, as determined by the Sentencing Commission. *Compare* U.S.S.G. § 2C1.1, *with* U.S.S.G. §§ 2B1.1, 2B4.1.[5] For this reason, he is not similarly situated to parents who were convicted of other offenses or sentenced in accordance with lower Guidelines ranges. *See, e.g.*, *United States v. Mena-Robles*, 4 F.3d 1026, 1035 n.9 (1st Cir. 1993) (where codefendants are convicted of different offenses, they are not "similarly situated"); *United States v. Butt*, 955

---

[4] *See* United States Sentencing Commission, Interactive Data Analyzer, *available at* https://ida.ussc.gov/analytics/saw.dll?Dashboard.

[5] One other parent defendant pled guilty to federal programs bribery nearly two years ago and was sentenced by another session of this Court. *See United States v. Sui*, 19-cr-10082-DPW. That defendant—who accepted responsibility for her conduct and was significantly less culpable and less involved in Singer's scheme than Abdelaziz—was sentenced to time-served: more than five months in a foreign prison where she did not speak the language while awaiting extradition to the United States.

F.2d 77, 90 (1st Cir. 1992) (same); *see also United States v. Gozes-Wagner*, 977 F.3d 323, 337 (5th Cir. 2020) ("Nor are defendants similarly situated when they are convicted under different statutes."); *United States v. Contreras*, 108 F.3d 1255, 1271 (10th Cir. 1997) (same).

Moreover, Section 3553(a)(6) codifies only "the need to avoid *unwarranted* sentence disparities among *similarly situated* defendants," and the defendant is not similarly situated to any parent sentenced to date in this case. *United States v. Vazquez-Rivera*, 470 F.3d 443, 449 (1st Cir. 2006) (emphasis in original). As the First Circuit has long held, defendants who accept responsibility and express remorse are not similarly situated to those, like the defendant, who do not. *See, e.g.*, *id.* (noting that "a defendant who chooses to enter into a plea bargain is not similarly situated to a defendant who contests the charges"); *see also United States v. Navedo–Concepción*, 450 F.3d 54, 60 (1st Cir. 2006) (defendants who pled guilty were not similarly situated to defendant who did not, and affirming 151-month sentence for defendant even though leader of the conspiracy who pled guilty received a 63-month sentence); *accord Davila-Gonzalez*, 595 F.3d at 49–50 ("no evidence" that defendant and co-defendant were "fair congeners" because co-defendant pled guilty pursuant to plea agreement and was not therefore "similarly situated to the appellant"); *United States v. Rodriguez-Lozada*, 558 F.3d 29, 45 (1st Cir. 2009) (same); *United States v. Brandao*, 539 F.3d 44, 65 (1st Cir. 2008) (same); *United States v. Martinez-Vives*, 475 F.3d 48, 56 (1st Cir. 2007) (same).[6] Indeed, far from merely exercising his Constitutionally protected right to a trial by a jury

---

[6] And of course, sentencing a defendant in accordance with a Guidelines range that does not include credit for acceptance of responsibility, when such credit is not warranted, is not an impermissible "trial penalty." *See, e.g.*, *United States v. Quejada-Zurique*, 708 F.2d 857, 861 (1st Cir. 1983) ("The defendant who opts to go to trial rather than negotiating a plea runs the risk of a harsher sentence than he would have received by pleading guilty."); *accord United States v. Rosario-Peralta*, 199 F.3d 552, 570 (1st Cir. 1999) (framing the relevant issue as granting defendants who accept responsibility and express remorse as "special leniency," rather than subjecting defendants who do not accept responsibility to harsher punishment); *United States v. Torres Santiago*, 729 F.2d 38, 40–41 (1st Cir. 1984) (same).

of his peers, as he contends, the defendant continues to deny responsibility for his actions, falsely minimize his culpability, and blame others. This minimization also underscores why the sentencing of Abdelaziz (and the forthcoming sentencing of his co-defendant John Wilson) are the most significant opportunities in this case for the Court to further the societal interest of general deterrence.

## IV.    CONCLUSION

For the foregoing reasons, the government respectfully recommends that the Court impose the following sentence: 14 months of incarceration to run concurrently on all counts of conviction; 24 months of supervised release, with 400 hours of community service; and a $250,000 fine.[7]

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By: /s/ Ian J. Stearns
KRISTEN A. KEARNEY
LESLIE A. WRIGHT
STEPHEN E. FRANK
IAN J. STEARNS
Assistant United States Attorneys

---

[7] Although the recommended fine is above the Guidelines ranges as calculated by the government and the PSR, the government respectfully submits that a statutory maximum fine is appropriate here upon consideration of the relevant factors, including the need to reflect the seriousness of the offense, promote respect for the law, afford adequate deterrence, and the defendant's ability to pay. *See* PSR ¶ 136; U.S.S.G. §§ 5E1.2(c)(3), (d). This Court has not imposed a fine of less than $250,000 for any side-door parent defendant, except for defendant Zadeh (who was convicted of a tax offense) and defendants who were spouses (whose combined fines were $250,000 or greater). *See* PSR ¶ 7.

## **CERTIFICATE OF SERVICE**

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

                                             */s/ Ian J. Stearns*
                                             IAN J. STEARNS
                                             Assistant United States Attorney