UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

UNITED STATES OF AMERICA

v.

GAMAL ABDELAZIZ, et al.,

Defendants.

---

No. 19-CR-10080-NMG

Leave to File Under Seal Granted
March 18, 2022 (ECF 2566)

**DEFENDANT GAMAL ABDELAZIZ'S
MOTION FOR RELEASE PENDING APPEAL**

Pursuant to 18 U.S.C. § 3143(b), Defendant Gamal Abdelaziz respectfully requests that the Court order his release during the pendency of his appeal. Mr. Abdelaziz satisfies all three criteria established by section 3143. First, he is not likely to flee and does not pose a danger to the safety of any other person or the community. The government has never alleged otherwise. Second, his appeal raises at least four "substantial questions of law"—in particular, whether a college admission "slot" is property, whether a payment to a victim can be a bribe, whether certain evidence should have been excluded, and whether there was a prejudicial variance. Third, if Mr. Abdelaziz ultimately prevails on any of these appellate issues, the Court of Appeals will likely order reversal of his conviction or a new trial. Mr. Abdelaziz joins in the arguments made by Defendant Wilson in his motion for release pending appeal.

## I.       Mr. Abdelaziz is Unlikely Likely to Flee

Mr. Abdelaziz satisfies the first criterion because he is not likely to flee and is not a danger to the community. This is undisputed, and as noted out the outset, the government has never alleged otherwise. Mr. Abdelaziz is a first time offender and was convicted of a non-violent crime. He has never had any interaction with the criminal justice system. He was arrested on March 12, 2019 and released the same day on personal recognizance. He has attended all of his court dates and has complied with all of the Court-ordered conditions of release.

## II.      Mr. Abdelaziz's Appeal Raises Substantial Questions of Law

Mr. Abdelaziz's appeal will raise multiple substantial questions of law. That a legal issue presents a "substantial question of law" does not mean that the District Court decided the underlying issue incorrectly, but only that there is "a 'close' question or one that very well could be decided the other way." *United States v. Bayko*, 774 F.2d 516, 523 (1st Cir. 1985) (quoting *Giancola*, 754 F.2d at 901). *See also United States v. Zimny*, 857 F.3d 97, 100 (1st Cir. 2017)

("After all, substantiality under § 3143(b) requires only a showing that the question is a close one.").

### A.  College Admissions Offers Are Not Property

The Court previously held that admissions "offers" are property for purposes of the mail and wire fraud statutes, *United States v. Sidoo*, 468 F. Supp. 3d 428, 441 (D. Mass. 2020), and instructed the jury that such "offers" are property, Tr. of Oct. 7, 2021 at 39. While Mr. Abdelaziz respects the Court's ruling, this legal issue is certainly a "substantial question of law," which the First Circuit will decide *de novo*, and for which bail pending appeal should be granted.

Whether an admissions offer is "property" has been extensively briefed. *See* ECF 1042, 1228, 2330. In short, the Defendants have argued that the federal mail and wire fraud statutes are limited to traditional concepts of property. *See Carpenter v. United States*, 484 U.S. 19, 26 (1987); *Cleveland v. United States*, 531 U.S. 12, 24 (2000). And admissions "offers" or their equivalent have never been considered a traditional form of property. There is no historical precedent—anywhere—suggesting that an offer of admission is the type of "traditional concept of property" that would be cognizable under the fraud statutes. To the extent there are any analogous cases, they show that such "offers" should *not* be considered property. *See United States v. Plyer*, 222 U.S. 15 (1911).

Indeed, courts have repeatedly held that misrepresentations made to obtain services, or an offer to do business, do **not** implicate the fraud statutes because they do not involve "property." *See United States v. Sadler*, 750 F.3d 585, 590 (6th Cir. 2014) (vacating wire fraud conviction where "the government showed that [the defendant] lied to pharmaceutical distributors when she ordered pills for the clinic by using a fake name on her drug orders and by falsely telling the distributors that the drugs were being used to serve 'indigent' patients" but defendant paid full

price for the drugs); *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016). Similarly, here, even if the misrepresentations prompted offers of admission, Mr. Abdelaziz ultimately paid full tuition in exchange for the educational services provided to his daughter and therefore USC suffered no property loss. At best, whether "property" under the fraud statutes includes an offer of admission to a university is ambiguous. And under the rule of lenity, "ambiguous criminal laws" must be "interpreted in favor of the defendants subjected to them." *United States v. Berroa*, 856 F.3d 141, 157 n.8 (1st Cir. 2017).

The Court need not dwell on this issue in order to grant Mr. Abdelaziz the relief he seeks. That is because another judge in this district, Judge Talwani, considered the exact same issue in a related case and came to the opposite conclusion as this session. Judge Talwani found that "admission slots are **not** money or property under the federal property fraud statutes," and dismissed certain property fraud counts based on that ruling. *See United States v. Ernst*, 502 F. Supp.3d 637, 647 (D. Mass. 2020) (emphasis added). In particular, Judge Talwani distinguished the *Frost* case on which this Court relied, and wrote that:

> There is little indication that university admission slots can be considered 'property' under the Supreme Court's construction of that term…. While the court accepts that there is substantial value in having integrity in the admissions process, the court is not persuaded that integrity in the admissions process constitutes the universities' 'property' for purposes of the property fraud statute….[A]s a matter of law, the government cannot secure a conviction on the theory that Defendants committed property fraud.

*Id.* at 650. Although the government was entitled to appeal Judge Talwani's dismissal of the property fraud theory—and had ample time to get a definitive ruling from the First Circuit on this issue—it declined to do so.

Judge Talwani's ruling that an offer of admission is not "property" definitively settles the question of whether the property fraud issue is "a 'close' question or one that very well could be

decided the other way." *Bayko*, 774 F.2d at 523. In finding that there is a "substantial question of law" here, this session need not admit error, but only recognize that the issue could be—and in fact was—decided by another judicial officer of this district "the other way." In light of Judge Talwani's ruling, the government's argument that the property issue is not a substantial question of law is equivalent to stating that her ruling was not only legal error (a dispute that will ultimately be decided by the First Circuit) but that another judicial officer's ruling was frivolous and not deserving of the respect of this session.

### B. A Payment to a Victim is Not a Bribe

The government's honest services and bribery charges rested on the novel theory that a payment *to the victim* can constitute a bribe. In other words, even if Mr. Abdelaziz intended to provide a payment—through the Key Worldwide Foundation—to USC, he could still be guilty of conspiracy to commit honest services fraud and federal program bribery. In case there is any doubt that the government's theory was that a payment to USC was a bribe, and that this was the theory under which Mr. Abdelaziz was convicted:

- The government wrote in a pleading in this case: "The government was not attempting to build a case that the parents understood Heinel to be personally pocketing money, and the government has never alleged that. The government has alleged—and the calls, checks and emails prove—that the defendants knew that one or more complicit insiders at USC were facilitating the admission of their children as recruited athletes in exchange for payments **to a USC athletic program**." ECF 1104 at 8 (emphasis added).

- During trial, the government told the Court, "Our whole case is built on the fact that there was a false profile and a bribe, and **a payment to the program is a bribe**." Tr. of Sept. 15, 2021 at 7.

- In its opening statement, the government told the jury: "The evidence will show that Signer was not honest with the parents. He did not tell them about these payments to insiders' pockets." Tr. of Sept. 13, 2021 at 29:11-13.

- In its closing, the government told the jury: "Singer didn't tell the defendants that he was paying the insiders personally…**Singer told the defendant the money would go to USC. There's no dispute about that**." Tr. of Oct. 6, 2021 at 27:23-24.

In its instructions to the jury, the Court permitted the jury to convict Mr. Abdelaziz on the theory that he conspired to make payments *to* USC by giving the government's requested instruction that "Payments to third parties, **including even employer universities**, may qualify as bribes or kickbacks." Tr. of Oct. 7, 2021 at 48:7-9 (emphasis added).

As the Court is aware, Mr. Abdelaziz has argued time and again that a "bribe," the presence of which is required under both the honest services statute and 18 U.S.C. § 666, simply cannot be a payment to the victim. The government's myopic focus on the quid pro quo element obscures the requirement that both statutes require a "bribe" as that term has always been understood. *See Skilling* v. *United States*, 561 U.S. 358, 409-11 (2010) ("[H]onest-services fraud does not encompass conduct more wide ranging than the paradigmatic cases of bribes and kickbacks…[it] criminalizes only the bribe-and-kickback core of the pre-McNally case law."). The *Skilling* Court held in particular that "undisclosed self-dealing," meaning, "the taking of official action by the employee that furthers his own undisclosed financial interest while purporting to act in the interests of those to whom he owes a fiduciary duty," did not constitute honest-services fraud. *Id*. at 409-10.

Outside of the "Varsity Blues" context, the concept that a bribe can be a payment *to the victim* is without any precedent anywhere in the United States. The government has pointed to no authority that directly supports its novel theory—the closest they have come are cases where the "bribee" directed the "briber" to make payments to third parties such as family or friends (i.e., not the defrauded entity itself). And the government's alternative theory—that some sort of psychic benefit or even an increase in salary is the "quid" in an illicit "quid pro quo" (where victim keeps the cash) fares no better. As Judge Easterbrook concluded when faced with a similar argument to the government's:

It would stretch the ordinary understanding of language, however, to call a public employee's regular compensation, approved through above-board channels, a kind of "private gain." . . . . It is linguistically possible to understand "private gain" as whatever adds to the employee's income or psyche—anything the employee would pay to have, rather than pay to avoid—but the Rule of Lenity counsels us not to read criminal statutes for everything they can be worth. The history of honest-services prosecutions is one in which the "private gain" comes from third parties who suborn the employee with side payments, often derived via kickbacks skimmed from a public contract. . . .

The United States has not cited, and we have not found, any appellate decision holding that an increase in official salary, or a psychic benefit such as basking in a superior's approbation (and thinking one's job more secure), is the sort of 'private gain' that makes an act criminal under § 1341 and § 1346. . . . . We now hold that neither an increase in salary for doing what one's superiors deem a good job, nor an addition to one's peace of mind, is a "private benefit' for the purpose of § 1346.

*United States v. Thompson*, 484 F.3d 877, 884 (7th Cir. 2007) (Easterbrook, J.).

Although the Court has ruled that a bribe can be a payment to the victim, and has instructed the jury as such, the undersigned respectfully submit that this legal question, which the First Circuit will decide *de novo,* is at the very least "a 'close' question or one that very well could be decided the other way." *Bayko*, 774 F.2d at 523. Again, the Court need not dwell long on this issue, because other judicial officers in this district have in fact expressed substantial doubt about whether a payment to a victim can be a bribe. Most notably, Judge Woodlock suggested that if the *sine qua non* of the offense—the illicit payment—was paid to the victim and used for the benefit of the victim, then there was no bribe:

> AUSA KEARNEY:  … In addition, there were payments directly to USC but to accounts that she controlled and benefited from.

> THE COURT: That's not a bribe, is it? It's received by USC. Then we've got a faithless employee. That's a different issue from bribery, right?

> AUSA KEARNEY: No, Your Honor, because in light of Skilling, there has to be a bribe or a kickback.

> THE COURT: Yes, there does, I agree. And this is a case in search of a bribe or a kickback . . . . So now we're back to this question of what was the

bribe that [Heinel] received? Because it has to be to her, not some account that she controlled, unless you say it was reasonably foreseeable to [Defendant] that she was going to toy with that account.

*See* Sentencing Tr. at 15-16, *United States v. Bizzack*, 19-cr-10222-DPW, ECF 34. Judge Woodlock then quizzed the AUSA, asking "Where do we have that he thought this was or believed that this was money going to Ms. Heinel as a faithless employee **as opposed to the institution itself.**" *Id.* at 24 (emphasis added).

### C. Exclusion of USC Evidence

There is also a substantial question as to whether Mr. Abdelaziz's evidence regarding USC's admissions practices was relevant and should have been admitted at trial. Mr. Abdelaziz intended to offer substantial evidence that it was common practice at USC to exchange donations (including donations to the athletic department) for preferential admissions treatment. Yet prior to trial, the Court ruled that "to the extent that there is evidence that [USC] admitted unqualified students whose parents made large donations to the school before such admissions and that the defendants knew about such admissions, it would be relevant … but if such alleged conduct was not known to the subject defendant, **it is irrelevant** and thus inadmissible." Tr. of Aug. 18, 2021 Hr'g at 19 (ECF 2108) (emphasis added). Mr. Abdelaziz also attempted to offer such evidence to impeach Rebecca Chassin,[1] but the Court denied those attempts as well, ruling again that the evidence was irrelevant and not proper impeachment. *See* ECF 2336 at 18-20. And Mr. Abdelaziz sought to call witnesses from USC to testify as to USC's policy of exchanging donations for preferential admissions consideration including in connection with athletic admissions, but the Court granted those potential witnesses' motions to quash on relevancy grounds. ECF 2265 at 5-6; ECF 2336 at 1-4, 20-22.

---

[1] For example, Exs. 1297, 1085, 1288, 7358, and 1565. *See also* ECF 2292 (describing exhibits).

Although this Court disagreed, Mr. Abdelaziz respectfully suggests that the excluded evidence was relevant for at least two reasons, and that the relevance determination constitutes a substantial question of law. First, evidence that USC accepted donations in exchange for preferential admissions treatment—including for athletes who were not otherwise talented enough to be admitted through athletics— makes Mr. Abdelaziz's good faith defense more reasonable. Second, such evidence makes it more probable that USC was not deprived of the honest services of its employees.

The reasonableness of Mr. Abdelaziz's good faith belief in the legitimacy of the process that Singer described to him is relevant to his intent. In *Cheek v. United States*, 498 U.S. 192 (1991), the Supreme Court held that a subjective but genuine belief that one is not violating the law negates willfulness, and that this is so whether or not the claimed belief or misunderstanding is objectively reasonable. *Id.* at 203-04. However, while the Court emphasized that the specific intent inquiry is focused on the *subjective* nature of a belief, it recognized that evidence *regarding the objective reasonableness is also relevant*. *Id.* ("[T]he more unreasonable the asserted beliefs or misunderstandings are, the more likely the jury will consider them to be nothing more than simple disagreement with [or, in a case like ours, disregard for] known legal duties . . ."). *See also United States v. Lankford*, 955 F.2d 1545, 1550-51 (11th Cir. 1992) (finding that district court erred in excluding expert testimony regarding reasonableness of defendant's conclusion that check he received was gift and not taxable income and stating "evidence of a belief's reasonableness tends to negate a finding of willfulness and to support a finding that the defendant's belief was held in good faith").

At the very least, the relevance of the USC evidence is "a 'close' question or one that very well could be decided the other way," as evidenced by the fact that Judge Kelley did, in

fact, determine the relevance question "the other way"—**again and again**—when ruling on the

Defendants' Rule 17 subpoenas. As to the relevance on intent, Judge Kelley reasoned, ███

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████ SEALED Tr. of

May 14, 2020 Hr'g at 24.

As to the relevance on the fiduciary duty issue, Judge Kelley said:

[T]he government is kind of stuck on the theory that, if the money is going into an account for the school in exchange for Heinel advocating for a student, then the defendants are guilty. . . . **you have to show that the school wasn't okay with that. Right?**

Tr. of Feb. 28, 2020 Hr'g at 15-16 (emphasis added). The government agreed and stated "we

intend to prove that." *Id.* Indeed, the government did recognize the relevance of this inquiry, as it

sought to prove this point through the testimony of Rebecca Chassin, who testified regarding

USC admissions policies. Yet defendants were prohibited from offering evidence showing that—

in fact—USC approved of exchanging donations for preferential admissions treatment, including

for student-athletes who would otherwise not have been good enough to be admitted.

According to Judge Kelley's reasoning, ██████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████ SEALED Tr. of May 14, 2020 Hr'g; *see*

*also id.* at 47 (███████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████). These statements demonstrate that the relevance issue is at the very least a close question that could go the other way, and in fact did go the other way before Judge Kelley.

### D.  Exclusion of Chat on Hearsay Grounds

The Court's hearsay rulings also present "substantial questions of law."  In particular, the Court erroneously excluded as hearsay an instant message conversation between two USC admissions officers (unrelated to Mr. Singer) regarding Mr. Abdelaziz's daughter in which those admissions officers appeared to laugh about her athletic skills. Tr. of Sept. 21, 2021 at 20-23; ECF 2265; ECF 2336. *See* excerpt from proposed Ex. 1288:

> Alexander Alvendia 8:38 AM:
> lol
>
> Is she *actually* a bball player??
>
> Kelsey Bradshaw 8:39 AM:
> shes supposedly the best bball player in the asian international school league?
>
> Alexander Alvendia 8:39 AM:
> Ha ok good to know
>
> Kelsey Bradshaw 8:39 AM:
> lol
>
> Alexander Alvendia 8:39 AM:
> Thanks!
>
> Kelsey Bradshaw 8:39 AM:
> but yes, it appears she actually plays the sport!
>
> Alexander Alvendia 8:43 AM:
> HA

This evidence demonstrated that, in practice, USC admissions officers with no connection to Mr. Singer regarded athletic qualifications as a joke—including with respect to Mr. Abdelaziz's daughter. The hearsay ruling is, at the very least, a "close" question that may have "gone the other way." *Bayko*, 774 F.2d at 523. The message was offered for a non-hearsay purpose, or otherwise was an exception to hearsay, and the assertions contained therein were either admittedly false, or wholly irrelevant. ECF 2275. It was the tone of the communication that Mr. Abdelaziz wanted to show the jury, but the Court held that "To the extent the exhibit

suggests a 'policy' of that department, its admission would be for the truth of the matter asserted, i.e. that the department's policy was nefarious…." ECF 2265 at 11. The Court's order conflated the assertions of litigants with the assertions of declarants. The hearsay rules are not concerned with the assertions of litigants—they are concerned with the assertions of declarants. *See* Fed. R. Evid. 801(c) (defining "hearsay" as a statement that a party offers "to prove the truth of the matter asserted in the statement"). The exclusion of this exhibit on hearsay grounds presents—at the very least—a "close question."[2]

### E. Exclusion of Singer's Statements

The Court also excluded evidence offered by defendants of statements that Mr. Singer made publicly or to other parents regarding the "side door" on relevance grounds.[3] *See* ECF 2329 (defendants' opposition to the government's motion to exclude). The Court reasoned that Mr. Abdelaziz failed to address the relevance of Mr. Singer's statements when he himself did not hear those statements. *See* ECF 2336 at 4-6 (stating that the Starbucks video "is irrelevant to the charges facing the defendants because there is no contention that they were present for, or even aware of, that presentation"); ECF 2265 at 78 (granting Ron Crawford motion to quash because defendants "failed 1) to address persuasively the relevance of the video at issue … 2) to

---

[2] The Court also excluded exhibits 1254, 1255, and 1540 on hearsay grounds. In particular, exhibit 1540 was a blank email with a subject line reading "Please send Profile for Sabrina Aziz." There is no assertion in this document capable of being hearsay. Exhibit 1254 was simply a forward of an email already in evidence. Again, there was no assertion in this document capable of being hearsay. Finally, exhibit 1255 was an email that read "Thanks. Will update her app and submit." The exclusion of exhibit 1255 was contrary to the rule established in *Mutual Life Ins. Co.* v. *Hillmon*, 145 U.S. 285 (1892). Although the government later agreed to withdraw its objection to these exhibits and they were read into evidence during the Defendants' case, Mr. Abdelaziz was deprived of the opportunity to cross-examine Mikaela Sanford on these emails. *See* Dkt. 2289. At the very least, Mr. Abdelaziz respectfully submits that this is a substantial question of law.

[3] Exs. 8141A (recording of Mr. Singer discussing how he deceived people to Yale soccer coach Rudy Meredith; excluded at Tr. of Oct. 1, 2021 at 135-36); 1043 (e-mail in which Mr. Singer describes the "side door" in legitimate way to other parent, excluded at Tr. of Sept. 24, 2021 at 167); 8197, 9721 and 9672 (e-mails in which Mr. Singer described the "side door" in legitimate way to other parents; excluded at Tr. of Oct. 1, 2021 at 136-37); 1422A, 1497A, and 9591A (recordings of Mr. Singer defrauding other parents; excluded at Tr. of Oct. 1, 2021 at 138-39).

introduce any evidence to suggest they had any knowledge of the presentation, or 3) to introduce
any evidence that they interacted with Singer in a similar context"). The result of the Court's
rulings was that the government was able to introduce mounds of evidence showing Mr. Singer's
nefarious description of the side door to certain parents—all admitted as co-conspirator
statements—but the jury was prohibited from considering the non-nefarious manner in which
Mr. Singer described the side door to others.

There is at the very least a "close question" about whether the excluded evidence is
relevant. A central aspect of Mr. Abdelaziz's defense was that Mr. Singer described the "side
door" to him as a legitimate process widely accepted by colleges and universities. Evidence that
Mr. Singer described the side door this way to others tends to make it *more* likely that it was also
presented this way to Mr. Abdelaziz. Confirming that this relevance issue is a "close question,"
in the ongoing Vavic trial, Judge Talwani recently permitted the defendant to introduce out-of-
court co-conspirator statements over the objection of the government. She reasoned:

> [B]ecause in order to understand both sides' arguments, we need to understand that
> alleged conspiracy…. It comes in not for the truth, but it comes in for some other
> purpose.  And I think our other purpose is sort of describing how everybody else
> acted and what everyone else did and why everyone else did what they did, **and
> the story comes in on both sides for that**.

*United States v. Ernst*, Trial Day 7 Tr. at 8-9.

A particularly important piece of evidence in this category was a video of Mr. Singer
giving a presentation to employees at Starbucks (the "Starbucks video") (Ex. 1374A). The
Starbucks video evidence was relevant because it has a tendency to make it more likely that Mr.
Abdelaziz's belief that the side door was legitimate was reasonable and held in good faith.
Despite government witness Bruce Isackson's claim that "you'd have to be a fool" to believe Mr.
Singer wasn't doing something nefarious (Tr. of Sept. 14, 2021 at 99), the Starbucks video is

strong evidence that reasonable people would fall for Mr. Singer's deception, to the degree that high level corporate officials would invite him to speak to a large group of their employees. Even this Court recognized that defendants "may have an appellate issue" based on its exclusion of the Starbucks video. Tr. of Sept. 30, 2021 at 29.

Moreover, other courts have declined to exclude evidence presented on a similar theory. In *United States v. Aboumoussallem*, the Second Circuit considered a factually distinct but theoretically similar case where a drug courier proffered as his defense that he was "duped" by his handler, and sought to introduce evidence of other instances of the handler "duping" unsuspecting individuals to act as drug couriers. 726 F.2d 906, 912 (2d Cir. 1984). The court held that this evidence made it less probable that the defendant possessed the requisite knowledge and lent some support to his defense, even though defendant offered no evidence that he was aware of the other couriers. *Id.* Similarly, here, while Mr. Abdelaziz was not specifically aware of the Starbucks video, that evidence lends support to his defense of being "duped" by Mr. Singer. Moreover, although Judge Kelley did not make a relevance ruling on this evidence, she recognized its importance and relevance to the defense:



SEALED Tr. of May 14, 2020 Hr'g at 21. Judge Kelley's and the Second Circuit's reasoning demonstrate how the First Circuit could reach a different conclusion on this issue.

Additionally, Mr. Abdelaziz sought to introduce the Starbucks video, e-mails, and other audio recordings of Singer speaking with other parents as impeachment evidence. Defendants are permitted to impeach a non-testifying hearsay declarant under Rule 806. The government was permitted to introduce statements in which Mr. Singer described the "side door" as an illicit program, painting the picture that Mr. Singer *always* described the side door this way. Mr. Abdelaziz sought to introduce impeachment evidence showing that this was not so, and that Singer in fact frequently described the "side door" as a perfectly legitimate process. The other calls, e-mails, and the Starbucks video constituted prior inconsistent statements that could be used to impeach Singer's pitch as presented by the government. *United States v. Graham*, 858 F.2d 986, 990 (5th Cir. 1988) ("Under rule 806 . . . any prior or subsequent inconsistent statements by . . . the declarant, would be admissible to impeach [the declarant's] credibility.").

The Court reasoned that these statements were nonetheless inadmissible because they were "not inconsistent with the explanations [Singer] provided to defendants." ECF 2336 at 5. But that is not the standard and simply begs the question. The ultimate issue is what Singer told Mr. Abdelaziz about the "side door"—and there is no recording or other real time memorialization of how Mr. Singer described the "side door" to Mr. Abdelaziz. Rule 806 provides that "[w]hen a hearsay statement . . . has been admitted in evidence . . . [t]he court may admit evidence of the declarant's inconsistent statement or conduct." Mr. Abdelaziz was not attempting to introduce the Starbucks video and other recordings as inconsistent with what Singer told him—in fact, Mr. Abdelaziz argued that those statements *were consistent* with what Singer told him. Instead, Mr. Abdelaziz sought to introduce the impeachment evidence as inconsistent with what Mr. Singer told certain other parents in recordings introduced by the government. The exclusion of this critical evidence presents a substantial question on appeal.

14

*See United States v. Stewart*, 907 F.3d 677, 691 (2d Cir. 2018) (vacating conviction where the excluded impeachment material "might have undermined the [declarant's statement] in the eyes of the jury, … leaving the government 'with a substantially weaker case' as to [the defendant's] intent such that 'a guilty verdict would be far from assured'").

### F.   Prejudicial Variance

There is also a substantial question as to whether there was a prejudicial variance that would warrant a new trial. At most, the evidence presented at trial may have shown a conspiracy between Mr. Abdelaziz and Mr. Singer. But there is at least a "substantial question" as to whether the evidence at trial was sufficient to prove the conspiracy alleged in the indictment— that is, a nationwide conspiracy involving coaches at different academic institutions, test proctors, and all types of parents, who arranged to both bribe coaches and administrators and cheat on standardized tests.

Particularly relevant is *United States v. Morrow*, 39 F.3d 1228, 1231-33 (1st Cir. 1994). In *Morrow*, the First Circuit considered whether there was sufficient evidence that the defendants joined an overarching, on-going insurance fraud conspiracy, or only a smaller conspiracy with respect to a particular car. Judge Boudin recognized that this fact pattern "poses a tricky issue in conspiracy law that may not have been clearly addressed in this circuit." *Morrow* 39 F.3d at 1231. There was ample evidence that the two defendants, who both pled guilty, "engaged in a conspiracy to commit their respective fraud," but "each of the appellants has a colorable claim that, although guilty of conspiracy to commit mail fraud, neither participated in the overarching conspiracy charged in the indictment but rather each joined only in a smaller, separate conspiracy relating to a different car—[Defendant 1] being associated with the 1975 Corvette and [Defendant 2] with the 1958 Corvette." *Id.* at 1233-34. *See also United States v. Franco-*

*Santiago*, 681 F.3d 1, 8-9 (1st Cir. 2012); *United States v. Monserrate-Valentin*, 729 F.3d 31, 43 (1st Cir. 2013) (considering *Morrow* and *Franco-Santiago* and stressing that mistakes arise when conspiracy crimes are treated "as though it were a group rather than an act [i.e., of agreement]… Hence, 'the gist of the conspiracy offense remains the agreement, and it is therefore essential to examine what kind of agreement or understanding existed as to each defendant.'").

The government has never seriously engaged with this problem. Before trial, it repeatedly stressed that this issue was not ripe because it sounded in variance, which is not a valid reason for a motion to dismiss. Indeed, this argument saved the conspiracy counts before Judge Talwani, even as Judge Talwani severed the remaining defendants due to risks of undue prejudice. *See United States v. Ernst*, 502 F. Supp. 3d 637, 654 (D. Mass. 2020) ("Defendants' points are well-taken; the factual allegations in the Superseding Indictment do not readily lend themselves to the conclusion that these Defendants were part of a single overarching conspiracy… But [such] considerations … is not the question at the stage of a motion to dismiss for duplicity.")

After trial, however, the government contended that this is "an argument the Court has rejected numerous times," but that in any case, it had met its burden. ECF 2424 at 26. But the evidence it cited to meet its burden is completely irrelevant under *Morrow*, *Franco-Santiago*, and *Monserrate-Valentin*, which stress an individual defendant's knowledge of and intention to join a multi-crime conspiracy as the relevant question. First, the government relied heavily on the statements of Bruce Isackson—a parent who pled guilty—that he was aware other parents were involved and this made him more comfortable participating in the scheme. *See* ECF 2424 at 27. But Mr. Isackson's state-of-mind and knowledge is irrelevant to what Mr. Abdelaziz knew and intended regarding the multiplicity of objectives Mr. Singer might have been attempting to

effectuate, as required under *Morrow* and its progeny. *See United States v. Cintolo*, 818 F.2d 980, 1003 (1st Cir.1987) ("A conspiracy conviction requires that a defendant's membership in the conspiracy be proved on the basis of [the defendant's] own words and actions (not on the basis of mere association or knowledge of wrongdoing."). The government has yet to identify any of Mr. Abdelaziz's *own words and actions* which could possibly show beyond a reasonable doubt that Mr. Abdelaziz intended to join the nationwide conspiracy alleged in the indictment.

Furthermore, Mr. Isackson testified that he had never heard of Mr. Abdelaziz, who did not belong to the same Southern California circles as many of the charged parents. *See, e.g.*, Tr. of Sept. 14, 2021 at 47 ("I know nothing about Gamal Abdelaziz -- I've forgotten his first name. Gamal. Gamal."). And while the government made much of the evidence that Singer and other members of the central, on-going conspiracy had an interdependence in how they operated (such as by co-mingling funds and tasks), *see* ECF 2424 at 27 n.17, this is completely beside the point as to Mr. Abdelaziz's intent and knowledge with respect to joining that nationwide, ongoing conspiracy rather than a separate Abdelaziz-Singer conspiracy. *Morrow*, *Franco-Santiago*, and *Monserrate-Valentin* instruct that the relevant inquiry is not the actions of a group, but what Mr. Abdelaziz agreed to. *See also United States v. Carnagie*, 533 F.3d 1231, 1239 (10th Cir. 2008) ("What is required is a shared, single criminal objective, not just similar or parallel objectives between similarly situated people.").[4]

Against this backdrop, the issue of whether the Government adequately proved Mr. Abdelaziz was in a single, on-going, multi-object conspiracy with Mr. Wilson, Mr. Isackson, and

---

[4] In any case, Singer actively played the parents off of one another as competitors, seeking to buy the same limited assets. Tr. of Sept. 15, 2021 at 55–56 (Singer telling Wilson that "Jovan [Vavic] is giving me one boys slot" but "[t]here are five plus wanting in"). This shows that the parents did not have a common goal of getting several students into elite universities, but rather the individual goal of getting *their* child into an elite university. *See also United States v. Glenn*, 828 F.2d 855, 859 (1st Cir. 1987) (Breyer, J.) (explaining that "when the evidence shows competition rather than 'mutual dependence and assistance,' the court should find separate conspiracies".).

multiple unrelated parents is close question that "very well could be decided the other way." And if there was a variance, it was almost certainly prejudicial. Even this Court acknowledged that a variance would likely result in a mistrial. Tr. of Aug. 18, 2021 at 13. A variance would mean that piles of evidence regarding the words and actions of *other parents*, including Mr. Isackson, should not have been admitted as co-conspirator hearsay exceptions. It would also mean that evidence of money going to Donna Heinel personally—which the Court found was relevant to "how the conspiracy operated"— should have been excluded because it was not relevant to a "spoke" conspiracy between Mr. Singer and Mr. Abdelaziz. And perhaps most prejudicial of all, a variance resulting in a "spoke" conspiracy between Mr. Singer and Mr. Abdelaziz would mean that the government failed to establish venue in the District of Massachusetts with respect to Mr. Abdelaziz.[5]

### III.   If Any of The Substantial Questions of Law Are Decided Favorably, The First Circuit Will Likely Reverse The Conviction Or Order a New Trial

Finally, Mr. Abdelaziz satisfies the third criterion of section 3143, because if any of the substantial questions of law set forth above are decided in his favor, the First Circuit will "likely" reverse his conviction or order a new trial. To be clear, this criterion does not require Mr. Abdelaziz to show (or this Court to find) that the First Circuit will, in fact, reverse his conviction

---

[5] Although, in order to find a prejudicial variance, the First Circuit would have to find that the jury had insufficient evidence to convict Mr. Abdelaziz of joining the conspiracy alleged in the indictment, it is—in fact—questionable whether the jury did find Mr. Abdelaziz guilty of joining that conspiracy. The Court's instructions in this regard were erroneous, and could have led the jury to convict Mr. Abdelaziz of joining a conspiracy *other than the conspiracy* alleged in the indictment. In particular, the Court instructed the jury that the conspiracy alleged in Count I "alleges that the defendants, along with others, conspired to commit, quote, mail fraud and honest services mail fraud (and wire fraud and honest services wire fraud), that is, having devised and intending to devise a scheme and artifice to defraud and obtain money and property, to wit admission to the (University of Southern California), by means of materially false and fraudulent pretenses, representations, and promises, and to defraud and deprive (USC) of (its) right to the honest and faithful services of (its) athletic coaches and university administrators, through bribes and kickbacks." Tr. of Oct. 7, 2021 at 32. The undersigned promptly objected to this description of the conspiracy, which is inconsistent with the overarching, nationwide conspiracy alleged in the indictment that includes other universities (e.g. Georgetown) and also cheating on standardized tests. Nevertheless, the Court declined to correct the instruction, which left the jury with the incorrect understanding that they could convict Mr. Abdelaziz on Count I even if he only joined a conspiracy to defraud USC.

or order a new trial. Instead, it requires that the Court answer the hypothetical: *assuming* the substantial questions of law are decided in his favor, will a reversal or new trial "likely" result? "The 'likely to result' standard is applied flexibly—a question that can be regarded as "close" will often suffice." *United States v. Colon-Munoz*, 292 F.3d 18, 20 (1st Cir. 2002).  Indeed, the "likely to result" language is a requirement only "that the claimed error not be harmless or unprejudicial." *Bayko*, 774 F.2d at 523.

First, with respect to the questions of whether an admissions slot is "property" and whether a payment to a victim can constitute a "bribe," if the First Circuit decides these issues in Mr. Abdelaziz's favor, then it is clear the legal bases for both counts of conviction will have been voided.  But even if just one of these substantial questions of law is decided in Mr. Abdelaziz's favor, it is still "likely" that the First Circuit will order a new trial. For instance, if the bribery issue is decided in Mr. Abdelaziz's favor but the property issue is not, both the honest services theory on count 1 and count 2 in its entirety will have been reversed, but *theoretically* the property fraud portion of count 1 could survive. However, the First Circuit would nonetheless "likely" order a new trial in this scenario because of the severe prejudice of the references to bribes and bribery throughout the trial. If Mr. Abdelaziz is correct that a payment to the school is not a bribe, then the bribery theory should have been dismissed before the case even went to trial, and the ensuing prejudice of having to justify to the jury a payment that the First Circuit concluded was not and *could not* be illegal would so taint the jury's view of the evidence that a new trial focused narrowly on the property issue would be ordered.

If the evidentiary issues were decided in Mr. Abdelaziz's favor, the First Circuit would also "likely" order a new trial. Quite simply, the exclusion of either the USC evidence or the Singer evidence (or both) cannot be said to be harmless. The USC evidence could very well have

led the jury to believe that Gamal Abdelaziz **reasonably** believed that an exchange of money for preferential admissions treatment, including for student-athletes who otherwise would not be admitted as student-athletes, was accepted and welcomed and that therefore he had no specific intent to defraud USC. Likewise, the evidence could have convinced the jury that USC employees did *not* breach their fiduciary duty to USC by recruiting student-athletes in exchange for donations. In either case, the government would have not been able to satisfy an element of both counts 1 and 2, and the First Circuit would order a new trial. The same is true of the Singer evidence. If the jury believed that Mr. Singer's "pitch" regarding the side door was consistent with the excluded evidence rather than with Mr. Isackson's statement that "you'd have to be a fool" to not know that Mr. Singer was doing something illegal, the jury could have very well found that Mr. Abdelaziz did not have the specific intent to defraud USC or engage in federal program bribery. Indeed, particularly with respect to the Starbucks video, the Court acknowledged that it may be an appellate issue which could lead to a re-trial.  Tr. of Sept. 30, 2021 at 29.

Finally, with respect to the variance issue, the inquiries of "substantial question" and "likely" reversal or retrial merge. A prejudicial variance necessarily requires a reversal or new trial.

## CONCLUSION

For the reasons explained herein, Mr. Abdelaziz respectfully requests that the Court order his release during the pendency of his appeal.


Dated: March 18, 2022                              Respectfully submitted,

                                                   GAMAL ABDELAZIZ

By his attorneys,

/s/ *Brian T. Kelly*
Brian T. Kelly (BBO # 549566)
Joshua C. Sharp (BBO # 681439)
Lauren A. Maynard (BBO # 698742)
NIXON PEABODY LLP
53 State Street
Boston, MA  02109
617-345-1000
bkelly@nixonpeabody.com
jsharp@nixonpeabody.com
lmaynard@nixonpeabody.com

Robert Sheketoff (BBO # 457340)
One McKinley Square
Boston, MA  02109
(617) 367-3449

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed electronically on March 18, 2022, and thereby delivered by electronic means to all registered participants as identified on the Notice of Electronic Filing.

/s/ *Brian T. Kelly*
Brian T. Kelly